IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| AMERITAS LIFE INSURANCE CORP., | : |
| | : |
| Plaintiff, | : |
| | : |
| v. | : C.A. No. _____ |
| | : |
| WILMINGTON SAVINGS FUND SOCIETY, | : **JURY TRIAL DEMANDED** |
| FSB, SOLELY AS SECURITIES | : |
| INTERMEDIARY, | : |
| | : |
| Defendant. | : |

## COMPLAINT

Plaintiff, Ameritas Life Insurance Corp. ("Ameritas"), files and asserts its Complaint against Defendant, Wilmington Savings Fund Society, FSB, solely in its capacity as Securities Intermediary ("WSFS"), and in support thereof, alleges as follows:

## INTRODUCTION

1. This action involves a stranger-originated life insurance ("STOLI") policy that was manufactured on the life of Marvin Flaks (the "Insured"), who, upon information and belief, was induced to lend his life to investors who procured a $3 million wagering policy on his life (the "Policy") in violation of Delaware's Constitution, insurable interest laws, and public policy.

## PARTIES

2. Ameritas is a life insurance company incorporated under the laws of State of Nebraska with its principal place of business in the State of Nebraska. Ameritas is therefore a citizen of the state of Nebraska for purposes of diversity jurisdiction.

3. Upon information and belief, Defendant, WSFS, is a national banking association with its principal place of business at 500 Delaware Avenue, Wilmington, DE 19801. WSFS is a citizen of the State of Delaware. WSFS is named as a party to this action solely because, as set

forth below, in its capacity as securities intermediary, it holds bare legal title as securities intermediary of the Policy.

## JURISDICTION AND VENUE

4. This Court has subject-matter jurisdiction under 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000, and because there is complete diversity of citizenship between Plaintiff, a citizen of Nebraska, and Defendant, a citizen of Delaware.

5. This Court has personal jurisdiction over Defendant, WSFS, because Ameritas' Complaint arises out of Defendant's and its predecessors' transaction of business in Delaware and its contracts to supply services in Delaware. *See* 10 Del. C. § 3104(c)(1), (2). Defendant purposefully availed itself of the rights and privileges of doing business in Delaware.

6. Moreover, this Court has personal jurisdiction over Defendant, WSFS, because it is a citizen of the State of Delaware.

7. The Court also has in rem jurisdiction over the Policy because Ameritas's core claim is that the Policy is void *ab initio*. As detailed below, the Policy was initially held and owned by a Delaware statutory trust that was physically located in Delaware and which at all times operated through a Delaware corporate trustee or securities intermediary located in Delaware.

8. Venue is proper in this judicial district under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to Plaintiff's claims occurred in the District of Delaware.

9. Venue is additionally proper in this judicial district because Defendant is a citizen of the State of Delaware.

## FACTS COMMON TO ALL CLAIMS

**A. The Policy Was Incepted As a Wager By Investors Who Lacked An Insurable Interest In Mr. Flaks' Life**

10. For hundreds of years, speculators have sought to use life insurance to wager on the lives of strangers. *See, e.g.*, *PHL Var. Ins. Co. v. Price Dawe 2006 Ins. Trust*, 28 A.3d 1059, 1069 (Del. 2011) ("*Price Dawe*") (human life wagering has existed "[s]ince the initial creation of

life insurance"); *Sun Life v. Wells Fargo*, 238 N.J. 157, 164 (2019) (human life wagering has existed since at least 1419). Under the laws of most jurisdictions, including Delaware, such wagering transactions are void *ab initio* and of no effect. *See e.g.*, *Wells Fargo Bank v. Est. of Malkin,* 278 A.3d 53, 56, 59, 65-66 (Del. 2022) ("*Malkin*"); *Lavastone Capital v. Estate of Berland*, 266 A.3d 964, 969, 970 n.17 (Del. 2021) ("*Berland*"); *Price Dawe*, 28 A.3d at 1059.

11. Although speculators have been around for hundreds of years, never has the human life wagering problem been more wide-spread or involved such vast amounts of money than in recent years. In the early 2000s, institutional investors began pooling large blocks of high-value life insurance policies into special purpose vehicles, such as tax-exempt entities or trusts, the interests of which were securitized and sold to other investors. *See*, *e.g.*, Susan Lord Martin, *Betting on the Lives of Strangers: Life Settlements, STOLI, and Securitization*, 13 U. Pa. J. Bus. L. 173, 192 (2010).

12. Making matters worse, in the early 2000s, there was not a sufficient supply of existing life insurance policies to satisfy investor demand. In particular, investors were interested in high-face amount policies insuring the lives of senior citizens, but there were only a limited number of seniors who had unwanted policies of sufficiently high value. As a result, promoters sought to solve the supply side shortage by generating new, high value policies. These resulting life insurance policies came to be known as STOLI policies.

13. The specific mechanisms by which each funder's STOLI program operated could and often did vary in one respect or another. But each shared basic similarities including that the policies at issue were procured and/or ultimately paid for by third parties without an insurable interest in the insured.

14. In Delaware and other places, not only do these STOLI policies violate insurable interest laws, but they take advantage of senior citizens and otherwise distort the proper use of life insurance—which is to provide actual protection to an insured's family, or others with an insurable interest in the insured, in the event an untimely death—into a cash machine whereby a stranger to the insured is actually more interested in seeing the insured dead than alive.

15. In the mid-2000s, Marvin Flaks, was in his mid-seventies living in Henderson, Nevada.

16. Upon information and belief, in or around early 2007, investors who were a part of the Ocean Gate STOLI program used Mr. Flaks to procure millions of dollars of life insurance—not for Mr. Flaks or his family or for a legitimate insurance purpose—but rather for investors.

17. Upon information and belief, investors procured at least one $3 million dollar life insurance policy on Mr. Flaks' life.

18. Upon information and belief, the investors did not have an insurable interest in Mr. Flaks' life and would not have been able to acquire the Policy had they not used Mr. Flaks to generate it in the first instance.

19. Specifically, as early as March 2007, Union Central Life Insurance Company ("Union Central") began receiving inquiries about issuing a life insurance policy insuring the life of a Nevada resident, Marvin Flaks, for $3,000,000.

20. Union Central was provided with an insurance application (the "First Application") insuring the life of Marvin Flaks that listed Betty Flaks, the Insured's wife, as the beneficiary of the policy.

21. In June 2007, Union Central was provided a second application ("Second Application") insuring the life of Marvin Flaks seeking a $3,000,000 face amount universal life policy that listed the Marvin Flaks Life Insurance Trust, a Delaware Trust, (the "Flaks Trust") as the owner and beneficiary of the policy. A true and correct copy of the Second Application, with appropriate redactions of personal identifying information, is attached as Exhibit A.

22. The Second Application identified the Flaks Trust as a Delaware trust, formed under Delaware law on June 28, 2007, and named Brian A. Sullivan, Esq. as the trustee of the Flaks Trust. *Id.* at 4. Upon information and belief, Mr. Sullivan conducted business out of Wilmington, Delaware.

23. The Second Application also represented to Union Central that the Insured was retired, had a gross income of $100,000, and had a net worth of $3 million. *Id.* at 2, 8.

24. The Second Application was signed on June 28, 2007 in Henderson, Nevada by the Insured. *Id.* at 14.

25. The Second Application was also signed on July 9, 2007 by Brian A. Sullivan, Esq. as trustee of the Flaks Trust, as proposed owner and beneficiary of the purported policy. *Id.* at 16.

26. The Second Application contained declarations that the statements and answers in the Second Application were complete and true to the best of the signatories' knowledge and belief. *Id.* at 14, 16.

27. Thus, in completing the Second Application, the signatories knew that they were required to provide truthful, accurate, and honest responses to the questions presented. Furthermore, they knew that Union Central would rely upon the statements recorded on the Second Application in determining whether to issue a policy with the face amount requested, or whether to issue a policy at all.

28. The Insured, the insurance agent (Anthony Socci), and Brian A. Sullivan Esq. (as trustee of the Flaks Trust) also executed a Statement of Policyowner and Agent Intent (the "Statement of Intent"). A true and correct copy of the Statement of Intent is attached as Exhibit B.

29. The Statement of Intent included a certification that: (1) the policy being purchased was not presently intended to be assigned or sold; (2) they had not spoken with anyone offering to pay them for the policy; (3) they had not been offered "free" or "no cost" insurance; (4) they did not, and did not anticipate, completing any loan papers in connection with the policy; and (5) they had not previously sold or assigned a life insurance policy to a third party. *Id.* at 2.

30. On or about July 17, 2007, in reliance on the Second Application and other documents and information provided to Union Central, including the Statement of Intent, Union Central issued policy number U000038534, insuring the life of the Insured, with a face amount of $3 million, for delivery to Brian A. Sullivan, Esq., the trustee of the Flaks Trust, in Delaware. A true and correct copy of the Policy is attached as Exhibit C.

31. Upon information and belief, Mr. Sullivan, as trustee of the Flaks Trust, acknowledged physical delivery of the Policy in Wilmington, Delaware, by executing a policy delivery receipt.

32. On or about August 6, 2007, an initial premium payment of $200,850 was made for the Policy in the form of a wire transfer that lists Brian A. Sullivan, Esq. as the trustee as well as Wilmington Sav Fund Society FSB.

33. Upon information and belief, and unbeknownst to Union Central at the time, at no point was the Insured or his wife at risk that their own funds would be ultimately used to pay premiums on the Policy.

34. On or about July 20, 2009, Union Central received a request to change the trustee of the Flaks Trust from Mr. Sullivan to Christiana Bank & Trust Company ("Christiana Bank"); this request was purportedly executed by Cedric Strother for Christiana Bank, as trustee of the Flaks Trust, on July 20, 2009.

35. On or about September 1, 2009, Union Central approved the change in trustee to Christiana Bank.

36. On or about December 28, 2010, Union Central was notified that Christiana Bank was succeeded as trustee by WSFS due to merger.

37. On or about June 4, 2015, Union Central received a request to change both the owner and beneficiary of the Policy, each dated May 22, 2015. The documents changed the owner and beneficiary from the Flaks Trust, through WSFS as its trustee, to WSFS as Securities Intermediary for an undisclosed third party.

38. On July 1, 2014, Union Central merged into Ameritas, and as a result, with respect to the Policy, Ameritas is the successor in interest to Union Central.

B. **The Policy Was Procured as Part of an Illegal Wagering Scam to Gamble on the Life of Mr. Flaks.**

39. Upon information and belief, the Insured died on November 5, 2022.

40. Following receipt of notification of death from third-party administrators for WSFS, as Securities Intermediary, Ameritas commenced a review of the purported Policy and has determined, upon information and belief, that it was procured as an illegal wager on the life of the Insured as part of a STOLI scheme in violation of Delaware law.

41. Ameritas has further determined, upon information and belief, that the Policy lacked an insurable interest prior to and at its inception and that any appearance of insurable interest was superficial only and was in reality a complete and total sham designed to conceal the true wagering nature of the Policy.

42. Ameritas has further determined, upon information and belief, that the Flaks Trust itself was an illegal sham created to give the false appearance of a valid insurance trust, and thus to give the superficial—but entirely false—appearance of a legitimate insurable interest.

43. Moreover, upon information and belief, the source of the funds for the initial premium payment on the Policy was not the Insured or any person or valid entity possessing an insurable interest in his life. Instead, the source of the premium was a third-party investor(s) who lacked an insurable interest in the Insured's life and was/were participating in a wager on the Insured's life.

44. Upon information and belief, individuals whose lives were insured under this type of program, the Ocean Gate Program, were used by investors as an instrumentality to effectuate the gamble. The seniors were financially induced to allow investors to use them to create policies for investors. Arrangements were made—prior to the policies being taken out—for the policies to be funded, either directly or indirectly, by investors and then formally transferred to investors either before or shortly after the policies were put in force.

45. Upon information and belief, the Policy was procured pursuant to such a scheme.

46. Upon information and belief, the Flaks Trust was either never funded or nominally funded, or in the alternative was funded with money not ultimately from the Insured or any person with an insurable interest in the Insured's life, but by using funds ultimately provided by third-party stranger investors with no insurable interest in the Insured.

47. Upon information and belief, before the Policy was ever issued, the insureds were financially induced to allow strangers to cause policies on their lives to be procured by and for investors through arrangements made prior to the Policy being effected.

48. Upon information and belief, either before the Policy was issued, at the same time, or shortly thereafter, the understanding and/or agreement to transfer the beneficial interest in the Flaks Trust was formalized, pursuant to which the Insured and/or his beneficiaries received compensation and the third-party investors were formally named beneficiaries of the Flaks Trust.

49. Upon information and belief, premiums were paid with funds ultimately provided by the third-party investors.

## FIRST CAUSE OF ACTION

## DECLARATORY JUDGMENT – ILLEGAL HUMAN LIFE WAGERING CONTRACT

50. Ameritas hereby incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth herein at length.

51. The Policy was applied for and signed in Delaware by a Delaware trust, as owner and beneficiary of the Policy. The Policy was then actually delivered to the trustee of the Flaks Trust, Brian Sullivan, in Wilmington, Delaware. The Policy is governed by Delaware law. 18 Del. C. § 2704(e)(4), (g).

52. The Delaware Constitution provides that "[a]ll forms of gambling are prohibited in this State except [those explicitly set forth in the statute]." Del. Const. Art. II, § 17. Moreover, the Delaware Supreme Court in *Price Dawe* and more recently in *Berland* and *Malkin* addressed the issues associated with life insurance policies used to wager on the death of insureds and has held that, under Delaware law, such policies are mere wagering contracts and are void *ab initio*.

53. As set forth herein, the Policy was, from the outset, procured or caused to be procured by the Ocean Gate program and its agents and other third parties on the life of Mr. Flaks for the benefit of investors with no insurable interest in his life. Whether Mr. Flaks knew the details of this scheme or his identity was merely used as an instrumentality to procure the Policy, stranger

investors were wagering on Mr. Flaks' life and hoping to trigger a secondary market cash-in on the Policy's death benefit.

54. Accordingly, Ameritas seeks, and is entitled to, a declaratory judgment that the Policy was an illegal wagering contract that violated the Delaware's Constitution, statutes, common law, and public policy, thus rendering the Policy void *ab initio*.

## SECOND CAUSE OF ACTION

## DECLARATORY JUDGMENT – LACK OF INSURABLE INTEREST

55. Ameritas hereby incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth herein at length.

56. The Policy was intentionally structured to be a "trust-owned insurance policy" as defined by Delaware's insurable interest statute, 18 Del. C. § 2704(e)(4). Because the Policy was delivered to the trustee of the Flaks Trust, Brian A. Sullivan Esq., in Wilmington, Delaware, the existence of an insurable interest "shall be governed by [Delaware's insurable interest statute] without regard to [the] insured's state of residency or location." 18 Del. C. § 2704(g).

57. Under Delaware law, only a valid and legitimate insurance trust can have a valid insurable interest in the life of the insured. *See* 18 Del. C. § 2704(c)(5).

58. However, here, because the Flaks Trust was an illegitimate cover for the wager on Mr. Flaks' life, the Flaks Trust lacked any insurable interest in the life of Mr. Flaks. Accordingly, no insurable interest existed at the time of issuance of the Policy, and the Policy is void *ab initio* for lack of insurable interest.

59. Additionally, the Policy was applied for and issued at the behest of individuals or entities—with no insurable interest in the life of the insured—who procured the Policy for the purpose of benefitting stranger investors in the life insurance secondary market. Accordingly, the Policy is void *ab initio* for lack of an insurable interest.

60. Therefore, Ameritas seeks, and is entitled to, a declaratory judgment that the Policy lacked insurable interest because it was procured by and for the benefit of strangers without an insurable interest under Delaware law.

WHEREFORE, Ameritas respectfully requests the entry of an Order by this Court as follows:

A. Declaring that the Policy is void *ab initio* due to it having been procured as a wagering contract on the life of Mr. Flaks;

B. Declaring that the Policy is void *ab initio* due to it having been procured without a valid insurable interest at inception;

C. Declaring that because the Policy is void *ab initio* it never existed;

D. Awarding Ameritas attorneys' fees and costs associated with bringing this lawsuit, as determined by the Court; and

E. Awarding Ameritas any further relief this Court deems appropriate.

DATED: March 3, 2023

COZEN O'CONNOR

*/s/ Kaan Ekiner*
Kaan Ekiner (5607)
1201 North Market St., Ste. 1001
Wilmington, DE 19801
Phone: 302-295-2046
Fax: 302-250-4356
kekiner@cozen.com

Michael J. Miller (*pro hac vice forthcoming*)
Joseph M. Kelleher (*pro hac vice forthcoming*)
Brian D. Burack (*pro hac vice forthcoming*)
Victoria G. Mazzola (*pro hac vice forthcoming*)
1650 Market St., Ste. 2800
Philadelphia, PA 19103

*Attorneys for Plaintiff,*
*Ameritas Life Insurance Corp.*