# Exhibit 5

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| AMERITAS LIFE INSURANCE CORP., <br><br> Plaintiff, <br><br> v. <br><br> WILMINGTON SAVINGS FUND SOCIETY, FSB, SOLELY AS SECURITIES INTERMEDIARY, <br><br> Defendant, <hr> WILMINGTON SAVINGS FUND SOCIETY, FSB, SOLELY AS SECURITIES INTERMEDIARY, <br><br> Counter-Claimant, <br><br> v. <br><br> AMERITAS LIFE INSURANCE CORP., <br><br> Counter-Defendant. | C.A. No. 23-236-GBW |

## PLAINTIFF/COUNTERCLAIM DEFENDANT'S RULE 26(a)(1)
## INITIAL DISCLOSURES

Pursuant to Federal Rule of Civil Procedure Rule 26(a)(1), Plaintiff/Counterclaim Defendant Ameritas Life Insurance Corp. ("Ameritas" or "Plaintiff"), by and through its undersigned attorneys, make the following Initial Disclosures:

## I.  <u>Rule 26(a)(1)(A)(i) Individuals</u>

The following individuals are likely to have discoverable information that Ameritas may use to support its claims or defenses concerning Policy No. U000038534 (the "Policy") taken out on the life of Marvin Flaks (the "Insured") at issue in this litigation:

**1.   Wilmington Savings Fund Society ("WSFS")**
      c/o Counsel to Defendant WSFS
      500 Delaware Avenue
      Wilmington, DE 19801

WSFS is expected to provide information concerning, *inter alia*, the business of WSFS; the relationship between WSFS and the securities entitlement holder for the Policy; the transfer of ownership for the Policy; the identity of the true beneficiary of the Policy; the application for the Policy; the solicitation, procurement, and delivery of the Policy; the sources of funding for the premiums paid on the Policy; and the claim for the death benefits under the Policy. WSFS is also expected to provide information concerning and the nature of any dealings with, among others, the individuals and entities identified in these Initial Disclosures, and any other individuals or entities identified in the pleadings or its Initial Disclosures.

**2.   Brian A. Sullivan, Esq.**
      300 Delaware Avenue
      Wilmington Delaware, DE 19899

Brian A. Sullivan, Esq., is expected to provide information concerning, *inter alia*, the creation of the Trust involved in this litigation; the intended purpose of the Trust; the intended beneficiary of the Trust; the source of funds used by the Trust to pay premiums on the Policy; the application for the Policy; the intended purpose of the Policy; any transfer or transfers of the beneficial interest in the Trust and/or the Policy; and/or the nature of the trustee's and/or the Trust's dealings with, among others, WSFS, the individuals and entities identified in these Initial

Disclosures, and any other individuals or entities identified in the pleadings or in WSFS's Initial Disclosures.

3.      **Werb and Sullivan**
        1225 North King Street, Suite 600,
        Wilmington, DE 19801

Werb and Sullivan is expected to provide information concerning, *inter alia*, the creation of the Trust involved in this litigation; the intended purpose of the Trust; the intended beneficiary of the Trust; the source of funds used by the Trust to pay premiums on the Policy; the application for the Policy; the intended purpose of the Policy; any transfer or transfers of the beneficial interest in the Trust and/or the Policy; and/or the nature of the trustee's and/or the Trust's dealings with, among others, WSFS, the individuals and entities identified in these Initial Disclosures, and any other individuals or entities identified in the pleadings or in WSFS's Initial Disclosures.

4.      **ITM TwentyFirst, LLC ("ITM")**
        333 South 7th Street
        Minneapolis, MN 55402

ITM is expected to provide information concerning, *inter alia*, the Policy; the source of funding for the premiums paid on the Policy; the application for the Policy; the method and circumstances of any transfers of ownership for the Policy; the claim for the death benefits under the Policy; the nature of the involvement and role in the application for, procurement of, financing of, and transfer of, any interest in the Policy or in any trusts in the name of the Marvin Flaks; information regarding the relationship between itself, the insurance producer for the Policy, purported premium finance lenders, and/or others; ITM's interactions with and relationship to any defendants (and their counsel) or any member of the Flaks family; communications with those on whose behalf or in concert with which ITM worked; contacts of ITM, and those on whose behalf or in concert with which ITM worked, in this forum; citizenship of ITM; ITM's (and their counsel's) knowledge of the existence of Ameritas' claims; any life expectancy reports conducted

regarding the Insured under the Policy; any mortality profiles regarding the Insured; and/or any communications or business with the individuals or entities identified in these Initial Disclosures.

### 5.     Accenture Credit Services ("Accenture")
161 N Clark St.
Chicago, IL 60601

Accenture is expected to provide information concerning, *inter alia*, the Policy; the source of funding for the premiums paid on the Policy; the application for the Policy; the method and circumstances of any transfers of ownership for the Policy; the claim for the death benefits under the Policy; the nature of the involvement and role in the application for, procurement of, financing of, and transfer of, any interest in the Policy or in any trusts in the name of the Marvin Flaks; information regarding the relationship between itself, the insurance producer for the Policy, purported premium finance lenders, and/or others; ITM's interactions with and relationship to any defendants (and their counsel) or any member of the Flaks family; communications with those on whose behalf or in concert with which Accenture worked; contacts of Accenture, and those on whose behalf or in concert with which Accenture worked, in this forum; citizenship of Accenture; Accenture's (and their counsel's) knowledge of the existence of Ameritas' claims; any life expectancy reports conducted regarding the Insured under the Policy; any mortality profiles regarding the Insured; and/or any communications or business with the individuals or entities identified in these Initial Disclosures.

### 6.     Ocean Gate[1]

Ocean Gate, including its subsidiary and other affiliate entities, is expected to provide information concerning, *inter alia*, the source of funds used to pay premiums on the Policy; the

---

[1] "Ocean Gate" includes Ocean Gate Life Settlement Program, LP and all other subsidiary and affiliate entities.

application for the Policy; the intended purpose of the Policy; the nature of the Ocean Gate premium finance program; any premium financing loan involving the Trust and the terms and conditions thereof; any repayment of said loan; any ancillary agreements or contracts executed in connection with any loan and the terms and conditions thereof; the underwriting and/or due diligence that was conducted, including, but not limited to, communications surrounding and the actual underwriting, mortality reports, and life expectancy reports; any transfer or transfers of any ownership or any beneficial interest in the Trust and/or the Policy; any purported surrender of the Policy in satisfaction of the loan; any purported sale of the Policy on the life settlement market and subsequent transfer of ownership; the nature of Ocean Gate's role in establishing the Trust and/or in connection with the application for, procurement of, financing of, and transfer of the Policy; and Ocean Gate's interactions with and relationship to any of the persons named herein.

       7.    **Anthony Socci**
            6515 Main Street
            Trumbull, CT 06611

Anthony Socci is expected to provide information concerning, *inter alia*, the creation of the Policy; the source of funds used to pay premiums on the Policy; the application for the Policy; the intended purpose of the Policy; any transfer or transfers of the ownership or the beneficial interest in the Trust and/or the Policy; any purported sale of the Policy on the life settlement market and subsequent transfer of ownership; and the nature of any third party's role in establishing the Trust and/or in connection with the application for procurement of, financing of, and transfer of, the Policy; and/or Mr. Socci's interactions with and relationship to, among others, the individuals and entities identified in these Initial Disclosures, the pleadings or in WSFS's Initial Disclosures.

       8.    **Omega Financial Group, LLC**
            6515 Main Street
            Trumbull, CT 06611

Omega Financial Group, LLC is expected to provide information concerning, *inter alia*, the creation of the Policy; the source of funds used to pay premiums on the Policy; the application for the Policy; the intended purpose of the Policy; any transfer or transfers of the ownership or the beneficial interest in the Trust and/or the Policy; any purported sale of the Policy on the life settlement market and subsequent transfer of ownership; and the nature of any third party's role in establishing the Trust and/or in connection with the application for procurement of, financing of, and transfer of, the Policy; and/or Omega Financial Group, LLC's interactions with and relationship to, among others, the individuals and entities identified in these Initial Disclosures, the pleadings or in WSFS's Initial Disclosures.

### 9.     Davida Trick

Davida Trick is expected to provide information concerning, *inter alia*, the financial status of Marvin Flaks; Marvin Flaks' estate planning needs; trusts benefiting the family or next of kin of Marvin Flaks; communications or business with the individuals or entities identified in these Initial Disclosures; the solicitation, procurement, and delivery of the Policy; and the source of funding for premiums paid on the Policy.

### 10.     Corporate Representative of Ameritas
c/o Cozen O'Connor, as Counsel to Ameritas

One or more corporate representatives of Ameritas are expected to provide information concerning Ameritas' issuance of the Policy; Ameritas' corporate policy against issuing policies intended to benefit stranger-investors; Ameritas' corporate policy against issuing policies that are funded by non-recourse premium financing; Ameritas' administration of the Policy; and Ameritas' receipt, review, and investigation of the claim for death benefits under the Policy.

**11.**     Ameritas also intends to seek documents and information from others whose identities have been concealed from Ameritas, including but not limited to from WSFS's securities

entitlement holder in connection with the Policy, prior owners and beneficiaries of the Policy and/or any trusts in the name of the Insured, servicers retained in connection with the Policy, and life expectancy providers that rendered services in connection with the Policy.

## II.    Rule 26(a)(1)(A)(ii) Documents

Ameritas may use the following categories of documents to support its claims or defenses:

1.    The Policy;

2.    Documents relating to the Trust;

3.    Documents relating to the payment of premiums on the Policy;

4.    The Policy's delivery receipt(s);

5.    Documents relating to the death benefit claim submitted for the Policy;

6.    Ameritas' Policy file;

7.    Documents concerning Ameritas' position with regard to issuing life insurance policies lacking insurable interest, life insurance policies procured for the benefit of investors, and life insurance policies funded by non-recourse premium financing;

8.    Documents identified by WSFS in its Initial Disclosures or otherwise produced by WSFS in this litigation;

9.    Documents in the possession of other persons or entities, including, but not limited to, communications and transactional documents relating to the solicitation, purpose, application, delivery, placement, ownership, financing, and transfer(s) of the Policy;

10.    Documents in the possession, custody, or control of non-parties or Defendant's securities entitlement holder in connection with the Policy relating to the Policy or any trusts in the name of the Insured, including,

7

among other things, their acquisition and ownership of the Policy; any risk disclosures provided in connection with their acquisition of the Policy, either individually or as part of a portfolio that contained the Policy; any payment of premium for the Policy by one or more of them; any request made, directly or indirectly, for a copy of the Insured's death certificate; the submission of a claim for the Policy death benefit(s) by Defendant or its securities entitlement holder(s)/undisclosed principal(s), either directly or indirectly; and

11.    Additional relevant documents to be identified during the course of discovery, including as may be relevant to any counterclaims or defenses that may ultimately be asserted by Defendant in this action.

### III.    Rule 26(a)(1)(A)(iii) Damages

Ameritas is seeking a declaration regarding the validity of the Policy, a form of relief which is not capable of "computation" under Rule (a)(1)(iii), as well as attorneys' fees and costs associated with bringing this lawsuit, as determined by the Court.  Ameritas will amend these disclosures should Ameritas amend its complaint to include a claim for damages.

### IV.    Rule 26(a)(1)(A)(iv) Insurance Agreements

Not applicable.

Dated: July 27, 2023                        **COZEN O'CONNOR P.C.**

                                            */s/ Kaan Ekiner*
                                            Kaan Ekiner (No. 5607)
                                            1201 North Market St., Ste. 1001
                                            Wilmington, DE 19801
                                            302-295-2046
                                            kekiner@cozen.com

Joseph M. Kelleher (admitted *pro hac vice*)
Kara E. Cheever (admitted *pro hac vice*)
Victoria G. Mazzola (admitted *pro hac vice*)
1650 Market St., Ste. 2800
Philadelphia, PA 19103

*Attorneys for Plaintiff/Counterclaim Defendant
Ameritas Life Insurance Corp.*

# Exhibit 6

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| AMERITAS LIFE INSURANCE CORP., | |
| Plaintiff, | |
| v. | |
| WILMINGTON SAVINGS FUND SOCIETY, FSB, SOLELY AS SECURITIES INTERMEDIARY, | |
| Defendant. | C.A. No. 23-236-GBW |
| WILMINGTON SAVINGS FUND SOCIETY, FSB, SOLELY AS SECURITIES INTERMEDIARY, | |
| Counter-Claimant, | |
| v. | |
| AMERITAS LIFE INSURANCE CORP., | |
| Counter-Claim Defendant. | |

**AMERITAS LIFE INSURANCE CORP.'S RESPONSES AND OBJECTIONS TO
WILMINGTON SAVINGS FUND SOCIETY, FSB'S FIRST SET OF
<u>REQUESTS FOR PRODUCTION OF DOCUMENTS</u>**

Pursuant to Rules 26 and 34 of the Federal Rules of Civil Procedure and the Local Rules

of Civil Practice and Procedure of the United States District Court for the District of Delaware,

Plaintiff, Counterclaim Defendant Ameritas Life Insurance Corp. ("Ameritas"), by and through its

undersigned attorneys, hereby submits the following responses and objections to Defendant,

Counterclaim Plaintiff Wilmington Savings Fund Society, FSB's ("WSFS") First Set of Requests

for Production of Documents, dated August 9, 2023 (each a "Request, and collectively the

"Requests").

## PRELIMINARY STATEMENT

The following responses and objections are based upon the facts, documents, and information presently known and available to Ameritas. Discovery, investigation, research, and analysis are ongoing in this case and may disclose the existence of additional documents and information pertinent to these Requests. Without obligating itself to do so, Ameritas reserves the right to change or supplement these responses and objections, as additional documents and information are discovered, revealed, recalled, or otherwise ascertained.

## GENERAL OBJECTIONS

Ameritas sets forth the following general objections, which are applicable to each of the Requests. Although additional specific objections may be asserted by Ameritas in response to specific Request, the non-assertion of specific objections is not a waiver of any general objections with respect to any such specific Request.

1.      Ameritas generally objects to the definitions and instructions of the Requests to the extent that they attempt to impose an obligation on Ameritas that exceeds the requirements of the Federal Rules of Civil Procedure.

2.      Ameritas generally objects to the Requests to the extent that they seek the disclosure of information and/or documents that are protected by the attorney-client privilege, the work-product doctrine, the common-interest doctrine, or any other applicable claim of protection or privilege. Nothing contained in these responses and objections is intended as, or shall be in any way deemed, a waiver of the attorney-client privilege, the work-product doctrine, the common-interest doctrine, or any other applicable claim of protection or privilege. If Ameritas withholds information or documents on the basis of privilege, it will produce a privilege log in accordance with the ESI Protocol dated July 27, 2023 (ECF 19).

2

3.      Ameritas generally objects to the Requests to the extent they seek: (a) information or documents outside of Ameritas's possession, custody or control; (b) information and/or documents already within WSFS's possession, custody or control; and/or (c) information and/or documents in the public domain or otherwise available to WSFS.

4.      Ameritas generally objects to the Requests to the extent that they seek to impose undue expense on Ameritas or are overly broad, unduly burdensome, and/or oppressive.

5.      Ameritas generally objects to the Requests to the extent they are vague and/or ambiguous.

6.      Ameritas generally objects to the Requests to the extent that they seek information and/or documents that is not relevant to this action and not reasonably calculated to lead to the discovery of admissible evidence.

7.      Ameritas generally objects to the Requests to the extent that they are not proportional to the issues and needs of this case.

8.      Ameritas generally objects to the Requests to the extent that they seek the production of confidential information and/or documents containing confidential information including personal, medical, and financial information regarding Ameritas's insureds, confidential information regarding producers, other confidential information, and/or proprietary information. Ameritas will produce responsive documents containing such information as confidential pursuant to a Protective Order entered in this legal action (ECF 18).

9.      Ameritas responds to the Requests subject to, without intending to waive, and expressly reserving: (a) any objection to materiality, relevance, privilege, and admissibility of any information or documents disclosed herein; and (b) the right to object to further discovery involving or relating to the subject matter of any information or documents disclosed herein.

3

10.     Nothing herein shall be construed as an admission of the truth or accuracy of any characterization or statement of any kind contained in the Requests, or the admissibility as evidence of any information or documents disclosed herein.

11.     By responding to the Requests, Ameritas neither admits nor concedes the appropriateness or the accuracy of the definitions provided by WSFS. Ameritas responds to the Requests in accordance with the applicable law and according to Ameritas's understanding of the fair and reasonable meaning of each Request. To the extent that Ameritas uses a defined term in responding to these Requests, such use of a defined term is for ease of reference only and shall not be construed as an adoption of the definition provided by WSFS or a waiver of any objection herein.

12.     Where Ameritas states that it will produce documents responsive to a Request, it means that Ameritas will produce such responsive documents that can be located after a reasonable search.

## **REQUESTS**

1.     All Documents that relate to Marvin Flaks or Betty Flaks.

**RESPONSE:** Ameritas objects to this Request on the grounds that it seeks "[a]ll" documents and thus is not proportional to the needs of the case, overly broad, unduly burdensome, and oppressive. Subject to and without waiving its general and specific objections, Ameritas will produce non-privileged documents responsive to this Request that can be located after a reasonable search.

2.     All Documents that relate to Davida Trick, including but not limited to documents and Communications that relate to the April 15, 2023 witness statement of Davida Trick submitted in connection with this action.

**RESPONSE:** Ameritas objects to this Request on the grounds that it seeks "[a]ll" documents and thus is not proportional to the needs of the case, overly broad, unduly burdensome, and oppressive. Ameritas further objects to this Request to the extent that it seeks documents protected by the attorney-client privilege, the work-product doctrine, the common-interest doctrine, or any other applicable claim of protection or privilege. Subject to and without waiving

LEGAL\65796643\1

its general and specific objections, Ameritas will produce non-privileged documents responsive to this Request from before March 3, 2023 (the date the Complaint in this action was filed) that can be located after a reasonable search.

3.      All Documents that relate to any Communications between or among You and Davida Trick, including but not limited to telephone logs, notes, and call summaries.

**RESPONSE:** Ameritas objects to this Request on the grounds that it seeks "[a]ll" documents and thus is not proportional to the needs of the case, overly broad, unduly burdensome, and oppressive. Ameritas further objects to this Request to the extent that it seeks documents protected by the attorney-client privilege, the work-product doctrine, the common-interest doctrine, or any other applicable claim of protection or privilege. Subject to and without waiving its general and specific objections, Ameritas will produce non-privileged documents responsive to this Request from before March 3, 2023 (the date the Complaint in this action was filed) that can be located after a reasonable search.

4.      All Documents that relate to the Flaks Trust.

**RESPONSE:** Ameritas objects to this Request on the grounds that it seeks "[a]ll" documents and thus is not proportional to the needs of the case, overly broad, unduly burdensome, and oppressive. Subject to and without waiving its general and specific objections, Ameritas will produce non-privileged documents responsive to this Request that can be located after a reasonable search.

5.      All Documents that relate to Ocean Gate, including but not limited to Communications about Ocean Gate.

**RESPONSE:** Ameritas objects to this Request on the grounds that it seeks "[a]ll" documents and thus is not proportional to the needs of the case, overly broad, unduly burdensome, and oppressive. Ameritas further objects to this Request on the grounds that it is vague and ambiguous. Ameritas further objects to this Request to the extent that it seeks documents protected by the attorney-client privilege, the work-product doctrine, the common-interest doctrine, or any other applicable claim of protection or privilege. Subject to and without waiving its general and specific objections, Ameritas will produce non-privileged documents responsive to this Request that can be located after a reasonable search.

6.      All Documents that relate to the Policy, including but not limited to the application for, underwriting of, and issuance of the Policy.

**RESPONSE:** Ameritas objects to this Request on the grounds that it seeks "[a]ll" documents and thus is not proportional to the needs of the case, overly broad, unduly burdensome, and oppressive. Subject to and without waiving its general and specific objections, Ameritas will produce non-privileged documents responsive to this Request that can be located after a reasonable search.

7.      All Documents comprising Your underwriting file for the Policy.

**RESPONSE:** Ameritas objects to this Request on the grounds that it seeks "[a]ll" documents and thus is not proportional to the needs of the case, overly broad, unduly burdensome, and oppressive. Subject to and without waiving its general and specific objections, Ameritas will produce non-privileged documents responsive to this Request that can be located after a reasonable search.

8.      All Documents that relate to any inquiry or investigation conducted by You or on

Your behalf at any time related to the Policy, including but not limited to, ascertaining the existence

of an insurable interest at the inception of the Policy, or ascertaining the truth or falsity of the

representations made in the application for the Policy.

**RESPONSE:** Ameritas objects to this Request on the grounds that it seeks "[a]ll" documents and thus is not proportional to the needs of the case, overly broad, unduly burdensome, and oppressive. Ameritas further objects to this Request to the extent that it seeks documents protected by the attorney-client privilege, the work-product doctrine, the common-interest doctrine, or any other applicable claim of protection or privilege. Subject to and without waiving its general and specific objections, Ameritas will produce non-privileged documents responsive to this Request that can be located after a reasonable search.

9.      Any manuals, handbooks, or other Documents related to Your policies, procedures,

protocols, guidelines, or practices applicable to any inquiry or investigation related to ascertaining

the existence of an insurable interest at the inception of any policy, and the truth or falsity of the

representations made in the application for any policy.

**RESPONSE:** Ameritas objects to this Request on the grounds that "other Documents" is vague and ambiguous. Subject to and without waiving its general and specific objections, Ameritas will produce its policies and procedures responsive to this Request that can be located after a reasonable search.

10.     All Documents collected or otherwise obtained in the course of any inquiry or

investigation into the death benefit claim submitted by Securities Intermediary on the Policy.

**RESPONSE:** Ameritas objects to this Request on the grounds that it seeks "[a]ll" documents and thus is not proportional to the needs of the case, overly broad, unduly burdensome, and oppressive. Ameritas further objects to this Request on the grounds that it is vague and ambiguous. Ameritas further objects to this Request to the extent that it seeks documents protected by the attorney-client privilege, the work-product doctrine, the common-interest doctrine, or any other applicable claim of protection or privilege. Subject to and without waiving its general and

6

specific objections, Ameritas will produce non-privileged documents responsive to this Request that can be located after a reasonable search.

11.     All Documents that relate to Brian A. Sullivan, Esq.

**RESPONSE:** Ameritas objects to this Request on the grounds that it seeks "[a]ll" documents and thus is not proportional to the needs of the case, overly broad, unduly burdensome, and oppressive. Ameritas further objects to this Request on the grounds that it is not reasonably calculated to lead to the discovery of admissible evidence. Subject to and without waiving its general and specific objections, Ameritas will produce non-privileged documents relating to Brian A. Sullivan, Esq. that can be located after a reasonable search to the extent that they relate to (i) the Policy, the Trust or the Insured, (ii) any investigation or review in connection with Brian A. Sullivan, Esq. or (iii) STOLI or insurable interest.

12.     All Documents that relate to Anthony Socci or Omega Financial Group, LLC.

**RESPONSE:** Ameritas objects to this Request on the grounds that it seeks "[a]ll" documents and thus is not proportional to the needs of the case, overly broad, unduly burdensome, and oppressive. Ameritas further objects to this Request on the grounds that it is not reasonably calculated to lead to the discovery of admissible evidence. Subject to and without waiving its general and specific objections, Ameritas will produce (a) its producer/agency files for Anthony Socci and Omega Financial Group, (b) broker detail reports for Anthony Socci and Omega Financial Group, (c) a summary of commissions paid in connection with the Policy, and (d) non-privileged documents relating to Anthony Socci or Omega Financial Group, LLC that can be located after a reasonable search to the extent that they relate to (i) the Policy, the Trust or the Insured, (ii) any investigation or review in connection with Anthony Socci or Omega Financial Group, LLC, or (iii) STOLI or insurable interest.

13.     All Documents that relate to the law firm Werb & Sullivan.

**RESPONSE:** Ameritas objects to this Request on the grounds that it seeks "[a]ll" documents and thus is not proportional to the needs of the case, overly broad, unduly burdensome, and oppressive. Ameritas further objects to this Request on the grounds that it is not reasonably calculated to lead to the discovery of admissible evidence. Subject to and without waiving its general and specific objections, Ameritas will produce non-privileged documents relating to Werb & Sullivan that can be located after a reasonable search to the extent that they relate to (i) the Policy, the Trust or the Insured, (ii) any investigation or review in connection with Werb & Sullivan, or (iii) STOLI or insurable interest.

14.     All Documents that relate to any Communications between or among You and any

third party related to the Policy, including but not limited to telephone logs, notes, and call

summaries.

**RESPONSE:** Ameritas objects to this Request on the grounds that it seeks "[a]ll" documents and thus is not proportional to the needs of the case, overly broad, unduly burdensome,

and oppressive. Ameritas further objects to this Request to the extent that it seeks documents protected by the attorney-client privilege, the work-product doctrine, the common-interest doctrine, or any other applicable claim of protection or privilege. Ameritas further objects to this Request on the grounds that "any third party" is vague and ambiguous. Subject to and without waiving its general and specific objections, Ameritas will produce non-privileged documents responsive to this Request from before March 3, 2023 (the date the Complaint in this action was filed) that can be located after a reasonable search.

15.    All Documents that relate to Your decision to not pay Securities Intermediary's claim for the death benefit under the Policy, including but not limited to any review or analysis performed by You or on Your behalf to arrive at Your decision.

**RESPONSE:** Ameritas objects to this Request on the grounds that it seeks "[a]ll" documents and thus is not proportional to the needs of the case, overly broad, unduly burdensome, and oppressive. Ameritas further objects to this Request to the extent that it seeks documents protected by the attorney-client privilege, the work-product doctrine, the common-interest doctrine, or any other applicable claim of protection or privilege. Ameritas further objects to this Request on the grounds that it is vague and ambiguous. Subject to and without waiving its general and specific objections, Ameritas will produce non-privileged documents responsive to this Request that can be located after a reasonable search.

16.    All Documents that relate to the terms of any agreement, arrangement, or understanding between You and any insurance agents or brokers involved in the sale or issuance of the Policy, including but not limited to any agreement, arrangement, or understanding between You and Anthony Socci or Omega Financial Group, LLC.

**RESPONSE:** Ameritas objects to this Request on the grounds that it seeks "[a]ll" documents and thus is not proportional to the needs of the case, overly broad, unduly burdensome, and oppressive. Ameritas further objects to this Request on the grounds that it is vague and ambiguous. Subject to and without waiving its general and specific objections, Ameritas will produce non-privileged documents responsive to this Request that can be located after a reasonable search.

17.    All Documents that relate to any commission paid by You to any insurance agent or broker related to the Policy, including but not limited to any commissions paid to Anthony Socci or Omega Financial Group, LLC.

**RESPONSE:** Ameritas objects to this Request on the grounds that it seeks "[a]ll" documents and thus is not proportional to the needs of the case, overly broad, unduly burdensome, and oppressive. Ameritas further objects to this Request on the grounds that it is vague and

8

ambiguous. Subject to and without waiving its general and specific objections, Ameritas will produce its producer/agency files for Anthony Socci and Omega Financial Group, LLC and a summary of commissions paid in connection with the Policy.

18.     Documents sufficient to establish the compensation structure for wealth management consultants, underwriters, brokers, agents, and Your other agents or employees involved in the underwriting or sale of any policies issued by You, including but not limited to commissions, bonuses, payment, or any form of compensation that is contingent upon the issuance of a policy by You.

**RESPONSE:** Ameritas objects to this Request on the grounds that it seeks "[a]ll" documents and thus is not proportional to the needs of the case, overly broad, unduly burdensome, and oppressive. Ameritas further objects to this Request on the grounds that it is not reasonably calculated to lead to the discovery of admissible evidence. Ameritas further objects to this Request on the grounds that it is vague and ambiguous. Ameritas will not produce documents in response to this Request at this time.

19.     All Documents concerning commissions, bonuses, payments, or any form of compensation other than salary paid by You to any of Your employees, directly or indirectly, as a result of Your issuance of the Policy to the Trust.

**RESPONSE:** Ameritas objects to this Request on the grounds that it seeks "[a]ll" documents and thus is not proportional to the needs of the case, overly broad, unduly burdensome, and oppressive. Ameritas further objects to this Request on the grounds that it is not reasonably calculated to lead to the discovery of admissible evidence. Ameritas further objects to this Request on the grounds that it is vague and ambiguous. Ameritas will not produce documents in response to this Request at this time.

20.     Documents that relate to any actual or contemplated disciplinary action by You against Anthony Socci, Omega Financial Group, LLC, or any other agent or broker involved in applying for or issuing the Policy, including but not limited to the termination of any contract, understanding, or arrangement between You and any such agent and any attempt by You to recover any commissions paid to any such agent.

**RESPONSE:** Ameritas objects to this Request on the grounds that it is overbroad, unduly burdensome, not reasonably calculated to lead to the discovery of admissible evidence, and not material or proportional to the needs of this action. Ameritas further objects to this Request on the

grounds that it is vague and ambiguous. Subject to and without waiving its general and specific objections, Ameritas will produce non-privileged documents relating to any actual or contemplated disciplinary action against Anthony Socci or Omega Financial Group, LLC that can be located after a reasonable search.

21.     Documents that relate to any actual or contemplated disciplinary action against any life insurance agent or life insurance broker with whom You have an agreement, understanding, or arrangement, on the grounds that said agent or broker submitted fraudulent Documents or information to You in connection with an application for a life insurance policy or participated in a STOLI transaction.

**RESPONSE:** Ameritas objects to this Request on the grounds that it is overbroad, unduly burdensome, not reasonably calculated to lead to the discovery of admissible evidence, and not material or proportional to the needs of this action. Ameritas further objects to this Request on the grounds that it is vague and ambiguous. Ameritas will not produce documents in response to this Request at this time.

22.     Any manuals, handbooks, or other Documents related to Your policies, procedures, protocols, guidelines, or practices applicable to the underwriting of life insurance policies generally and/or the Policy specifically.

**RESPONSE:** Ameritas objects to this Request to the extent that "other Documents" is vague and ambiguous. Ameritas further objects to this Request on the grounds that it is overbroad, unduly burdensome, not reasonably calculated to lead to the discovery of admissible evidence, and not material or proportional to the needs of this action. Subject to and without waiving its general and specific objections, Ameritas will produce the policies and procedures relating to the underwriting of life insurance policies that were applicable to the Policy at the time of its underwriting and issuance.

23.     Any manuals, handbooks, or other Documents created or modified during the period from January 1, 2007 to the present, related to any actual or contemplated change in Your policies, procedures, protocols, guidelines, or practices applicable to the underwriting of (i) any life insurance policy on the life of an insured over 60 years of age and/or (ii) any life insurance policy with a face amount in excess of $1 million.

**RESPONSE: :** Ameritas objects to this Request to the extent that "other Documents" is vague and ambiguous. Ameritas further objects to this Request on the grounds that it is overbroad,

unduly burdensome, not reasonably calculated to lead to the discovery of admissible evidence, and not material or proportional to the needs of this action. Subject to and without waiving its general and specific objections, Ameritas will produce any policies and procedures relating to the underwriting of life insurance policies that were applicable to the Policy at the time of its underwriting and issuance.

24.    Documents created or modified during the period from January 1, 2007 to the present, related to any actual or contemplated change in Your policies, procedures, protocols, guidelines, or practices related to STOLI.

**RESPONSE:** Ameritas objects to this Request on the grounds that it is vague and ambiguous. Ameritas further objects to this Request on the grounds that it is overbroad, unduly burdensome, not reasonably calculated to lead to the discovery of admissible evidence, and not material or proportional to the needs of this action. Subject to and without waiving its general and specific objections, Ameritas will produce any policies and procedures relating to STOLI that were applicable to the Policy at the time of its underwriting and issuance.

25.    Documents created or modified during the period from January 1, 2007 to the present, related to any actual or contemplated change in Your policies, procedures, protocols, guidelines, or practices related to STOLI.

**RESPONSE:** Ameritas objects to this Request on the grounds that it is duplicative of Request No. 24. Ameritas refers WSFS to its response to Request No. 24, *supra*.

26.    Nonconfidential and non-privileged Documents related to any presentations or information You received regarding STOLI from any third party, including but not limited to Cozen O'Connor PC or any other law firms.

**RESPONSE:** Ameritas objects to this Request on the grounds that it is overbroad, unduly burdensome, not reasonably calculated to lead to the discovery of admissible evidence, and not material or proportional to the needs of this action. Ameritas further objects to this Request on the grounds that it is vague and ambiguous. Subject to and without waiving its general and specific objections, Ameritas will produce non-privileged documents responsive to this Request that can be located after a reasonable search.

27.    Documents created or modified during the period from January 1, 2007 to the present related to any actual or contemplated change in Your policies, procedures, protocols,

guidelines, or practices related to the transfer of beneficial interests in trusts owning policies issued by You.

**RESPONSE:** Ameritas objects to this Request on the grounds that it is vague and ambiguous. Ameritas further objects to this Request on the grounds that it is overbroad, unduly burdensome, not reasonably calculated to lead to the discovery of admissible evidence, and not material or proportional to the needs of this action. Subject to and without waiving its general and specific objections, Ameritas will produce its policies and procedures from January 1, 2007 to March 3, 2023 (the date the Complaint in this action was filed) relating to the transfer of beneficial interests in trusts owning life policies that can be located after a reasonable search.

28.     Documents related to any questions other than the questions set forth in any insurance policy application that You, Your employees, or Your agents are or were required to ask potential insureds, policy owners, insurance agents, insurance brokers, trustees, or their respective representatives during the period from January 1, 2007 to the present, to determine if those persons were attempting to procure a life insurance policy from You in connection with a STOLI transaction or arrangement.

**RESPONSE:** Ameritas objects to this Request on the grounds that it is overbroad, unduly burdensome, not reasonably calculated to lead to the discovery of admissible evidence, and not material or proportional to the needs of this action. Ameritas further objects to this Request on the grounds that it is vague and ambiguous. Subject to and without waiving its general and specific objections, Ameritas will produce any non-privileged documents responsive to that Request to the extent that they were applicable to the Policy at the time of its underwriting and issuance.

29.     Documents related to any documents that You, Your employees, or Your agents are or were required to request from potential insureds, policy owners, insurance agents, insurance brokers, trustees, or their respective representatives during the period from January 1, 2007 to the present to determine if those persons were attempting to procure a life insurance policy from You in connection with a STOLI transaction or arrangement.

**RESPONSE:** Ameritas objects to this Request on the grounds that it is overbroad, unduly burdensome, not reasonably calculated to lead to the discovery of admissible evidence, and not material or proportional to the needs of this action. Ameritas further objects to this Request on the grounds that it is vague and ambiguous. Subject to and without waiving its general and specific objections, Ameritas will produce any non-privileged documents responsive to that Request to the extent that they were applicable to the Policy at the time of its underwriting and issuance.

30.     Documents related to any questions other than the questions set forth in any insurance policy application that You, Your employees, or Your agents are or were required to ask potential insureds, policy owners, insurance agents, insurance brokers, trustees, or their respective representatives during the period from January 1, 2007 to the present, to determine if the financial information they provided in their applications was truthful and accurate.

**RESPONSE:** Ameritas objects to this Request on the grounds that it is overbroad, unduly burdensome, not reasonably calculated to lead to the discovery of admissible evidence, and not material or proportional to the needs of this action. Ameritas further objects to this Request on the grounds that it is vague and ambiguous. Subject to and without waiving its general and specific objections, Ameritas will produce any non-privileged documents responsive to that Request to the extent that they were applicable to the Policy at the time of its underwriting and issuance.

31.     Documents related to any documents that You, Your employees, or Your agents are or were required to request from potential insureds, policy owners, insurance agents, insurance brokers, trustees, or their respective representatives, during the period from January 1, 2007 to the present to determine if the financial information they provided in their applications was truthful and accurate.

**RESPONSE:** Ameritas objects to this Request on the grounds that it is overbroad, unduly burdensome, not reasonably calculated to lead to the discovery of admissible evidence, and not material or proportional to the needs of this action. Ameritas further objects to this Request on the grounds that it is vague and ambiguous. Subject to and without waiving its general and specific objections, Ameritas will produce any non-privileged documents responsive to that Request to the extent that they were applicable to the Policy at the time of its underwriting and issuance.

32.     All Documents that evidence or reflect any payment of premiums on the Policy.

**RESPONSE:** Ameritas objects to this Request on the grounds that it seeks "[a]ll" documents and thus is not proportional to the needs of the case, overly broad, unduly burdensome, and oppressive. Subject to and without waiving its general and specific objections, Ameritas will produce a summary of the payment of premiums that it received for the Policy and any records of such payments that can be located after a reasonable search.

33.     All Documents that evidence or reflect any costs that You incurred in connection with issuing and administering the Policy.

**RESPONSE:** Ameritas objects to this Request on the grounds that it is not proportional to the needs of the case, overly broad, unduly burdensome, and oppressive. Ameritas further objects to this Request on the grounds that it is not reasonably calculated to lead to the discovery of admissible evidence. Ameritas further objects to this Request on the grounds that it is vague and ambiguous. Ameritas is willing to meet and confer with WSFS regarding the scope of this Request.

34.     All Documents that relate to any reinsurance that covers or may cover the Policy or any group of policies that includes or may include the Policy, including but not limited to any agreements, understandings, or arrangements between or among You and any Reinsurers.

**RESPONSE:** Ameritas objects to this Request on the grounds that it is not proportional to the needs of the case, overly broad, unduly burdensome, and oppressive. Ameritas further objects to this Request on the grounds that it is not reasonably calculated to lead to the discovery of admissible evidence. Ameritas further objects to this Request on the grounds that it is vague and ambiguous. Ameritas will not produce documents responsive to this Request at this time.

35.     All Documents that relate to Your exercise or consideration to exercise the option to reassume the risk on the Policy or a group of policies that included the Policy.

**RESPONSE:** Ameritas objects to this Request on the grounds that it is not proportional to the needs of the case, overly broad, unduly burdensome, and oppressive. Ameritas further objects to this Request on the grounds that it is not reasonably calculated to lead to the discovery of admissible evidence. Ameritas further objects to this Request on the grounds that it is vague, ambiguous, and confusing. Ameritas will not produce documents in response to this Request at this time.

36.     All Communications between You and any Reinsurers related to the Policy or any group of policies that includes or may include the Policy.

**RESPONSE:** Ameritas objects to this Request on the grounds that it is not proportional to the needs of the case, overly broad, unduly burdensome, and oppressive. Ameritas further objects to this Request on the grounds that it is not reasonably calculated to lead to the discovery of admissible evidence. Ameritas further objects to this Request on the grounds that it is vague and ambiguous. Ameritas will not produce documents in response to this Request at this time.

37.     All Communications between You and any Reinsurers related to STOLI.

**RESPONSE:** Ameritas objects to this Request on the grounds that it is not proportional to the needs of the case, overly broad, unduly burdensome, and oppressive. Ameritas further objects to this Request on the grounds that it is not reasonably calculated to lead to the discovery of admissible evidence. Ameritas further objects to this Request on the grounds that it is vague and ambiguous. Ameritas will not produce documents in response to this Request at this time.

38.    All Communications between You and any Reinsurers regarding the denial of a death benefit claim or the rescission or voiding of a policy on the grounds that the policy was void for lack of insurable interest or based on misrepresentations in connection with the policy application.

**RESPONSE:** Ameritas objects to this Request on the grounds that it is not proportional to the needs of the case, overly broad, unduly burdensome, and oppressive. Ameritas further objects to this Request on the grounds that it is not reasonably calculated to lead to the discovery of admissible evidence. Ameritas further objects to this Request on the grounds that it is vague and ambiguous. Ameritas will not produce documents in response to this Request at this time.

39.    All Documents created or modified after January 1, 2007 that relate to the actual or potential financial or economic impact that STOLI policies had, have, or will have upon Your financial position, including but not limited to the impact upon Your past and present revenues, profits, and/or losses and any forecasts of future revenues, profits, and/or losses, and lapse rates.

**RESPONSE:** Ameritas objects to this Request on the grounds that it is not proportional to the needs of the case, overly broad, unduly burdensome, and oppressive. Ameritas further objects to this Request on the grounds that it is not reasonably calculated to lead to the discovery of admissible evidence. Ameritas further objects to this Request on the grounds that it is vague and ambiguous. Ameritas will not produce documents in response to this Request at this time.

40.    Any manuals, handbooks, or other Documents related to Your policies, procedures, protocols, guidelines, or practices applicable to claims handling generally.

**RESPONSE:** Ameritas objects to this Request on the grounds that it is overbroad, unduly burdensome, not reasonably calculated to lead to the discovery of admissible evidence, and not material or proportional to the needs of this action. Ameritas further objects to this Request on the grounds that it is vague and ambiguous. Subject to and without waiving its general and specific objections, Ameritas will produce any policies and procedures relating to claims handling that were applicable to the Policy at the time that WSFS submitted its claim for the Policy.

41.    Documents created or modified during the period from January 1, 2007 to the present related to any actual or contemplated change in Your policies, procedures, protocols, guidelines, or practices related to claims handling generally.

**RESPONSE:** Ameritas objects to this Request on the grounds that it is overbroad, unduly burdensome, not reasonably calculated to lead to the discovery of admissible evidence, and not

15

material or proportional to the needs of this action. Ameritas further objects to this Request on the grounds that it is vague and ambiguous. Subject to and without waiving its general and specific objections, Ameritas will produce any policies and procedures relating to claims handling that were applicable to the Policy at the time that WSFS submitted its claim for the Policy.

42.     Any manuals, handbooks, or other Documents related to Your policies, procedures, protocols, guidelines, or practices applicable to claims handling for policies owned by any person other than the insured named in the Policy.

**RESPONSE:** Ameritas objects to this Request on the grounds that it is overbroad, unduly burdensome, not reasonably calculated to lead to the discovery of admissible evidence, and not material or proportional to the needs of this action. Ameritas further objects to this Request on the grounds that it is vague and ambiguous. Subject to and without waiving its general and specific objections, Ameritas will produce any policies and procedures relating to claims handling that were applicable to the Policy at the time that WSFS submitted its claim for the Policy.

43.     All Documents created or modified during the period from January 1, 2007 to the present related to any actual or contemplated change in Your policies, procedures, protocols, guidelines, or practices related to claims handling for policies owned by any person other than the insured named in the Policy.

**RESPONSE:** Ameritas objects to this Request on the grounds that it is overbroad, unduly burdensome, not reasonably calculated to lead to the discovery of admissible evidence, and not material or proportional to the needs of this action. Ameritas further objects to this Request on the grounds that it is vague and ambiguous. Subject to and without waiving its general and specific objections, Ameritas will produce any policies and procedures relating to claims handling that were applicable to the Policy at the time that WSFS submitted its claim for the Policy.

44.     Any manuals, handbooks, or other Documents related to Your policies, procedures, protocols, guidelines, or practices applicable to claims handling for policies You believe are STOLI or have characteristics that You associate with STOLI.

**RESPONSE:** Ameritas objects to this Request on the grounds that it is overbroad, unduly burdensome, not reasonably calculated to lead to the discovery of admissible evidence, and not material or proportional to the needs of this action. Ameritas further objects to this Request on the grounds that it is vague and ambiguous. Subject to and without waiving its general and specific objections, Ameritas will produce any policies and procedures relating to claims handling for STOLI policies that were applicable at the time that WSFS submitted its claim for the Policy.

45.     All Documents created or modified during the period from January 1, 2007 to the present related to any actual or contemplated change in Your policies, procedures, protocols, guidelines, or practices related to claims handling for policies You believe are STOLI or have characteristics that You associate with STOLI.

**RESPONSE:** Ameritas objects to this Request on the grounds that it is overbroad, unduly burdensome, not reasonably calculated to lead to the discovery of admissible evidence, and not material or proportional to the needs of this action. Ameritas further objects to this Request on the grounds that it is vague and ambiguous. Subject to and without waiving its general and specific objections, Ameritas will produce any policies and procedures relating to claims handling for STOLI policies that were applicable at the time that WSFS submitted its claim for the Policy.

46.     Any manuals, handbooks, or other Documents related to Your policies, procedures, protocols, guidelines, or practices applicable to claims handling for policies (i) on the lives of insureds 60 years of age or older and/or (ii) with a face amount in excess of $1 million.

**RESPONSE:** Ameritas objects to this Request on the grounds that it is overbroad, unduly burdensome, not reasonably calculated to lead to the discovery of admissible evidence, and not material or proportional to the needs of this action. Ameritas further objects to this Request on the grounds that it is vague and ambiguous. Subject to and without waiving its general and specific objections, Ameritas will produce any policies and procedures relating to claims handling that were applicable to the Policy at the time that WSFS submitted its claim for the Policy.

47.     All Documents created or modified during the period from January 1, 2007 to the present related to any actual or contemplated change in Your policies, procedures, protocols, guidelines, or practices related to claims handling for policies (i) on the lives of insureds 60 years of age or older and/or (ii) with a face amount in excess of $1 million.

**RESPONSE:** Ameritas objects to this Request on the grounds that it is overbroad, unduly burdensome, not reasonably calculated to lead to the discovery of admissible evidence, and not material or proportional to the needs of this action. Ameritas further objects to this Request on the grounds that it is vague and ambiguous. Subject to and without waiving its general and specific objections, Ameritas will produce any policies and procedures relating to claims handling that were applicable to the Policy at the time that WSFS submitted its claim for the Policy.

48.     Any manuals, handbooks, or other Documents related to Your policies, procedures, protocols, guidelines, or practices applicable to any post-sale screening, audit, or review of life

insurance policies with a face amount in excess of $1 million dollars, where the named insured was 60 years of age or older on the date of policy issuance.

**RESPONSE:** Ameritas objects to this Request on the grounds that it is overbroad, unduly burdensome, not reasonably calculated to lead to the discovery of admissible evidence, and not material or proportional to the needs of this action. Ameritas further objects to this Request on the grounds that the term "post-sale" is vague and ambiguous. Subject to and without waiving its general and specific objections, Ameritas is willing to meet and confer with WSFS concerning the scope of this Request.

49.    All Documents that relate to any investigation, post-sale screening, audit, or review undertaken by You of an individual policy or policies in excess of $1 million dollars in coverage, issued on the lives of insureds 60 years of age or older.

**RESPONSE:** Ameritas objects to this Request on the grounds that it is overbroad, unduly burdensome, not reasonably calculated to lead to the discovery of admissible evidence, and not material or proportional to the needs of this action. Ameritas further objects to this Request on the grounds that the term "post-sale" is vague and ambiguous. Subject to and without waiving its general and specific objections, Ameritas is willing to meet and confer with WSFS concerning the scope of this Request.

50.    All Documents that relate to any life insurance policy issued by You and upon which a policyholder submitted a claim, where You failed to pay the claim within the period prescribed by applicable law or specified in the policy.

**RESPONSE:** Ameritas objects to this Request on the grounds that it is not proportional to the needs of the case, overly broad, unduly burdensome, and oppressive. Ameritas further objects to this Request on the grounds that it is not reasonably calculated to lead to the discovery of admissible evidence. Ameritas further objects to this Request on the grounds that it is vague and ambiguous. Ameritas will not produce documents in response to this Request at this time.

51.    For any life insurance policy issued by You and upon which a policyholder submitted a claim and You failed to pay the claim within the period prescribed by applicable law or specified in the policy, all Documents that relate to any post-claim inquiry or investigation conducted by You or on Your behalf related to such policy, for any purpose, including but not limited to ascertaining the existence of an insurable interest at the inception of a life insurance

policy issued by You and ascertaining the truth or falsity of any representation in the policy application.

**RESPONSE:** Ameritas objects to this Request on the grounds that it is not proportional to the needs of the case, overly broad, unduly burdensome, and oppressive. Ameritas further objects to this Request on the grounds that it is not reasonably calculated to lead to the discovery of admissible evidence. Ameritas further objects to this Request on the grounds that it is vague and ambiguous. Ameritas will not produce documents in response to this Request at this time.

52.     All Documents that relate to the criteria or standards You employ to determine whether to pay or deny a claim on a policy for lack of insurable interest or misrepresentations in the policy application.

**RESPONSE:** Ameritas objects to this Request on the grounds that it is overbroad, unduly burdensome, not reasonably calculated to lead to the discovery of admissible evidence, and not material or proportional to the needs of this action. Ameritas further objects to this Request on the grounds that it is vague and ambiguous. Subject to and without waiving its general and specific objections, Ameritas will produce any policies and procedures relating to claims handling that were applicable to the Policy at the time that WSFS submitted its claim for the Policy.

53.     All Documents that relate to the criteria or standards You employ to determine whether a life insurance policy issued by You is STOLI.

**RESPONSE:** Ameritas objects to this Request on the grounds that it is overbroad, unduly burdensome, not reasonably calculated to lead to the discovery of admissible evidence, and not material or proportional to the needs of this action. Ameritas further objects to this Request on the grounds that it is vague and ambiguous. Subject to and without waiving its general and specific objections, Ameritas will produce any policies and procedures relating to claims handling that were applicable to the Policy at the time that WSFS submitted its claim for the Policy.

54.     All Documents that relate to any Communications between You and any of Your policyholders relating to any delay in the payment of or failure to pay a claim on a life insurance policy, including but not limited to any inquiries or complaints from policyholders.

**RESPONSE:** Ameritas objects to this Request on the grounds that it is not proportional to the needs of the case, overly broad, unduly burdensome, and oppressive. Ameritas further objects to this Request on the grounds that it is not reasonably calculated to lead to the discovery of admissible evidence. Ameritas further objects to this Request on the grounds that it is vague and ambiguous. Ameritas will not produce documents in response to this Request at this time.

55.     All Documents that relate to any Communications between or among You and the office of any state insurance commissioner, department of insurance, or any other regulatory agency relating to any delay in the payment of or failure to pay a claim on a life insurance policy.

**RESPONSE:** Ameritas objects to this Request on the grounds that it is not proportional to the needs of the case, overly broad, unduly burdensome, and oppressive. Ameritas further objects to this Request on the grounds that it is not reasonably calculated to lead to the discovery of admissible evidence. Ameritas further objects to this Request on the grounds that it is vague and ambiguous. Ameritas will not produce documents in response to this Request at this time.

56.     All Communications between You and any third party related to the transfer of beneficial interests in trusts for policies issued by You, including but not limited to Communications with any state insurance commissioner, department of insurance, or any other regulatory agency regulators.

**RESPONSE:** Ameritas objects to this Request on the grounds that it is not proportional to the needs of the case, overly broad, unduly burdensome, and oppressive. Ameritas further objects to this Request on the grounds that it is not reasonably calculated to lead to the discovery of admissible evidence. Ameritas further objects to this Request on the grounds that it is vague and ambiguous. Ameritas will not produce documents in response to this Request at this time.

57.     All Documents that relate to Your ongoing review of policies that were issued by You where the beneficial interest in the trust owning the policy was transferred.

**RESPONSE:** Ameritas objects to the premise of this Request in that is assumes that Ameritas is conducting an ongoing review of policies that it issued where the beneficial interest in the trust owning the policy was transferred. Ameritas further objects to this Request on the grounds that it is not proportional to the needs of the case, overly broad, unduly burdensome, and oppressive. Ameritas further objects to this Request on the grounds that it is not reasonably calculated to lead to the discovery of admissible evidence. Ameritas further objects to this Request on the grounds that it is vague and ambiguous. Ameritas will not produce documents in response to this Request at this time.

58.     The deposition, trial, or hearing transcripts, including all exhibits, of any current or former employee or agent of Ameritas, in any action (including any arbitration) Ameritas denied a death benefit claim or sought to rescind or void a policy on the grounds that policy was void for lack of insurable interest or based on misrepresentations in connection with the policy application.

**RESPONSE:** Ameritas objects to this Request on the grounds that it is not proportional to the needs of the case, overly broad, unduly burdensome, and oppressive. Ameritas further objects to this Request on the grounds that it is not reasonably calculated to lead to the discovery of admissible evidence. Ameritas further objects to this Request on the grounds that it is vague and ambiguous. Ameritas is willing to meet and confer regarding the scope of this Request.

59.     The deposition, trial, or hearing transcripts, including all exhibits, of any current or former employee or agent of Ameritas, in any action (including any arbitration) that involved Ameritas' denial of a claim for the death benefit or refusal to pay any claim for the death benefit under any policy since January 1, 2007.

**RESPONSE:** Ameritas objects to this Request on the grounds that it is not proportional to the needs of the case, overly broad, unduly burdensome, and oppressive. Ameritas further objects to this Request on the grounds that it is not reasonably calculated to lead to the discovery of admissible evidence. Ameritas further objects to this Request on the grounds that it is vague and ambiguous. Ameritas will not produce documents in response to this Request at this time.

60.     All Documents that relate to Your approval of specific broker general agents, brokers, or agents to procure policies that would likely be resold to an investor on the secondary market, including but not limited to policies that You may have referred to as STOLI.

**RESPONSE:** Ameritas objects to the premise of this Request, which assumes that Ameritas "approv[es]" "specific broker general agents, brokers, or agents to procure policies that would likely be resold to an investor on the secondary market, including but not limited to policies that [Ameritas] may have referred to as STOLI." Ameritas further objects to this Request on the grounds that it is vague, ambiguous, argumentative, and confusing. Ameritas is willing to meet and confer with WSFS regarding the scope of this Request.

61.     Documents sufficient to identify all of the life settlement programs You approved.

**RESPONSE:** Ameritas objects to the premise of this Request, which assumes that Ameritas "approv[es]" of any "life settlement programs." Ameritas further objects to this Request on the grounds that it is vague, ambiguous, argumentative, and confusing. Ameritas further objects to this Request on the grounds that it is vague, ambiguous, argumentative, and confusing. Ameritas is willing to meet and confer with WSFS regarding the scope of this Request.

62.     Documents sufficient to identify the total number of policies, total face amount, and total amount of premiums You have collected on policies issued in connection with transactions involving Ocean Gate.

21

**RESPONSE:** Ameritas objects to this Request on the grounds that it is overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence. Ameritas also objects to this Request on the grounds that the term "transactions involving Ocean Gate" is vague and ambiguous. Ameritas further objects to this Request to the extent that it seeks documents protected by the attorney-client privilege, the work-product doctrine, the common-interest doctrine, or any other applicable claim of protection or privilege. Ameritas further objects to this Request on the grounds that it seeks information that is not in the possession, custody, or control of Ameritas. Ameritas is willing to meet and confer with WSFS regarding the scope of this Request.

63.     All Documents that You contend evidence, demonstrate, reflect, or establish that

the Policy is void for lack of insurable interest.

**RESPONSE:** Ameritas objects to this Request on the grounds that it seeks "[a]ll" documents and thus is not proportional to the needs of the case, overly broad, unduly burdensome, and oppressive. Ameritas further objects to this Request to the extent that it seeks documents protected by the attorney-client privilege, the work-product doctrine, the common-interest doctrine, or any other applicable claim of protection or privilege. Ameritas further objects to this Request to the extent that it seeks documents not in the possession, custody, or control of Ameritas. Subject to and without waiving its general and specific objections, Ameritas will produce non-privileged documents responsive to this Request that can be located after a reasonable search.

64.     All Documents that You contend evidence, demonstrate, reflect, or establish that

the Policy was procured by investors.

**RESPONSE:** Ameritas objects to this Request on the grounds that it seeks "[a]ll" documents and thus is not proportional to the needs of the case, overly broad, unduly burdensome, and oppressive. Ameritas further objects to this Request to the extent that it seeks documents protected by the attorney-client privilege, the work-product doctrine, the common-interest doctrine, or any other applicable claim of protection or privilege. Ameritas further objects to this Request to the extent that it seeks documents not in the possession, custody, or control of Ameritas. Subject to and without waiving its general and specific objections, Ameritas will produce non-privileged documents responsive to this Request that can be located after a reasonable search.

65.     All Documents that You contend evidence, demonstrate, reflect, or establish that

Marvin Flaks and his family did not have a legitimate insurance purpose.

**RESPONSE:** Ameritas objects to this Request on the grounds that it seeks "[a]ll" documents and thus is not proportional to the needs of the case, overly broad, unduly burdensome, and oppressive. Ameritas further objects to this Request to the extent that it seeks documents not in the possession, custody, or control of Ameritas. Subject to and without waiving its general and specific objections, Ameritas will produce non-privileged documents responsive to this Request that can be located after a reasonable search.

66.     All Documents that You contend evidence, demonstrate, reflect, or establish that the Policy "was procured as an illegal wager on the life of" Marvin Flaks, as alleged in paragraph 40 of the Complaint.

**RESPONSE:** Ameritas objects to this Request on the grounds that it seeks "[a]ll" documents and thus is not proportional to the needs of the case, overly broad, unduly burdensome, and oppressive. Ameritas further objects to this Request to the extent that it seeks documents not in the possession, custody, or control of Ameritas. Subject to and without waiving its general and specific objections, Ameritas will produce non-privileged documents responsive to this Request that can be located after a reasonable search.

67.     All Documents that You contend evidence, demonstrate, reflect, or establish "that the Flaks Trust itself was an illegal sham created to give the false appearance of a valid insurance trust, and thus to give the superficial—but entirely false—appearance of a legitimate insurance trust" as alleged in paragraph 42 of the Complaint.

**RESPONSE:** Ameritas objects to this Request on the grounds that it seeks "[a]ll" documents and thus is not proportional to the needs of the case, overly broad, unduly burdensome, and oppressive. Ameritas further objects to this Request to the extent that it seeks documents not in the possession, custody, or control of Ameritas. Subject to and without waiving its general and specific objections, Ameritas will produce non-privileged documents responsive to this Request that can be located after a reasonable search.

68.     All Documents that You contend evidence, demonstrate, reflect, or establish that "the source of funds for the initial premium payment on the Policy was not [Marvin Flaks] or any person or valid entity possessing an insurable interest in his life" but rather "a third-party investor(s) who lacked an insurable interest in [Marvin Flaks]'s life and was were [sic] participating in a wager on [Marvin Flaks]'s life" as alleged in paragraph 43 of the Complaint.

**RESPONSE:** Ameritas objects to this Request on the grounds that it seeks "[a]ll" documents and thus is not proportional to the needs of the case, overly broad, unduly burdensome, and oppressive. Ameritas further objects to this Request to the extent that it seeks documents not in the possession, custody, or control of Ameritas. Subject to and without waiving its general and specific objections, Ameritas will produce non-privileged documents responsive to this Request that can be located after a reasonable search.

69.     All Documents related to the inquiries Ameritas began receiving about issuing a life insurance policy insuring the life of Marvin Flaks, as referenced in paragraph 19 of the Complaint.

**RESPONSE:** Ameritas objects to this Request on the grounds that it seeks "[a]ll" documents and thus is not proportional to the needs of the case, overly broad, unduly burdensome, and oppressive. Subject to and without waiving its general and specific objections, Ameritas will produce non-privileged documents responsive to this Request that can be located after a reasonable search.

70.     All Documents related to the "First Application" described in paragraph 20 of the Complaint.

**RESPONSE:** Ameritas objects to this Request on the grounds that it seeks "[a]ll" documents and thus is not proportional to the needs of the case, overly broad, unduly burdensome, and oppressive. Subject to and without waiving its general and specific objections, Ameritas will produce non-privileged documents responsive to this Request that can be located after a reasonable search.

DATED: September 8, 2023              **COZEN O'CONNOR**

                                       */s/ Kaan Ekiner*
                                       Kaan Ekiner (Bar No. 5607)
                                       1201 North Market St., Ste. 1001
                                       Wilmington, DE 19801
                                       (302) 295-2046
                                       kekiner@cozen.com

                                       Joseph M. Kelleher (*pro hac vice*)
                                       Kara E. Cheever (*pro hac vice*)
                                       Victoria G. Mazzola (*pro hac vice*)
                                       1650 Market St., Ste. 2800
                                       Philadelphia, PA 19103
                                       jkelleher@cozen.com
                                       kcheever@cozen.com
                                       vmazzola@cozen.com

                                       *Attorneys for Plaintiff, Counter-Claim Defendant,*
                                       *Ameritas Life Insurance Corp.*

# Exhibit 7

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

AMERITAS LIFE INSURANCE CORP.,

          Plaintiff,

    v.

WILMINGTON SAVINGS FUND SOCIETY, FSB, SOLELY AS SECURITIES INTERMEDIARY,

          Defendant,

_____

WILMINGTON SAVINGS FUND SOCIETY, FSB, SOLELY AS SECURITIES INTERMEDIARY,

          Counter-Claimant,

    v.

AMERITAS LIFE INSURANCE CORP.,

          Counter-Defendant.

C.A. No. 23-236-GBW

## PLAINTIFF/COUNTERCLAIM DEFENDANT'S
## AMENDED RULE 26(a)(1) INITIAL DISCLOSURES

Pursuant to Federal Rule of Civil Procedure Rule 26(a)(1), Plaintiff/Counterclaim Defendant Ameritas Life Insurance Corp. ("Ameritas" or "Plaintiff"), by and through its undersigned attorneys, make the following Amended Initial Disclosures:

## I.  Rule 26(a)(1)(A)(i) Individuals

The following individuals are likely to have discoverable information that Ameritas may use to support its claims or defenses concerning Policy No. U000038534 (the "Policy") taken out on the life of Marvin Flaks (the "Insured") at issue in this litigation:

1.  **Wilmington Savings Fund Society ("WSFS")**
    c/o Counsel to Defendant WSFS
    500 Delaware Avenue
    Wilmington, DE 19801

WSFS is expected to provide information concerning, *inter alia*, the business of WSFS; the relationship between WSFS and the securities entitlement holder for the Policy; the transfer of ownership for the Policy; the identity of the true beneficiary of the Policy; the application for the Policy; the solicitation, procurement, and delivery of the Policy; the sources of funding for the premiums paid on the Policy; and the claim for the death benefits under the Policy. WSFS is also expected to provide information concerning and the nature of any dealings with, among others, the individuals and entities identified in these Initial Disclosures, and any other individuals or entities identified in the pleadings or its Initial Disclosures.

2.  **Brian A. Sullivan, Esq.**
    300 Delaware Avenue
    Wilmington Delaware, DE 19899

Brian A. Sullivan, Esq., is expected to provide information concerning, *inter alia*, the creation of the Trust involved in this litigation; the intended purpose of the Trust; the intended beneficiary of the Trust; the source of funds used by the Trust to pay premiums on the Policy; the application for the Policy; the intended purpose of the Policy; any transfer or transfers of the beneficial interest in the Trust and/or the Policy; and/or the nature of the trustee's and/or the Trust's dealings with, among others, WSFS, the individuals and entities identified in these Initial

Disclosures, and any other individuals or entities identified in the pleadings or in WSFS's Initial Disclosures.

    **3.**    **Werb and Sullivan**
                 1225 North King Street, Suite 600,
                 Wilmington, DE 19801

Werb and Sullivan is expected to provide information concerning, *inter alia*, the creation of the Trust involved in this litigation; the intended purpose of the Trust; the intended beneficiary of the Trust; the source of funds used by the Trust to pay premiums on the Policy; the application for the Policy; the intended purpose of the Policy; any transfer or transfers of the beneficial interest in the Trust and/or the Policy; and/or the nature of the trustee's and/or the Trust's dealings with, among others, WSFS, the individuals and entities identified in these Initial Disclosures, and any other individuals or entities identified in the pleadings or in WSFS's Initial Disclosures.

    **4.**    **ITM TwentyFirst, LLC ("ITM")**
                 333 South 7th Street
                 Minneapolis, MN 55402

ITM is expected to provide information concerning, *inter alia*, the Policy; the source of funding for the premiums paid on the Policy; the application for the Policy; the method and circumstances of any transfers of ownership for the Policy; the claim for the death benefits under the Policy; the nature of the involvement and role in the application for, procurement of, financing of, and transfer of, any interest in the Policy or in any trusts in the name of the Marvin Flaks; information regarding the relationship between itself, the insurance producer for the Policy, purported premium finance lenders, and/or others; ITM's interactions with and relationship to any defendants (and their counsel) or any member of the Flaks family; communications with those on whose behalf or in concert with which ITM worked; contacts of ITM, and those on whose behalf or in concert with which ITM worked, in this forum; citizenship of ITM; ITM's (and their counsel's) knowledge of the existence of Ameritas' claims; any life expectancy reports conducted

regarding the Insured under the Policy; any mortality profiles regarding the Insured; and/or any communications or business with the individuals or entities identified in these Initial Disclosures.

**5.      Accenture Credit Services ("Accenture")**
161 N Clark St.
Chicago, IL 60601

Accenture is expected to provide information concerning, *inter alia*, the Policy; the source of funding for the premiums paid on the Policy; the application for the Policy; the method and circumstances of any transfers of ownership for the Policy; the claim for the death benefits under the Policy; the nature of the involvement and role in the application for, procurement of, financing of, and transfer of, any interest in the Policy or in any trusts in the name of the Marvin Flaks; information regarding the relationship between itself, the insurance producer for the Policy, purported premium finance lenders, and/or others; ITM's interactions with and relationship to any defendants (and their counsel) or any member of the Flaks family; communications with those on whose behalf or in concert with which Accenture worked; contacts of Accenture, and those on whose behalf or in concert with which Accenture worked, in this forum; citizenship of Accenture; Accenture's (and their counsel's) knowledge of the existence of Ameritas' claims; any life expectancy reports conducted regarding the Insured under the Policy; any mortality profiles regarding the Insured; and/or any communications or business with the individuals or entities identified in these Initial Disclosures.

**6.      Ocean Gate[1]**

Ocean Gate, including its subsidiary and other affiliate entities, is expected to provide information concerning, *inter alia*, the source of funds used to pay premiums on the Policy; the

---

[1] "Ocean Gate" includes Ocean Gate Life Settlement Program, LP and all other subsidiary and affiliate entities.

application for the Policy; the intended purpose of the Policy; the nature of the Ocean Gate premium finance program; any premium financing loan involving the Trust and the terms and conditions thereof; any repayment of said loan; any ancillary agreements or contracts executed in connection with any loan and the terms and conditions thereof; the underwriting and/or due diligence that was conducted, including, but not limited to, communications surrounding and the actual underwriting, mortality reports, and life expectancy reports; any transfer or transfers of any ownership or any beneficial interest in the Trust and/or the Policy; any purported surrender of the Policy in satisfaction of the loan; any purported sale of the Policy on the life settlement market and subsequent transfer of ownership; the nature of Ocean Gate's role in establishing the Trust and/or in connection with the application for, procurement of, financing of, and transfer of the Policy; and Ocean Gate's interactions with and relationship to any of the persons named herein**.**

      **7.**    **Anthony Socci**
           6515 Main Street
           Trumbull, CT 06611

Anthony Socci is expected to provide information concerning, *inter alia*, the creation of the Policy; the source of funds used to pay premiums on the Policy; the application for the Policy; the intended purpose of the Policy; any transfer or transfers of the ownership or the beneficial interest in the Trust and/or the Policy; any purported sale of the Policy on the life settlement market and subsequent transfer of ownership; and the nature of any third party's role in establishing the Trust and/or in connection with the application for procurement of, financing of, and transfer of, the Policy; and/or Mr. Socci's interactions with and relationship to, among others, the individuals and entities identified in these Initial Disclosures, the pleadings or in WSFS's Initial Disclosures.

8. **Omega Financial Group, LLC**
    6515 Main Street
    Trumbull, CT 06611

Omega Financial Group, LLC is expected to provide information concerning, *inter alia*, the creation of the Policy; the source of funds used to pay premiums on the Policy; the application for the Policy; the intended purpose of the Policy; any transfer or transfers of the ownership or the beneficial interest in the Trust and/or the Policy; any purported sale of the Policy on the life settlement market and subsequent transfer of ownership; and the nature of any third party's role in establishing the Trust and/or in connection with the application for procurement of, financing of, and transfer of, the Policy; and/or Omega Financial Group, LLC's interactions with and relationship to, among others, the individuals and entities identified in these Initial Disclosures, the pleadings or in WSFS's Initial Disclosures.

9. **Davida Trick**

Davida Trick is expected to provide information concerning, *inter alia*, the financial status of Marvin Flaks; Marvin Flaks' estate planning needs; trusts benefiting the family or next of kin of Marvin Flaks; communications or business with the individuals or entities identified in these Initial Disclosures; the solicitation, procurement, and delivery of the Policy; and the source of funding for premiums paid on the Policy.

10. **Corporate Representative of Ameritas**
    c/o Cozen O'Connor

One or more corporate representatives of Ameritas are expected to provide information concerning Ameritas' issuance of the Policy; Ameritas' corporate policy against life insurance policies intended to benefit stranger-investors; Ameritas' corporate policy against life insurance policies that are funded by non-recourse premium financing; and Ameritas' receipt, review, and investigation of the claim for death benefits under the Policy.

**11. Kelly Halverson (Senior Vice President – Individual Chief Actuary and Underwriting, Ameritas)**
c/o Cozen O'Connor

Kelly Halverson may provide information concerning Ameritas' underwriting of life insurance policies; Ameritas' corporate policy against life insurance policies intended to benefit stranger-investors; and Ameritas' corporate policy against life insurance policies that are funded by non-recourse premium financing.

**12. Dennis Peyton (Vice President – Claims, Ameritas)**
c/o Cozen O'Connor

Dennis Peyton may provide information concerning Ameritas' corporate policy against life insurance policies intended to benefit stranger-investors; Ameritas' corporate policy against life insurance policies that are funded by non-recourse premium financing; and Ameritas' receipt, review, and investigation of the claim for death benefits under the Policy.

**13. Scott Farmen (Vice President – Compliance, Ameritas)**
c/o Cozen O'Connor

Scott Farmen may provide information concerning Ameritas' corporate policy against life insurance policies intended to benefit stranger-investors; Ameritas' corporate policy against life insurance policies that are funded by non-recourse premium financing; Ameritas' administration of life insurance policies; and Ameritas' receipt, review, and investigation of the claim for death benefits under the Policy.

14. Ameritas also intends to seek documents and information from others whose identities have been concealed from Ameritas, including but not limited to from WSFS's securities entitlement holder in connection with the Policy, prior owners and beneficiaries of the Policy and/or any trusts in the name of the Insured, servicers retained in connection with the Policy, and life expectancy providers that rendered services in connection with the Policy.

7

## II.  **Rule 26(a)(1)(A)(ii) Documents**

Ameritas may use the following categories of documents to support its claims or defenses:

1.      The Policy;

2.      Documents relating to the Trust;

3.      Documents relating to the payment of premiums on the Policy;

4.      The Policy's delivery receipt(s);

5.      Documents relating to the death benefit claim submitted for the Policy;

6.      Ameritas' Policy file;

7.      Documents concerning Ameritas' position with regard to issuing life insurance policies lacking insurable interest, life insurance policies procured for the benefit of investors, and life insurance policies funded by non-recourse premium financing;

8.      Documents identified by WSFS in its Initial Disclosures or otherwise produced by WSFS in this litigation;

9.      Documents in the possession of other persons or entities, including, but not limited to, communications and transactional documents relating to the solicitation, purpose, application, delivery, placement, ownership, financing, and transfer(s) of the Policy;

10.     Documents in the possession, custody, or control of non-parties or Defendant's securities entitlement holder in connection with the Policy relating to the Policy or any trusts in the name of the Insured, including, among other things, their acquisition and ownership of the Policy; any risk disclosures provided in connection with their acquisition of the Policy, either individually or as part of a portfolio that contained the Policy; any

payment of premium for the Policy by one or more of them; any request made, directly or indirectly, for a copy of the Insured's death certificate; the submission of a claim for the Policy death benefit(s) by Defendant or its securities entitlement holder(s)/undisclosed principal(s), either directly or indirectly; and

11.  Additional relevant documents to be identified during the course of discovery, including as may be relevant to any counterclaims or defenses that may ultimately be asserted by Defendant in this action.

### III.  Rule 26(a)(1)(A)(iii) Damages

Ameritas is seeking a declaration regarding the validity of the Policy, a form of relief which is not capable of "computation" under Rule (a)(1)(iii), as well as attorneys' fees and costs associated with bringing this lawsuit, as determined by the Court.  Ameritas will amend these disclosures should Ameritas amend its complaint to include a claim for damages.

### IV.  Rule 26(a)(1)(A)(iv) Insurance Agreements

Not applicable.

Dated: September 21, 2023

**COZEN O'CONNOR P.C.**

*/s/ Kaan Ekiner*
Kaan Ekiner (No. 5607)
1201 North Market St., Ste. 1001
Wilmington, DE 19801
302-295-2046
kekiner@cozen.com

Joseph M. Kelleher (admitted *pro hac vice*)
Kara E. Cheever (admitted *pro hac vice*)
Victoria G. Mazzola (admitted *pro hac vice*)
1650 Market St., Ste. 2800
Philadelphia, PA 19103

*Attorneys for Plaintiff/Counterclaim Defendant
Ameritas Life Insurance Corp.*

# Exhibit 8

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| AMERITAS LIFE INSURANCE CORP., | |
| Plaintiff, | |
| v. | |
| WILMINGTON SAVINGS FUND SOCIETY, FSB, SOLELY AS SECURITIES INTERMEDIARY, | C.A. No. 23-236-GBW |
| Defendant. | |
| WILMINGTON SAVINGS FUND SOCIETY, FSB, SOLELY AS SECURITIES INTERMEDIARY, | |
| Counter-Claimant, | |
| v. | |
| AMERITAS LIFE INSURANCE CORP., | |
| Counter-Claim Defendant. | |

**AMERITAS LIFE INSURANCE CORP.'S RESPONSES AND OBJECTIONS TO WILMINGTON SAVINGS FUND SOCIETY'S FIRST SET OF INTERROGATORIES**

Pursuant to Rules 26 and 34 of the Federal Rules of Civil Procedure and the Local Rules of Civil Practice and Procedure for the United States District Court for the District of Delaware, Plaintiff Ameritas Life Insurance Corp. ("Ameritas"), by and through its undersigned attorneys, hereby submits the following Responses and Objections to the First Set of Interrogatories served by Defendant Wilmington Savings Fund Society, as Securities Intermediary ("WSFS") (the "Interrogatories").

## PRELIMINARY STATEMENT

The following responses and objections are based upon the facts, documents, and information presently known and available to Ameritas. Discovery, investigation, research, and analysis are ongoing in this case and may disclose the existence of additional documents and information pertinent to these Interrogatories. Without obligating itself to do so, Ameritas reserves the right to change or supplement these responses and objections, as additional documents and information are discovery revealed, recalled, or otherwise ascertained.

## GENERAL OBJECTIONS

Ameritas sets forth the following general objections, which are applicable to each of the specific Interrogatories. Although additional specific objections may be asserted by Ameritas in response to specific Interrogatories, the non-assertion of specific objections is not a waiver of any general objections with respect to any such specific Interrogatories.

1.      Ameritas generally objects to the Definitions and Instructions of the Interrogatories to the extent that they attempt to impose an obligation on Ameritas that exceeds the requirements of the Federal Rules of Civil Procedure.

2.      Ameritas generally objects to the Interrogatories to the extent that they seek the disclosure of information and/or documents that are protected by the attorney-client privilege, the work-product doctrine, the common-interest doctrine, or any other applicable claim of protection or privilege. Nothing contained in these Responses and Objections is intended as, or shall be in any way deemed, a waiver of the attorney-client privilege, the work-product doctrine, the common-interest doctrine, or any other applicable claim of protection or privilege. If Ameritas withholds protected information or documents on the basis of privilege, it will produce a privilege log.

3.     Ameritas generally objects to the Interrogatories to the extent they seek: (a) information or documents outside of Ameritas' possession, custody or control; (b) information and/or documents already within WSFS's possession, custody or control; or (c) information and/or documents in the public domain or otherwise available to WSFS.

4.     Ameritas generally objects to the Interrogatories to the extent that they seek to impose undue expense on Ameritas or are overly broad, unduly burdensome, and/or oppressive.

5.     Ameritas generally objects to the Interrogatories to the extent they are vague and/or ambiguous.

6.     Ameritas generally objects to the Interrogatories to the extent that they seek information and/or documents that is not relevant to this action and not reasonably calculated to lead to the discovery of admissible evidence.

7.     Ameritas generally objects to the Interrogatories to the extent that they are not proportional to the issues and needs of this case.

8.     Ameritas generally objects to the Interrogatories to the extent that they purport to require Ameritas to obtain information and/or documents from or with respect to persons over whom Ameritas has no control, including but not limited to former employees, on the ground that such Interrogatories exceed the permissible scope of discovery.

9.     Ameritas responds to the Interrogatories subject to, without intending to waive, and expressly reserving: (a) any objection to materiality, relevance, privilege, and admissibility of any information or documents disclosed herein; and (b) the right to object to further discovery involving or relating to the subject matter of any information or documents disclosed herein.

10.     Nothing herein shall be construed as an admission of the truth or accuracy of any characterization or statement of any kind contained in the Interrogatories, or the admissibility as evidence of any information or documents disclosed herein.

11.     By responding to the Interrogatories, Ameritas neither admits nor concedes the appropriateness or the accuracy of the definitions provided by WSFS. Ameritas responds to the Interrogatories in accordance with the applicable law and according to Ameritas' understanding of the fair and reasonable meaning of each specific Interrogatory. To the extent that Ameritas uses a defined term in responding to these Interrogatories, such use of a defined term is for ease of reference only and shall not be construed as an adoption of the definition provided by WSFS or a waiver of any objection herein.

## **INTERROGATORIES**

1.     Identify all Persons with knowledge relating to Ameritas' claims and defenses in this case, including a description of each Person's role and/or involvement with respect to the Policy and such claim or defense.

**RESPONSE:** Ameritas objects to this Interrogatory on the grounds that it seeks the identification of "all Persons" and thus it overly broad and burdensome. Ameritas further objects to this Interrogatory on the grounds that it seeks information contained in documents produced in discovery and thus the burden or deriving or ascertaining the answer from such documents is substantially the same for WSFS as it is for Ameritas. Ameritas further objects that discovery, investigation, research, and analysis are ongoing in this case. Subject to and without waiving any objection, Ameritas states:

- WSFS (Record owner and beneficiary of the Policy)
- BroadRiver (Beneficial owner of the Policy)
- Brian A. Sullivan, Esq. (Trustee)
- ITM TwentyFirst, LLC (Provider of life expectancy reports)
- AVS (Provider of life expectancy reports)
- Ocean Gate Life Settlement L.P. (Originator of the Policy)
- Anthony Socci (Broker)
- Omega Financial Group, LLC (Broker agency)
- Davida Trick (Mr. Flaks' daughter)
- Dennis Peyton (Ameritas Vice President, Claims Services) (former)

3

- Gregory Stark (Ameritas Director, Customer Service)
- Lindsay Erickson (Ameritas Lead Compliance Analyst)
- Lined Mason (Ameritas Vice President of Service)
- Nancy Peters (Ameritas Director, Agency Field Services)
- Scott Corbett (Ameritas Vice President, Underwriting)
- Scott Farmen (Ameritas Vice President, Compliance)
- Barbara Meadows (Ameritas Senior Life Claims Examiner)
- Cindy Fristo (Ameritas Former Director, Customer Service)
- Craig Schommer (Ameritas Vice President, Actuarial)
- Jody Houck (Ameritas Lead Agency Field Service Analyst)
- Kelly Halverson (Ameritas Senior Vice President, Chief Actuary and Underwriting)
- Stephanie Butcher (Ameritas Supervisor, Customer Service)
- William Shamleffer (Ameritas Director, Underwriting)
- Rhonda Loosle (Ameritas Manager, Claims Services)
- Scott Foreman (Ameritas Senior Life Claims Examiner)
- Rebecca Vonderhaar (Ameritas Lead Claims Team Resource Manager)
- Matt Holman (Ameritas Director, Assistant General Counsel)
- Jill O'Connor (no longer with Ameritas – previous title was Manager, Life Claims)
- Patricia Boylan (Ameritas Senior Paralegal)
- Andrea Snowden (Ameritas Vice President, Associate General Counsel)

2.      Identify all Persons with knowledge relating to Ameritas' issuance of the Policy,

including but not limited to knowledge relating to the application for and underwriting of the

Policy.

**RESPONSE:** Ameritas objects to this Interrogatory on the grounds that it seeks information contained in documents produced in discovery and thus the burden of deriving or ascertaining the answer from such documents is substantially the same for WSFS as it is for Ameritas. Subject to and without waiving any objections, Ameritas refers WSFS to the underwriting file for the Policy located at documents bates stamped Ameritas-Flaks 0000714-1031.

3.      Identify all Persons with knowledge relating to Ameritas' decision not to pay the

death benefit under the Policy, including but not limited to any Reinsurer with whom Ameritas

consulted regarding this decision.

**RESPONSE:** Ameritas objects to this Interrogatory on the grounds that it seeks information contained in documents produced in discovery and thus the burden of deriving or ascertaining the answer from such documents is substantially the same for WSFS as it is for Ameritas. Subject to and without waiving any objections, Ameritas states that the following

4

individuals may have at least some knowledge relating to Ameritas' claim investigation of the Policy:

- Rhonda Loosle
- Scott Foreman
- Rebecca Vonderhaar
- Matt Holman
- Dennis Peyton
- Jill O'Connor
- Patricia Boylan
- Andrea Snowden
- Individuals at Cozen O'Connor

4.      Identify all Persons with knowledge of any inquiry or investigation conducted by Ameritas or on Ameritas' behalf at any time related to the Policy, including but not limited to, ascertaining the existence of an insurable interest at the inception of the Policy, or ascertaining the truth or falsity of the representations made in the application for the Policy.

**RESPONSE:** Ameritas objects to this Interrogatory on the grounds that it seeks information contained in documents produced in discovery and thus the burden of deriving or ascertaining the answer from such documents is substantially the same for WSFS as it is for Ameritas. Ameritas further objects to this Interrogatory on the grounds that the terms "inquiry" and "investigation" are vague and ambiguous. Subject to and without waiving any objections, Ameritas refers WSFS to the underwriting file for the Policy located at documents bates stamped Ameritas-Flaks 0000714-1031. Amerita further states that the following individuals may have at least some knowledge relating to the subject of this Interrogatory:

- Rhonda Loosle
- Scott Foreman
- Rebecca Vonderhaar
- Matt Holman
- Dennis Peyton
- Jill O'Connor
- Patricia Boylan
- Andrea Snowden
- Individuals at Cozen O'Connor

5.      Describe in detail what efforts You undertook when You underwrote the Policy to verify that the Person to whom You issued the Policy had an insurable interest in the life of the insured, including but not limited to (a) the Persons who participated on Your behalf in such

efforts, (b) the persons You contacted, (c) the dates when You contacted those Persons, and (d) the Documents You reviewed.

**RESPONSE:** Ameritas objects to this Interrogatory on the grounds that it seeks information contained in documents produced in discovery and thus the burden of deriving or ascertaining the answer from such documents is substantially the same for WSFS as it is for Ameritas. Subject to and without waiving any objections, Ameritas refers WSFS to the policies and procedures relating to ascertaining the existence of insurable interest at the inception of any policy that Ameritas produced in this litigation located at documents bates stamped Ameritas-Flaks 0001885-1910, as well as Ameritas' underwriting file for the Policy located at documents bates stamped Ameritas-Flaks 0000714-1031.

6.      Describe in detail what efforts You undertook after You received a claim for the death benefit under the Policy to verify that the Person to whom You issued the Policy had an insurable interest in the life of the insured, including but not limited to (a) the Persons who participated on Your behalf in such efforts, (b) the Persons You contacted, (c) the dates when You contacted those Persons, and (d) the Documents You reviewed.

**RESPONSE:** Ameritas objects to this Interrogatory to the extent that it seeks information contained in documents produced in discovery and thus the burden of deriving or ascertaining the answer from such documents is substantially the same for WSFS as it is for Ameritas. Ameritas further objects to this Interrogatory to the extent that it seeks the disclosure of information protected by the attorney-client privilege and/or litigation work product doctrine. Subject to and without waiving any objections, Ameritas states that on December 14, 2022, Ameritas referred the claim to outside counsel at Cozen O'Connor. Counsel at Cozen O'Connor Michael Miller, Victoria Mazzola, and Philip Farinella conducted an investigation pursuant to which they reviewed the documents bates stamped Ameritas-Flaks 0000001-1072. This investigation revealed, among other things, the following: the insured was elderly at the time of issuance; the Policy was issued during a heavy period of STOLI activity between 2004 and 2008; the Policy was a high face amount universal life policy, a popular type for STOLI; the initial premium was paid in a large lump sum by a third party that became the owner of the Policy; the producer Anthony Socci was the producer on another policy that was suspected to be STOLI, as litigated in *U.S. Bank, N.A. v. Ameritas Life Ins. Co.*, No. 3:22-cv-01645 (D. Conn.); the ownership of the Policy was changed to Christiana Bank & Trust Co as Trustee (itself later acquired by WSFS) on or about September 1, 2009 pursuant to correspondence from Cedric Strother; on May 22, 2015, WSFS became the owner and beneficiary of the Policy as securities intermediary; from 2015 to 2020, EP Legacy Trust D Securities was the originator paying premiums on the Policy; Christiana Bank, WSFS, and Cedric Strother had involvement in other STOLI activity pursuant to Cozen O'Connor's knowledge and experience; and Christiana Bank, WSFS, Cedric Strother, and EP Legacy Trust D Securities' involvement was indicative of origination via the Ocean Gate program, pursuant to Cozen O'Connor's knowledge and experience.

6

7.     Describe in detail what efforts You undertook when You underwrote the Policy to verify the accuracy of the information stated in the Policy application, including but not limited to (a) the Persons who participated on Your behalf in such efforts, (b) the Persons You contacted, (c) the dates when You contacted those Persons, and (d) the Documents You reviewed.

**RESPONSE:** Ameritas objects to this Interrogatory on the grounds that it seeks information contained in documents produced by Ameritas in discovery and thus the burden of deriving or ascertaining the answer from such documents is substantially the same for WSFS as it is for Ameritas. Subject to and without waiving any objections, Ameritas refers WSFS to the policies and procedures relating to the inception of any policy that Ameritas produced in this litigation located at documents bates stamped Ameritas-Flaks 0001885-1910, as well as Ameritas' underwriting file for the Policy located at documents bates stamped Ameritas-Flaks 0000714-1031.

8.     Describe in detail what efforts You undertook after You received a claim for the death benefit under the Policy to verify the accuracy of the information stated in the Policy application, including but not limited to (a) the Persons who participated on Your behalf in such efforts, (b) the Persons You contacted, (c) the dates when You contacted those Persons, and (d) the Documents You reviewed.

**RESPONSE:** Ameritas objects to this Interrogatory on the grounds that it seeks information contained in documents produced in discovery and thus the burden of deriving or ascertaining the answer from such documents is substantially the same for WSFS as it is for Ameritas. Subject to and without waiving any objections, Ameritas states that on December 14, 2022, Ameritas referred the claim to outside counsel at Cozen O'Connor. Counsel at Cozen O'Connor Michael Miller, Victoria Mazzola, and Philip Farinella conducted an investigation pursuant to which they reviewed the documents bates stamped Ameritas-Flaks 0000001-1072. This investigation revealed, among other things, the following: the insured was elderly at the time of issuance; the Policy was issued during a heavy period of STOLI activity between 2004 and 2008; the Policy was a high face amount universal life policy, a popular type for STOLI; the initial premium was paid in a large lump sum by a third party that became the owner of the Policy; the producer Anthony Socci was the producer on another policy that was suspected to be STOLI, as litigated in *U.S. Bank, N.A. v. Ameritas Life Ins. Co.*, No. 3:22-cv-01645 (D. Conn.); the ownership of the Policy was changed to Christiana Bank & Trust Co as Trustee (itself later acquired by WSFS) on or about September 1, 2009 pursuant to correspondence from Cedric Strother; on May 22, 2015, WSFS became the owner and beneficiary of the Policy as securities intermediary; from 2015 to 2020, EP Legacy Trust D Securities was the originator paying premiums on the Policy; Christiana Bank, WSFS, and Cedric Strother had involvement in other STOLI activity pursuant to Cozen O'Connor's knowledge and experience; and Christiana Bank, WSFS, Cedric Strother, and

EP Legacy Trust D Securities' involvement was indicative of origination via the Ocean Gate program, pursuant to Cozen O'Connor's knowledge and experience.

9.      Identify any and all Reinsurers for the Policy or any group of policies that includes

the Policy.

**RESPONSE:** Subject to and without waiving any objections, Ameritas states that Ameritas reinsured the Policy with Transamerica Financial Ins. Co., Munich Reinsurance America, Reinsurance Group of America and Swiss Re Life & Health America Inc.

10.     Identify each and every life insurance agent or broker who was involved in the

application for and issuance of the Policy, and describe any commissions or other consideration

that Ameritas paid and/or provided to such agent or broker for such involvement.

**RESPONSE:** Ameritas objects to this Interrogatory on the grounds that any commissions Ameritas paid and/or provided to the agent or broker on the Policy is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence. Subject to and without waiving any objections, Ameritas states that Anothony Socci was the broker for the Policy and has been paid commissions totaling $137,846.59 regarding the Policy. *See* Ameritas-Flaks 0001662.

11.     State whether You have terminated the contracts of any life insurance agent or

broker who was involved in the application for and issuance of the Policy.

**RESPONSE:** Ameritas objects to this Interrogatory on the grounds that it is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence. Ameritas further objects that "contracts" is vague and ambiguous. Subject to and without waiving any objections, Ameritas states that the full-time contract for Anthony Socci ended on August 31, 2019. Mr. Socci is still active as an independent agent.

12.     Describe in detail any inquiry or investigation conducted by You, at any time,

related to the Policy, including any inquiry or investigation to ascertain the existence of an

insurable interest at the inception of the Policy.

**RESPONSE:** Ameritas objects to this Interrogatory to the extent that it seeks information contained in documents produced in discovery and thus the burden of deriving or ascertaining the answer from such documents is substantially the same for WSFS as it is for Ameritas. Subject to and without waiving any objections, Ameritas states that on December 14, 2022, Ameritas referred the claim to outside counsel at Cozen O'Connor. Counsel at Cozen O'Connor Michael Miller, Victoria Mazzola, and Philip Farinella conducted an investigation pursuant to which they reviewed the documents bates stamped Ameritas-Flaks 0000001-1072. This investigation revealed, among other things, the following: the insured was elderly at the time of issuance; the Policy was issued

during a heavy period of STOLI activity between 2004 and 2008; the Policy was a high face amount universal life policy, a popular type for STOLI; the initial premium was paid in a large lump sum by a third party that became the owner of the Policy; the producer Anthony Socci was the producer on another policy that was suspected to be STOLI, as litigated in *U.S. Bank, N.A. v. Ameritas Life Ins. Co.*, No. 3:22-cv-01645 (D. Conn.); the ownership of the Policy was changed to Christiana Bank & Trust Co as Trustee (itself later acquired by WSFS) on or about September 1, 2009 pursuant to correspondence from Cedric Strother; on May 22, 2015, WSFS became the owner and beneficiary of the Policy as securities intermediary; from 2015 to 2020, EP Legacy Trust D Securities was the originator paying premiums on the Policy; Christiana Bank, WSFS, and Cedric Strother had involvement in other STOLI activity pursuant to Cozen O'Connor's knowledge and experience; and Christiana Bank, WSFS, Cedric Strother, and EP Legacy Trust D Securities' involvement was indicative of origination via the Ocean Gate program, pursuant to Cozen O'Connor's knowledge and experience.

13.    Describe in detail Your policies, procedures, protocols, guidelines, or practices applicable to any inquiry or investigation related to ascertaining the existence of an insurable interest at the inception of any policy, including by identifying by bates numbers any applicable written policies, procedures, protocols, or practices.

**RESPONSE:** Ameritas objects to this Interrogatory on the grounds that it seeks information contained in documents produced in discovery and thus the burden of deriving or ascertaining the answer from such documents is substantially the same for WSFS as it is for Ameritas. Subject to and without waiving any objections, Ameritas refers WSFS to the policies and procedures relating to ascertaining the existence of insurable interest at the inception of any policy that Ameritas produced in this litigation located at bates stamp Ameritas-Flaks 0001598-1910 and Ameritas-Flaks 0001923-40.

14.    Describe in detail the "review of the purported Policy" You allegedly conducted upon notification of Marvin Flaks' death, as alleged in paragraph 40 of the Complaint.

**RESPONSE:** Ameritas objects to this Interrogatory on the grounds that it seeks information contained in documents produced in discovery and thus the burden of deriving or ascertaining the answer from such documents is substantially the same for WSFS as it is for Ameritas. Ameritas further objects to this Interrogatory to the extent that it seeks the disclosure of information protected by the attorney-client privilege and/or litigation work product doctrine. Subject to and without waiving any objections, Ameritas states that on December 14, 2022, Ameritas referred the claim to outside counsel at Cozen O'Connor. Counsel at Cozen O'Connor Michael Miller, Victoria Mazzola, and Philip Farinella conducted an investigation pursuant to which they reviewed the documents bates stamped Ameritas-Flaks 0000001-1072. This investigation revealed, among other things, the following: the insured was elderly at the time of issuance; the Policy was issued during a heavy period of STOLI activity between 2004 and 2008; the Policy was a high face amount universal life policy, a popular type for STOLI; the initial premium was paid in a large lump sum by a third party that became the owner of the Policy; the

9

producer Anthony Socci was the producer on another policy that was suspected to be STOLI, as litigated in *U.S. Bank, N.A. v. Ameritas Life Ins. Co.*, No. 3:22-cv-01645 (D. Conn.); the ownership of the Policy was changed to Christiana Bank & Trust Co as Trustee (itself later acquired by WSFS) on or about September 1, 2009 pursuant to correspondence from Cedric Strother; on May 22, 2015, WSFS became the owner and beneficiary of the Policy as securities intermediary; from 2015 to 2020, EP Legacy Trust D Securities was the originator paying premiums on the Policy; Christiana Bank, WSFS, and Cedric Strother had involvement in other STOLI activity pursuant to Cozen O'Connor's knowledge and experience; and Christiana Bank, WSFS, Cedric Strother, and EP Legacy Trust D Securities' involvement was indicative of origination via the Ocean Gate program, pursuant to Cozen O'Connor's knowledge and experience.

15. State all facts that support Your contention that "in or around early 2007, investors who were a part of the Ocean Gate STOLI program used Mr. Flaks to procure millions of dollars of life insurance—not for Mr. Flaks or his family or for a legitimate insurance purpose—but rather for investors," as alleged in paragraph 16 of the Complaint, including identifying any third-party "investor" for whom You contend the Policy was originated and any Person whom You contend had an interest in the Policy at the time it was issued.

**RESPONSE:** Ameritas objects to this Interrogatory on the grounds that it seeks information contained in documents produced or to be produced in discovery and thus the burden of deriving or ascertaining the answer from such documents is substantially the same for WSFS as it is for Ameritas. Ameritas further objects that discovery, investigation, research, and analysis are ongoing in this case. Subject to and without waiving any objections, Ameritas states that the Policy was originated for Ocean Gate Life Settlement, LP by Ocean Gate Life Settlement, LP. Ameritas refers WSFS to its Complaint in this matter, which sets forth the non-exhaustive facts showing the basis for Ameritas' allegation, as well as the documents produced in this action relating to the issuance and origination of the Policy, including but not limited to the Successor Beneficiary Agreement, dated July 23, 2007 (i.e., one week after the Policy was issued on July 17, 2007). *See* WSFS_SI_00000723.

16. State all facts that support Your contention that "[u]pon information and belief, Mr. Sullivan, as trustee of the Flaks Trust, acknowledged physical delivery of the Policy in Wilmington, Delaware, by executing a policy delivery receipt," as alleged in paragraph 31 of the Complaint.

**RESPONSE:** Ameritas objects to this Interrogatory on the grounds that it seeks information contained in documents produced or to be produced in discovery and thus the burden of deriving or ascertaining the answer from such documents is substantially the same for WSFS as it is for Ameritas. Ameritas further objects that discovery, investigation, research, and analysis are

ongoing in this case. Subject to and without waiving any objections, Ameritas states that it was normal practice and procedure for policies such as the Policy to be physically delivered to the intended owner of the policy and such owner would acknowledge such delivery by executing a policy delivery receipt. Ameritas further states that upon information and belief, Brian A. Sullivan, Esq., the intended owner of the Policy, was located in Wilmington, Delaware.

17.     State all facts that support Your contention that "[u]pon information and belief, and

unbeknownst to Union Central at the time, at no point was the Insured or his wife at risk that their

own funds would be ultimately used to pay premiums on the Policy," as alleged in paragraph 33

of the Complaint.

**RESPONSE:** Ameritas objects to this Interrogatory on the grounds that it seeks information contained in documents produced or to be produced in discovery and thus the burden of deriving or ascertaining the answer from such documents is substantially the same for WSFS as it is for Ameritas. Ameritas further objects that discovery, investigation, research, and analysis are ongoing in this case. Subject to and without waiving any objections, Ameritas refers WSFS to its Complaint in this matter, which sets forth the non-exhaustive facts showing the basis for Ameritas' allegation, the witness statement by Davida Trick, dated April 15, 2023, and documents produced in this action relating to payment of premiums for the Policy.

18.     State all facts that support Your contention that "the Policy lacked an insurable

interest prior to and at its inception and that any appearance of insurable interest was superficial

only and was in reality a complete and total sham designed to conceal the true wagering nature of

the Policy," as alleged in paragraph 41 of the Complaint.

**RESPONSE:** Ameritas objects to this Interrogatory on the grounds that it seeks information contained in documents produced or to be produced in discovery and thus the burden of deriving or ascertaining the answer from such documents is substantially the same for WSFS as it is for Ameritas. Ameritas further objects that discovery, investigation, research, and analysis are ongoing in this case. Subject to and without waiving any objections, Ameritas refers WSFS to its Complaint in this matter, which sets forth the non-exhaustive facts showing the basis for Ameritas' allegation, the witness statement by Davida Trick, dated April 15, 2023, and the documents produced in this action relating to the issuance and origination of the Policy.

19.     State all facts that support Your contention that "the Flaks Trust itself was an illegal

sham created to give the false appearance of a valid insurance trust, and thus to give the

superficial—but entirely false—appearance of a legitimate insurable interest," as alleged in

paragraph 42 of the Complaint.

**RESPONSE:** Ameritas objects to this Interrogatory on the grounds that it seeks information contained in documents produced or to be produced in discovery and thus the burden of deriving or ascertaining the answer from such documents is substantially the same for WSFS as it is for Ameritas. Ameritas further objects that discovery, investigation, research, and analysis are ongoing in this case. Subject to and without waiving any objections, Ameritas refers WSFS to its Complaint in this matter, which sets forth the non-exhaustive facts showing the basis for Ameritas' allegation, the witness statement by Davida Trick, dated April 15, 2023, and the documents produced in this action relating to the issuance and origination of the Policy.

20. State all facts that support Your contention that "[u]pon information and belief, premiums were paid with funds ultimately provided by third-party investors," as alleged in paragraph 49 of the Complaint.

**RESPONSE:** Ameritas objects to this Interrogatory on the grounds that it seeks information contained in documents produced or to be produced in discovery and thus the burden of deriving or ascertaining the answer from such documents is substantially the same for WSFS as it is for Ameritas. Ameritas further objects that discovery, investigation, research, and analysis are ongoing in this case. Subject to and without waiving any objections, Ameritas refers WSFS to its Complaint in this matter, which sets forth the non-exhaustive facts showing the basis for Ameritas' allegation, the witness statement by Davida Trick, dated April 15, 2023, and documents produced in this action relating to payment of premiums for the Policy.

DATED: February 9, 2024                    **COZEN O'CONNOR**

                                           */s/ Kaan Ekiner*
                                           Kaan Ekiner (Bar No. 5607)
                                           1201 North Market St., Ste. 1001
                                           Wilmington, DE 19801
                                           Phone: 302-295-2046
                                           Fax: 302-250-4356
                                           kekiner@cozen.com

                                           Joseph M. Kelleher (*pro hac vice*)
                                           Kara E. Cheever (*pro hac vice*)
                                           Victoria G. Mazzola (*pro hac vice*)
                                           1650 Market St., Ste. 2800
                                           Philadelphia, PA 19103
                                           jkelleher@cozen.com
                                           kcheever@cozen.com
                                           vmazzola@cozen.com

                                           *Attorneys for Plaintiff and Counter-Claim*
                                           *Defendant, Ameritas Life Insurance Corp.*

## **VERIFICATION**

I, Kelly Halverson, am authorized by Defendant/Counterclaim Plaintiff, Ameritas Life Insurance Corp., to provide these Responses and Objections to Wilmington Savings Fund Society's First Set of Interrogatories and declare under penalty of perjury that the foregoing Answers are true and correct to the best of my knowledge, information, and belief.

Executed this 8th day of February, 2024.

Kelly Halverson
Senior Vice President, Chief Actuary
& UW, Individual
Ameritas Life Insurance Corp.

# Exhibit 9



**COZEN**
**O'CONNOR**

A PROFESSIONAL CORPORATION

277 PARK AVENUE   NEW YORK, NY 10172   212.883.4900   888.864.3017   212.986.0604 FAX   www.cozen.com

October 20, 2010

**CONFIDENTIAL**

California Public Employees' Retirement System
Lincoln Plaza North
400 Q Street
Sacramento, California 95814
Attn: Dan Kiefer

Re:   Ocean Gate Life Settlement Program

Ladies & Gentlemen:

     We have acted as special regulatory counsel to Ocean Gate Life Settlement Program, LP, a Delaware limited partnership (the "Purchaser"), in connection with a life settlement program (the "Program"), pursuant to which (i) an individual (the "Insured") has formed a Delaware irrevocable trust (the "Trust"), (ii) the Trust has acquired a life insurance policy insuring the life of the Insured (the "Policy") and (iii) after the Policy was issued to the Trust, the beneficiary of the Trust has sold its beneficial interest in the Trust (the "Trust Interest") to the Purchaser. This opinion letter (the "Opinion") is being delivered pursuant to your request, and with the consent of the Purchaser.

<div align="center">

FACTS AND ASSUMPTIONS

</div>

     In rendering this Opinion, our examination of documents has been limited to the examination of originals or copies of documents provided to us with respect to each Trust in which the Purchaser has purchased a Trust Interest, which documents are referenced on Schedule A attached hereto and made a part hereof (the "Transaction Documents").

     For purposes of this Opinion, we have not reviewed any documents other than the Transaction Documents. We have assumed that there exists no provision in any document that we have not reviewed that is inconsistent with the opinions stated herein.

NYC_MIDTOWN\15850161\8  119740.000

H-AMT019733

California Public Employees' Retirement System
October 20, 2010
Page 2

In addition to the Transaction Documents, we have conducted interviews of the Purchaser as well as personnel at Dearborn Capital Partners, LLC (the "Aggregator"), with respect to the Program (together, the "Interviews").

We have relied solely upon the foregoing Transaction Documents, the factual statements and information set forth therein, the factual statements and information provided by the Purchaser and the Aggregator during the Interviews, as well as the additional matters recited or assumed herein, all of which we have assumed to be true, complete and accurate. We have also relied upon, and assumed the accuracy and completeness of, the representations and warranties contained in the Transaction Documents, oral and written statements and other information obtained from the Purchaser and Aggregator. Except as expressly set forth herein, we have not undertaken any independent investigation (including, without limitation, conducting any review, search, or investigation of any public files, records or dockets) to determine the accuracy or completeness of the facts that are material to our opinions stated herein, and no inference as to our knowledge concerning such facts should be drawn from our reliance on the representations of the Purchaser, the Aggregator or others in connection with the preparation and delivery of this Opinion.

Whenever a statement herein is qualified by the phrase "to our knowledge," "known to us" or words of similar import, such phrase shall mean that none of the attorneys in this firm who have had active involvement in analyzing the transactions contemplated by the Program is consciously aware at this time of facts or other information inconsistent with or contrary to such statement. We have not undertaken an independent investigation or review to determine the accuracy or completeness of any such statement, and any limited inquiry undertaken by us during the preparation of this Opinion should not be regarded as such an investigation or review. No inference as to our knowledge of any matters bearing on the accuracy or completeness of such statement should be drawn from the fact of our representation of the Purchaser.

We have assumed in this Opinion that the documents and instruments reviewed by us have not been amended by any oral or written amendment or conduct of the parties thereto, and that there are no extrinsic agreements or understandings among the parties that would modify or affect the interpretation of, or the terms of the Transaction Documents or the respective rights and obligations of the parties thereunder.

We express no opinion concerning the laws of any jurisdiction other than the laws of the State of Delaware and the federal laws of the United States of America.

We have assumed and relied upon the genuineness and due authorization of all signatures, the authenticity of all documents submitted to us as originals, the conformity to original documents of all documents submitted to us as copies, telecopies or pdfs, and the authenticity of the originals of all documents submitted to us as copies, telecopies or pdfs.

The opinions expressed herein are based upon and subject to the compliance by each the Purchaser, the Insured, the Trustee (as defined herein), the Initial Beneficiary (as defined herein) and the Agent (as defined herein) at all relevant times, with all provisions of the Transaction Documents.

California Public Employees' Retirement System
October 20, 2010
Page 3

_____

In rendering our opinions set forth below, we have assumed the legal capacity for all purposes relevant hereto of all natural persons and, with respect to all parties to agreements or instruments relevant hereto, that such parties had the requisite power and authority (corporate or otherwise) to execute, deliver and perform such agreements or instruments, that such parties have all the necessary governmental licenses, permits or authorizations to act in the capacities in which they are to act thereunder, that such agreements or instruments have been duly authorized by all requisite action (corporate or otherwise), have been duly executed and delivered by such parties and that such agreements or instruments are the valid, binding and enforceable obligations of such parties.

**Program Facts**:

For the purposes of this Opinion, and based on the Transaction Documents and the Interviews referenced above, we have assumed that the facts and statements outlined in this Opinion are true, correct and complete. We have been advised of the following facts by the Purchaser and nothing in our Interview with the Aggregator was inconsistent therewith (referred to herein as "Program Facts"):

From time to time, the Purchaser was contacted by the Aggregator[1] to assess the Purchaser's interest in acquiring interests in entities owning the right to the proceeds of various life insurance policies on the lives of high net worth individuals. The Aggregator would provide the Purchaser with a life insurance illustration ("Illustration") based on a life proposed to be insured. The Aggregator sent each Illustration concurrently to the Purchaser as well as numerous other prospective purchasers. If the Purchaser was interested in the representations set forth in a particular Illustration, the Purchaser would reply to the Aggregator via email with a non-binding and hypothetical indication of interest in purchasing an interest in a trust owning a policy similar to the policy described in the Illustration. Such indications of interest did not include a hypothetical purchase price, and were not, nor were they intended to constitute, an offer to purchase any interest in any Policy. The Aggregator would, with respect to any given Illustration, expect to receive indications of interest from any number of prospective purchasers, including the Purchaser.

There was no communication, at the time of or prior to the Purchaser's indication of interest to the Aggregator, between the Purchaser or any of its affiliates, officers, directors, employees, agents or representatives and the Agent (as defined herein), Insured, Trustee or Initial Beneficiary or any of the affiliates, officers, directors, employees, agents or representatives thereof. No Transaction Documents were provided by the Aggregator or the Purchaser to the Agent, Insured, Trustee or Initial Beneficiary or any of the affiliates, officers, directors, employees, agents or representatives thereof at the time of Purchaser's indication of interest to the Aggregator, nor at any point prior to the issuance of the Policy. Furthermore, neither the Purchaser nor the Aggregator has informed us that the Purchaser's indication of interest to the Aggregator was communicated to the Insured, Trustee or Initial Beneficiary.

_____

[1] Life Spring, LLC is a separate entity that also acted as an aggregator under the Program. We did not interview Life Spring, LLC. Life Spring, LLC and Dearborn Capital Partners, LLC are referred to hereinafter collectively as the "Aggregator".

H-AMT019735

California Public Employees' Retirement System
October 20, 2010
Page 4

The Insured created and established an irrevocable trust under the laws of the State of Delaware (the "Trust") for the purpose of owning, maintaining, and administering a life insurance policy on the life of the Insured, a high net worth individual. The Insured named an individual with an address and its principal place of business in the State of Delaware as Trustee.[2] The Insured designated as sole beneficiary of the Trust one or more individuals who are family members of the Insured, including without limitation the Insured's spouse, a child of the Insured, a grandchild of the Insured, an individual who is related by blood or law to the Insured, or such other individual whom the Insured considers to be a family member based upon a relationship of love and affection between the Insured and such individual (the "Initial Beneficiary").

After the Trust was established, the Trust procured, with the consent of the Insured,[3] the Policy, issued by a life insurance company licensed to do business in the State of Delaware (the "Carrier"). At the time the Policy was issued, and at all relevant times thereafter, the Trust has been both the owner and beneficiary of the Policy. At the time of issuance of the Policy, the Insured: (i) had a minimum net worth of two million dollars ($2,000,000), (ii) was at least seventy (70) years of age and had a life expectancy greater than twenty-four (24) months, as determined by at least one independent third party medical underwriter, (iii) did not have any catastrophic, life-threatening or terminal illness or condition, and (iv) did not suffer from any chronic illness that rendered the Insured unable to perform two (2) or more activities of daily living or any cognitive impairment that caused the Insured to require substantial supervision in order to protect the Insured from threats to the Insured's health and safety. In addition, at the time of issuance of the Policy, the Insured had a valid need for the life insurance coverage, and the death benefit and premium under the Policy was not greater than the amount appropriate for the Insured, based upon the Insured's income, assets and other relevant factors. The Agent may, in some cases, have discussed with the Insured or the Initial Beneficiary a sale of the Policy or the Trust Interest as part of a discussion of all of the Insured's financial options, but no such transfer was guaranteed or arranged at that time.

Prior to procurement of the Policy, life expectancy reports may have been obtained by the Insured, or on his or her behalf. Furthermore, during the course of procurement but prior to issuance of the Policy, the Insured and/or the Initial Beneficiary may have solicited interest from, or offered to sell interests in the Policy or Trust to any variety of prospective purchasers. However, at no point prior to or during the procurement of the Policy did the Purchaser, the Aggregator, the Agent, or any of the Purchaser's, Aggregator's or Agent's affiliates, officers, directors, employees, agents or representatives: (i) enter into any agreement, or make any offer to enter into any agreement, whether oral, written or otherwise, to purchase the Policy or any interest in the Trust from any party, including but not limited to the Insured, Trustee, or Initial Beneficiary, or any representative or agent of the Insured, Trustee, or Initial Beneficiary or (ii)

---

[2] While this opinion is limited to Delaware law, the Program also acquired Trust Interests in Policies that were previously owned by life insurance trusts in the following jurisdictions: California, Florida, Illinois, Maryland, Massachusetts, New Jersey, New York, Pennsylvania, and Texas.
[3] The Insured's consent is evidenced by the terms of the Trust Agreement, as well as the Policy application, each document signed by the Insured.

H-AMT019736

California Public Employees' Retirement System
October 20, 2010
Page 5

purchase or offer to purchase the Policy or any interest in the Trust from any party, including but not limited to the Insured, Trustee, or Initial Beneficiary, or any representative or agent of the Insured, Trustee, or Initial Beneficiary. At no point prior to or during the procurement of the Policy did the Purchaser, the Aggregator or any of the Purchaser's or Aggregator's affiliates, officers, directors, employees, agents or representatives have any contact with the Insured, Trustee or Initial Beneficiary, or any affiliates, officers, directors, employees, agents or representatives thereof. Neither the Purchaser nor any of its affiliates, officers, directors, employees, agents or representatives provided the Aggregator with compensation for its services in connection with the Program; such compensation was provided solely by the Insured, its Agent, or the Initial Beneficiary.

Following the procurement and issuance of the Policy, the Aggregator contacted the Purchaser to determine the Purchaser's interest in purchasing the Initial Beneficiary's Trust Interest. Such contact occurred only following Policy issuance, in certain instances on the same day the Policy was issued, and in other instances several months following Policy issuance. The Aggregator included an illustration based on the issued Policy, as well as a life expectancy report on the Insured. The Purchaser responded, if interested, by submitting an offer to purchase the Trust Interest to the Aggregator that was subsequently communicated to the Trustee/Insured's licensed life insurance agent (the "Agent"). If the Purchaser's bid was accepted, the Purchaser, for the first time, provided form Transaction Documents, which if accepted by the Trustee and Initial Beneficiary, were subsequently executed. The form Transaction Documents provided by the Purchaser, and subsequently executed by the relevant parties, included a Successor Beneficiary Agreement, whereby the Initial Beneficiary agreed to transfer its Trust Interest to the Purchaser as successor beneficiary in return for the Purchaser's payment of consideration, and the Purchaser became responsible for the immediate payment of the entire first year's target premium under the Policy, or any remaining portion thereof, and for payment of subsequent premiums due under the Policy. Execution of the Transaction Documents was determined in part by the timing of the Aggregator's contact with the Purchaser, and occurred in certain instances on the same day the Policy was issued, and in other instances several months following Policy issuance.

The initial life insurance premium or deposit payment on the Policies was most often paid by a party other than the Purchaser, such as the Insured or the Initial Beneficiary. The amounts of such initial life insurance premium payments varied in each instance.

With respect to each Policy, following the transfer of the Initial Beneficiary's Trust Interest to the Purchaser as Successor Beneficiary, the Purchaser caused the amendment and restatement of the Trust Agreement, as well as the appointment of a successor trustee. Ultimately, Christiana Bank was named as Successor Trustee of the Trust. The Carriers have been notified, with respect to certain Policies, that Christiana Bank had been appointed as Successor Trustee.

We have assumed that no provision or characteristic of the Program is inconsistent with or contrary to the Program Facts. We have, with your permission, relied solely upon the Program Facts, all of which we assume to be true, complete, and accurate in all respects for the purposes of this Opinion.

H-AMT019737

California Public Employees' Retirement System
October 20, 2010
Page 6

---

## DISCUSSION AND ANALYSIS

*1.    Delaware Statutory Law Regarding Insurable Interest*

The insurable interest statutes under the Delaware Insurance Code provide that:

> ...a trust owned life insurance policy, if delivered to the place of business in Delaware of the trustee of said trust, shall be deemed to have been delivered in this State.[4]

Generally, the place where a policy of insurance is delivered is deemed to be the place where the contract was made, and the laws of the jurisdiction in which the contract was made govern the obligations imposed by such policy. If a trust-owned life insurance policy is delivered to a trustee in Delaware, the policy should be considered to have been "made" in Delaware. And under Delaware law, the law of the place where insurance contract was made governs the obligations imposed by such contract.[5]

As set forth in the Program Facts, the Policy is owned by the Trust, and the Policy was delivered to the trustee at the trustee's place of business in Delaware. As a result, the Policy should be subject to the insurance laws of Delaware, including, without limitation, the insurable interest requirements under the Delaware Insurance Code and common law, as explained below.

With respect to the procurement of life insurance on one's own life, the universal rule is that "everyone not under some type of legal disability ... may validly contract for insurance on his own life ..."[6] The substantial interest that each individual has in the continuation of his or her own life gives that individual an insurable interest therein. Further, it is a general principle of insurance law that a person who procures a policy of life insurance for his own benefit on the life of another person must have an insurable interest in the continuance of the life of the insured.

Thus, assuming that an individual is competent to contract, an individual may legally procure insurance on his or her own life and health and may designate whomever he or she chooses to receive the policy proceeds, whether or not the designated beneficiary is someone who has an insurable interest in that person. In situations where a person other than the individual insured takes out a policy of insurance on the life of the insured, the designated beneficiary must have an insurable interest in the life of the individual insured.

In Delaware, these principles are codified in Section 2704 of the Delaware Insurance Code.[7] Section 2704(a) provides:

---

[4] 18 Del. C. § 2704(g).

[5] See, *Wilmington Trust Co. v. Mutual Life Ins. Co.*, 177 F.2d 404, 406 (3d Cir. Del. 1949) ("It is generally the law that the place where a policy of insurance is delivered shall be deemed to be the place where the contract was made, here Delaware.")

[6] R.E. Keeton, Insurance Law 119 -120 (West 1971).

[7] All further statutory references are to the Delaware Insurance Code, unless provided otherwise.

H-AMT019738

California Public Employees' Retirement System
October 20, 2010
Page 7

Any individual of competent legal capacity may procure or effect an insurance contract upon his/her own life or body for the benefit of any person, but no person shall procure or cause to be procured any insurance contract upon the life or body of another individual unless the benefits under such contract are payable to the individual insured or his/her personal representatives or to a person having, at the time when such contract was made, an insurable interest in the individual insured.[8]

The Insurance Code defines an insurable interest as follows:

"Insurable interest" as to such personal insurance means that every individual has an insurable interest in the life, body and health of himself or herself and a person has an insurable interest in the life, body and health of other individuals as follows:

(1) In the case of individuals related closely by blood or by law, a substantial interest engendered by love and affection;

(2) In the case of other persons, a lawful and substantial economic interest in having the life, health or bodily safety of the individual insured continue, as distinguished from an interest which would arise only by, or would be enhanced in value by, the death, disablement or injury of the individual insured;

...

(5) The trustee of a trust established by an individual has an insurable interest in the life of that individual and the same insurable interest in the life of any other individual as does any person who is treated as the owner of such trust for federal income tax purposes. The trustee of a trust has the same insurable interest in the life of any individual as does any person with respect to proceeds of insurance on the life of such individual (or any portion of such proceeds) that are allocable to such person's interest in such trust. If multiple beneficiaries of a trust have an insurable interest in the life of the same individual, the trustee of such trust has the same aggregate insurable interest in such life as such beneficiaries with respect to proceeds of insurance on the life of such individual (or any portion of such proceeds) that are allocable in the aggregate to such beneficiaries' interest in the trust....[9]

The Delaware Insurance Code thus provides that an insured may procure life insurance on his or her own life and designate any person he or she pleases as beneficiary. Where a person other than the insured procures an insurance contract upon the life of the insured, the benefits under such contract may only be payable to persons having, at the time when such contract was

---

[8] 18 Del. C. § 2704 (a).
[9] 18 Del. C. § 2704 (c).

NYC_MIDTOWN\1585016\8 119740.000

H-AMT019739

California Public Employees' Retirement System
October 20, 2010
Page 8

made, an insurable interest in the individual insured. If such beneficiary of the policy is a trust established by the insured as grantor and owner thereof, then 18 Del. C. § 2704 (c)(5) provides that the trustee of such trust should have the same insurable interest in the life of the insured as does the insured (as the owner of such trust for federal income tax purposes).

2.    *Under the Delaware Insurance Code, the Trust's Insurable Interest in the Life of the Insured Must Exist Only When the Policy is Made.*

It is widely recognized that, as a life insurance contract is not regarded as a contract of indemnity, it is sufficient that an insurable interest exist at the inception of the contract.[10] As noted by Columbia Professor Edwin W. Patterson in *Essentials of Insurance Law* (1935), "Insurable interest in life must exist at the inception of the policy but need not exist at the time when death occurs. An incipient interest is both necessary and sufficient." If the insurable interest requirement is satisfied by the Trust at the time the Policy is issued, such Policy should be valid, regardless of subsequent transactions with respect to the Policy.

The Delaware Insurance Code explicitly provides that an insurable interest need only exist at the time a policy is issued. Section 2704(a) provides that:

> ... no person shall procure or cause to be procured any insurance contract upon the life or body of another individual unless the benefits under such contract are payable to the individual insured or his/her personal representatives or to a person having, *at the time when such contract was made,* an insurable interest in the individual insured.[11]

Under the Program Facts, the Insured as Grantor established the Trust, the Trust subsequently procured the Policy (with the Insured's consent) naming the Trust as Policy beneficiary and Owner, the Insured designated the Initial Beneficiary as sole beneficiary of the Trust at the time the Policy was issued, and the Initial Beneficiary pursuant to 18 Del. C. § 2704(c)(2) was as an individual related closely by blood or by law, thus the Trust should have the same insurable interest in the life of the Insured as the Insured itself pursuant to 18 Del. C. § 2704 (c)(5). A change in the Trust's beneficiary effected by a transfer of Trust Interests that occurs after the Policy is issued should not change the insurable interest analysis, absent a "scheme, purpose or agreement to transfer or assign the policy to a person without an insurable interest in order to evade the law against wagering contracts." This exception is discussed in more detail below in the discussion of courts interpreting Delaware law.

---

[10] Couch on Insurance 3d, § 41 :23 (1997) "Time When Interest Must Exist." See also, U. Rich, L. Rev. 71 (Does Lack of an Insurable Interest Preclude an Insurance Agent from Taking an Absolute Assignment of his Client's Life Policy?) ("In the context of life insurance it is universally agreed that the [insurable] interest need exist only at the time of the inception of the policy. Consequently, the insurable interest rules are primarily concerned with the initial issuance of a life policy and less with subsequent events.")

[11] 18 Del. C. § 2704 (a) (emphasis added).

H-AMT019740

California Public Employees' Retirement System
October 20, 2010
Page 9

*3.    Insurable Interest Under Delaware Common Law*

One of the reasons that the insurance laws and the courts at common law impose an insurable interest requirement is to avoid wagering on death and related abuses. If a completely unrelated third party purchased life insurance on the life of an individual, the third party would have an economic interest in the early death of the person insured. Because such economic incentives could potentially put an insured at risk, one cannot procure an insurance contract without having an insurable interest in the insured's life.

In Delaware, this prohibition on wagering is set forth in the long standing decision of the Superior Court of Delaware in *Baltimore Life Ins. Co. v. Floyd.*[12] In *Floyd*, the Court discussed insurable interest as a means of avoiding disinterested speculation and wagering, and stated that:

> ... it is held that the insurance upon a life shall be effected and resorted to only for some benefit incident to or contemplated by the insured, and that insurance procured upon a life by one or in favor of one under circumstances of speculation or hazard amounts to a wager contract and is therefore void, upon the theory that it contravenes public policy.[13]

In addition, the *Floyd* Court explained that "[e]vidence of such an insurable interest is evidence that the contract is not a wager and is evidence of the contract's validity."[14]

During the summer of 2010, the U.S. District Court for the District of Delaware issued three decisions which are each relevant to the insurable interest analysis. These decisions are discussed below.

*A.    Sun Life Assur. Co. v. Berck*

*Sun Life Assur. Co. v. Berck,* 2010 U.S. Dist. LEXIS 65192 (D. Del. June 29, 2010) ("Berck") involved an action filed by the insurer against the trustee of an insurance trust that, along with the insured and the insurance producer, were alleged to have procured a policy on the life of the insured as part of a STOLI scheme. The application for coverage was signed by the insured as well as the trustee on behalf of the trust, and stated that the purpose of the coverage was estate planning. Plaintiff alleged that the policy, as a STOLI arrangement, was void as a wagering policy, that the insured did not initiate its procurement on his own, and that the policy was never intended to be paid to the insured's spouse or another person with an insurable interest.

The District Court indicated that the insurable interest requirement emerged "to curtail use of insurance contracts as wagering contracts by distinguishing between contracts that sought to dampen the risk of actual future loss and those that instead sought to speculate on whether

---

[12] *Baltimore Life Ins. Co. v. Floyd,* 28 Del. 201 (Del. 1914) ("Floyd").

[13] *Id.* at 206.

[14] *Id.*

H-AMT019741

California Public Employees' Retirement System
October 20, 2010
Page 10

some future contingency would occur."[15] The District Court found that the plaintiff failed to sufficiently state a claim for a lack of insurable interest, yet in light of the "important public policy implicated by STOLI arrangements," the Court granted the plaintiff time to amend its complaint. The Court noted that neither the Third Circuit nor the Delaware Supreme Court have addressed what constitutes insurable interest at the time a policy is procured. The Court noted the lack of consensus in other states, with (i) the defendant proffering that a bilateral agreement with the alleged stranger-third party being a necessary element to establish a lack of insurable interest,[16] and (ii) the plaintiff arguing that the mere unilateral intent to transfer the policy to an unidentified third party at the time of procurement is sufficient to show a lack of insurable interest.[17]

The Court recognized the divergence among the jurisdictions between the mutual and unilateral intent approaches. While the Court did not commit to adopting either of the two approaches, it recognized that in all cases cited by the parties except one,[18] the courts have required that the identity of the stranger third party be identifiable in order to indicate the existence of bilateral intent. The Court found that the plaintiff failed to allege any indication of a bilateral nature to the plan, scheme, or design, that there was no indication that any particular third party stranger was aware of the alleged STOLI arrangement, and that the plaintiff's allegation of "a plan, scheme and/or design," without more, is merely a "formulaic recitation of the elements of a cause of action" and is insufficient to provide grounds for entitlement to relief. Nevertheless the Court granted the plaintiff leave to amend its complaint.

### B. *Lincoln Nat'l Life Ins. Co. v. Snyder*

In *Lincoln Nat'l Life Ins. Co. v. Snyder*, 2010 U.S. Dist. LEXIS 71127 (D. Del. July 15, 2010) ("Snyder") the plaintiff carrier filed an action against its agent, the trustee of a trust established by the plaintiff's insured, and certain other individuals. The plaintiff alleged that the policy in this case was procured as a wagering contract to sell to stranger investors on the

---

[15] *Id.* at 14, citing to *Sun Life Assurance Co. of Canada v. Paulson*, Civ. No. 07-3877, 2008 U.S. Dist. LEXIS 11719, 2008 WL 451054, *2 n.4 (D. Minn. Feb. 15, 2008) ("Paulson").

[16] In support of its contention, the defendant relied upon the U.S. District Court for the District of Minnesota's decision in *Paulson*, the leading "mutual intent" case. *Paulson*, which involved similar facts as *Berck*, and the very same plaintiff, provided that under Minnesota law, the mutual intent of the insured and the third party to avoid the prohibition on wagering contracts determines the existence of an illegal scheme, purpose, or agreement to transfer or assign the policy to a person without an insurable interest. The Court clearly enunciated that "[t]he most important factor in determining the parties' intent is "whether or not the assignment [from the insured to the third party] was done in pursuance of a preconceived agreement." *Id.* At 6.

[17] The plaintiff cited several decisions from the District Courts in New Jersey and New York in support of its contention that mere intent to transfer at the time of procurement, absent a preconceived agreement, is sufficient to violate the statutory requirement for insurable interest. The *Berck* Court did note, however, that with one exception, each of the cases cited by the plaintiff actually required an arrangement between the insured and an identifiable third party.

[18] *Lincoln National Life Insurance Co. v. Calhoun*, 596 F. Supp. 2d 882, 890 (D.N.J. 2009) ("Calhoun").

H-AMT019742

California Public Employees' Retirement System
October 20, 2010
Page 11

secondary life market. The plaintiff alleged that the insured was solicited to participate in a STOLI arrangement whereby the insured established a trust, named his wife as the beneficiary thereof, and that the insured and trustee subsequently submitted an application for an $18.5m policy on the life of the insured, naming the trust as owner and beneficiary thereof. The policy was issued, but when the insured died during the contestable period, the insurer initiated a contested death claim investigation.

The *Snyder* action ensued, in which the plaintiff brought claims including negligent misrepresentation, fraudulent inducement, and fraud against the Trust, and sought declaratory judgment that the policy (1) is voidable or void *ab initio* for lack of insurable interest; (2) was illegally procured; and (3) was procured through material misrepresentation. Plaintiff sought damages and sought to retain some or all of the premiums paid under the policy.

The District Court noted that neither the Third Circuit nor the Delaware Supreme Court has addressed what constitutes insurable interest at the time a policy is procured, and that the states lack consensus on this issue. The Court in *Snyder* looked to the plaintiff's complaint to determine whether the complaint sufficiently alleged facts demonstrating an arrangement, at the time the policy was issued, to transfer the policy. The plaintiff's complaint alleged, *inter alia*: the insured had been approached to participate in a STOLI scheme for the benefit of stranger investors; investors were solicited to invest in the policy prior to submission of the application; material misrepresentations were made on the application regarding the insured's income, net worth and purpose for the policy in order to conceal the STOLI nature of the policy; plaintiff found evidence that the beneficial interest in the Trust was sold during a contestable death claim investigation after the insured's death; stranger investors paid the premiums on the policy and compensated the insured for his participation in the alleged STOLI scheme; the defendants, including the agent and another individual, were also involved in procuring a policy declared void *ab initio* for lack of an insurable interest in California (the "Teren Policy"); and the agent and other defendants solicited investors to invest in the policy in *Snyder* and the Teren Policy as a package.

As a result of the foregoing allegations, the Court found that the plaintiff sufficiently alleged, beyond a speculative level, that there was an arrangement in place at the time of procurement to transfer the policy, and accordingly, that the plaintiff had sufficiently pled facts to state a claim that the policy was void *ab initio* for lack of any insurable interest. In *Snyder*, the Court expressly recognized that a trust settled by the insured can be named as owner and beneficiary of a policy written on the life of the insured, *provided* the policy is not a wagering contract. The Court specifically stated: "While there is no doubt an insured can name his own trust as the owner and beneficiary, the insurable interest doctrine developed in common law and out of public policy concerns that deem insurance policies without an insurable interest at inception to be illegal wagering contracts. "[Wagering contracts] have a tendency to create a desire for the [death of the insured]. They are, therefore, **independently of any statute on the subject**, condemned, as being against public policy." See Warnock v. Davis, 104 U.S. 775, 779, 26 L. Ed. 924, 4 Ky. L. Rptr. 67 (1881) (emphasis added).[19]

---

[19] *Snyder* at 27 (emphasis in opinion).

California Public Employees' Retirement System
October 20, 2010
Page 12

The *Snyder* case demonstrates an instance in which a carrier alleged that a policy procured pursuant to a STOLI arrangement lacks the requisite insurable interest, and the carrier's complaint survived a motion to dismiss under Delaware law. But *Snyder* also seems to indicate that to do so, a carrier must likely meet the mutual intent standard; that is, evidence must be proffered demonstrating an arrangement, at the time the policy was issued, to transfer the policy. The carrier in *Snyder* was able to allege such facts in its complaint. While the Program Facts do not appear to indicate such an arrangement, the analysis of whether an arrangement existed is a very fact specific determination.

### C.   *Principal Life Ins. Co. v. Rucker*

In *Principal Life Ins. Co. v. Rucker*, -- F.Supp.2d --, 2010 WL 3395661 (D. Del. Aug. 30, 2010) ("Rucker"), an insurer initiated an action against the trustee of a trust claiming that a life insurance policy issued on the life of its insured was void for lack of an insurable interest and due to material misrepresentations made in the policy application. The insured obtained life insurance following interactions with parties including an agent of the insurer. The insured acted as settlor of two separate trusts: an insurance trust, which was named as beneficiary of the policy, and a family trust, which was named as beneficiary of the insurance trust. Shortly following policy issuance, the beneficial interest in the insurance trust was sold by the family trust to a third party.

The *Rucker* Court indicated that "a life insurance policy procured at the behest of another, however, may lack an insurable interest,"[20] and determined that where an insurance company can establish a scheme, purpose or agreement to transfer or assign a life insurance policy to subvert the law against insurable contracts, that policy is void ab initio.[21] The District Court in *Rucker* looked to the approach used by the Court in recent Delaware STOLI cases that analyzed whether the policy was "procured under a scheme, purpose or agreement to transfer or assign the policy to a person without an insurable interest in order to evade the law against wagering contracts."

In examining the transfer of beneficial interests in the insurance trust (as policy beneficiary), the Court stated that although the insurance trust itself remained the named beneficiary, the subsequent purchaser of the beneficial interests in the trust "is the actual beneficiary and will receive all Policy proceeds according to the [transfer agreement]." The Court found that the trust was "established solely to evade the law against wagering contracts", and that "an interest in the Policy and an interest in the Insurance Trust are one in the same."[22]

The facts of *Rucker* included admissions by the insurance trust that the agent had always intended to transfer the policy from the outset, evidence from depositions that the insured and the agent had a pre-negotiated agreement to transfer the beneficial interest in the policy without which the insured would have never applied for coverage, and the failure of the insured to dispute allegations that the insured always intended to sell the beneficial interest in the policy for

---

[20] *Rucker* at 5.

[21] *Id* at 6.

[22] *Rucker* at 7.

H-AMT019744

California Public Employees' Retirement System
October 20, 2010
Page 13

a sum certain. In light of such facts and the Court's determination that the public policy concerns against wagers cannot "be avoided by transferring the Policy under the guise of a trust",[23] the Court found that (i) the facts demonstrated a scheme or plan to evade the law against wagering contracts, (ii) the policy lacked an insurable interest at inception, and (iii) the policy is void as against Delaware's insurable interest statute and public policy.

In addition to disregarding the distinction between transference of an interest in the policy and the transfer of a beneficial interest in the trust as policy beneficiary, the *Rucker* Court also addressed a core element of the *Sun Life v. Paulson* decision, a decision that the courts interpreting Delaware law have frequently cited to determine whether a scheme to evade the anti-wagering law exists. The *Paulson* decision has been interpreted to require that the identity of a purported buyer be established to determine that a scheme or plan to transfer the policy existed at or prior to policy issuance. The *Rucker* Court, however, found that in light of the aforementioned facts in the case, the insured "clearly intended to sell the beneficial interests in the Policy at the time it was procured" regardless of whether the insured knew the identity of the future purchaser.

The Court's analysis suggests that when the following facts are present, the insured under a life insurance policy may be considered to have intended to sell the beneficial interests in the policy itself at the time such policy was procured: (i) the beneficial interest in the insurance trust (as beneficiary of the life insurance policy) is transferred to a third party shortly after the policy is issued, and (ii) there are statements on the record that the agent informed the insured that the insured would receive a sum certain because the policy would be sold, that the insured procured the policy on the basis of statements by the agent that the policy would be sold, and that the agent knew that the insured had every intention of selling the policy.

The *Rucker* analysis also refutes the notion that when a trust is from the outset and remains the policy beneficiary, and merely transfers beneficial interests in the trust itself, the legal interest in a policy is never transferred. The Court decided that the beneficial interest in such a policy is in fact transferred via the transfer of beneficial interests in the trust (a trust that the Court remarks would be, under such circumstances, established solely to evade the prohibitions against wagering). Under such circumstances, the Court decided that an interest in the Policy and an interest in the trust as beneficiary "are one and the same."[24]

A Carrier or the heirs of the Insured may seek to challenge the Purchaser of the Trust Interests if they can establish that an insurable interest did not exist at the time of issuance because the policy was procured under a scheme, purpose or agreement to transfer or assign the policy to a person without an insurable interest in order to evade the law against wagering contracts. Such challenges would likely rely on the recent decisions discussed above as a basis for assertions that the Trust lacks an insurable interest in the Policies.

In *Rucker*, when determining whether a scheme existed to evade the anti-wager prohibitions and whether the Policy lacked an insurable interest at inception, the Court looked to

---

[23] *Id.*

[24] *Rucker* at 7.

California Public Employees' Retirement System
October 20, 2010
Page 14

evidence on the record that demonstrated and expressly acknowledged the insured's intent, as well as the agent's intent, as well as an arrangement to procure the policy for later sale to a third party. While the Program Facts do not appear to indicate such an arrangement, the analysis of whether an arrangement existed and the insured's intent is a very fact specific determination.

### D.    Delaware Has No Life Settlements Statutes

Chapter 18 of the Delaware Insurance Code (18 Del. C. §§ 7501 et seq) is the Delaware Viatical Settlements Act. While Delaware imposes a regulatory framework that governs the disposition of a Policy by way of a viatical settlement, Delaware has not and does not have a life settlement framework that would regulate the disposition of a Policy where the Insured was not a person with a catastrophic or life threatening illness or condition. The Policies under the Program Facts do not fall within the scope of Delaware's Viatical Settlements Act, and in the absence of a relevant regulatory framework governing life settlements, the Trust Interests need not be subject to a life settlement analysis in Delaware.

*4.    Passage of the Incontestability Period Bars a Carrier from Thereafter Asserting Claims Unless an Exception Applies.*

### A.    Application to Carrier

Section 2908 of the Insurance Code provides that there is a two year incontestability period in Delaware:

> There shall be a provision that the policy shall be incontestable after it has been in force during the lifetime of the insured for a period of not more than 2 years after its date of issue, except for (1) nonpayment of premiums, and (2) at the insurer's option, provisions relating to benefits in the event of total and permanent disability and provisions granting additional benefits specifically against death by accident or accidental means.

While the Delaware courts have not specifically barred challenges to the incontestability provisions based on an alleged lack of insurable interest, the Delaware Supreme Court has barred challenges based on fraudulent misstatements that were not acted upon within the incontestability period. [25] The U.S. District Court for the District of Delaware has found that:

> The provision that a policy shall be incontestable after it has been in force during the lifetime of the insured for a period of two years … means only this, that within the limits of the coverage the policy shall stand, unaffected by any defense that it was invalid in its inception, or thereafter became invalid by reason of a condition. [26]

---

[25] See, *Penn Mut. Life Ins. Co. v. Oglesby*, 695 A.2d 1146 (Del. 1997) ("Oglesby").

[26] *Wilmington Trust Co. v. Mutual Life Ins. Co.*, 68 F. Supp. 83,87 (D. Del. 1946) ("Wilmington Trust").

H-AMT019746

California Public Employees' Retirement System
October 20, 2010
Page 15

Incontestability provisions have historically been used to provide the insured with certainty and assurance that once the period of contestability runs, the coverage under a policy of insurance is firm and the beneficiaries under the policy are protected. As the U.S. District Court for the District of Delaware stated in *Oglesby v. Penn Mut. Life Ins. Co.*, 889 F. Supp. 770 (D. Del. 1995),

> Historically, these clauses arose as a reaction to the "early greed and ruthlessness of the insurers," 7 Williston on Contracts § 912 at 394 (3d ed. 1963), who were apt to deny benefits years after the policy had issued based on technicalities or pre-existing conditions. *Paul Revere Life Ins. Co. v. Haas*, 137 N.J. 190, 644 A.2d 1098, 1102 (N.J. 1994); *Wischmeyer v. Paul Revere Life Ins. Co.*, 725 F. Supp. 995, 1000 (S.D. Ind. 1989). As a result, many beneficiaries, especially those claiming under life or health insurance policies, were left in the untenable predicament of litigating against powerful insurance carriers. *Wischmeyer v. Paul Revere Life Ins. Co.*, 725 F. Supp. 995, 1000 (S.D. Ind. 1989).

The *Oglesby* Court explained that as a result, states enacted legislation requiring life, disability, and health insurance policies to contain incontestability clauses as tools to promote certainty and reduce litigation. As stated in *Wilmington Trust*:

> the legislative policy behind incontestability clauses is to eliminate the right to question the validity of the policy after the lapse of time, except in the specific situations excepted in the statutes pertaining to incontestability.[27]

The Delaware statutes contain no express exception to the applicability of the incontestability provisions of the Delaware Insurance Code for challenges based on an alleged lack of insurable interest.

In the *Berck* decision, discussed *supra*, the District Court considered whether plaintiff was legally entitled to contest the validity of an insurance contract on grounds of fraud or misrepresentation after the two-year incontestability period. The Court noted that this was a matter of first impression in Delaware, and looked to the manner in which other jurisdictions have handled alleged misrepresentations of insurable interest when raised after the incontestability period has run. The Court noted that while New York bars the insurer from raising lack of insurable interest after the period has run, [28] other states have refused to enforce policies where the policyholder had no insurable interest in the insured regardless of whether a claim is brought following the passage of the contestable period.[29]

---

[27] *Wilmington Trust* at 86.

[28] Citing to *New England Mutual Life Ins. Co. v. Caruso*, 73 N.Y.2d 74, 535 N.E.2d 270, 270, 538 N.Y.S.2d 217 (N.Y. 1989).

[29] Including California (see, *Paul Revere Life v. Fima*, 105 F.3d 490, 492 (9th Cir. 1997).

California Public Employees' Retirement System
October 20, 2010
Page 16

The Court considered strong public policy arguments for and against finding the claims barred by the incontestable period, which include contractual certainty on one hand, and discouraging fraud on the other. However, in light of the insufficiency of the plaintiff's complaint regarding the alleged lack of insurable interest, the Court declined to decide whether an exception for fraud or misrepresentation will allow the plaintiff to challenge the policy outside the contestability period until the complaint is properly amended and before the Court. As a result, determination of whether a challenge based on a lack of insurable interest, or a misrepresentation thereof (sounding in fraud), will be allowed if raised after the two-year incontestability period remains uncertain in Delaware.

As of the date of this Opinion, each Policy in the Program was issued and has been in effect for at least two (2) years from the date that the respective Policy was issued. Assuming that no changes were made to any Policy such as an increase in death benefits or any other such change that would extend the effective date for incontestability purposes, all of the Delaware Policies as of the date of this Opinion are now outside of the Delaware incontestable period. However, it is unclear whether a challenge by a carrier to the insurable interest with respect to such mature policies will barred by operation of 18 Del. C. § 2908.

**B.     Standing Conferred by Statute to Insured or His/Her Estate if Policy Proceeds are Paid in Violation of Delaware Insurable Interest Laws**

Section 2704(b) provides that the insured under a life insurance policy, or his/her executor or administrator, as applicable, may sue the beneficiary under the policy, or another assignee or payee thereunder, if policy proceeds are paid in contravention of the insurable interest laws set forth under Section 2704. Section 2704(b) expressly provides:

> If the beneficiary, assignee or other payee under any contract made in violation of this section receives from the insurer any benefits thereunder accruing upon the death, disablement or injury of the individual insured, the individual insured or his/her executor or administrator, as the case may be, may maintain an action to recover such benefits from the person so receiving them.

The right of action under § 2704(b) is not limited to the incontestable period. As a result, the Insured or his/her estate is not precluded from bringing an action against the Trust and the Purchaser to recover proceeds paid under the Policy, and is free to allege that the Policy lacked an insurable interest.

<div align="center">OPINION</div>

Based on the foregoing facts, representations, statements, and assumptions being correct at all relevant times, and based on the discussion and analysis above and subject to the qualifications set forth below, it is our opinion that, under present reported Delaware decisional authority and statutes applicable to the interpretation and enforcement of the insurance laws, and in a properly presented case, a Delaware court, acting reasonably and correctly applying the law to the facts as set forth in the Program Facts after full consideration of all relevant factors, should

California Public Employees' Retirement System
October 20, 2010
Page 17

---

hold that the Trust has the requisite insurable interest in the life of the Insured, under the Delaware Insurance Code, to enforce the Policy on the Insured's life as owner and beneficiary of such Policy. However, cases interpreting Delaware law require an examination of the intent of the Insured and Trust to transfer the Policy and the intent of the transferee to acquire the Policy. Such analysis of intent is a very fact specific determination. It is uncertain under Delaware whether any challenges raised by a Carrier with respect to insurable interest may, regardless of merit, be barred by operation of the incontestability provisions of the Delaware Insurance Law, although the Insured and his or her estate would not be so barred.

## QUALIFICATIONS

The foregoing opinions assume that the facts, representations, statements, and assumptions set forth in this Opinion will be those that exist at the time a state court considers the issues.

While we believe that our opinion respecting the insurable interest of the Trust is supported by sound analysis of existing Delaware law, we have found no statute or reported judicial authority that directly determines whether policies such as those procured pursuant to the Program Facts have the requisite insurable interest. Moreover, we have found no reported judicial authority which has considered a transaction containing all the material facts and circumstances that are present with respect to the Program and opines directly on these issues. In rendering our opinion, we have thus relied on authorities discussing certain of the facts and circumstances that are present in the Program, and cases and statutes discussing more generally factors indicating whether a trust established by an insured, such as the Trust under the Program Facts, has an insurable interest. Accordingly, our opinion is not based on controlling precedent but rather on what we believe to be a sound reasoned analysis of existing authorities applied to the Program Facts.

Furthermore, you should recognize that it is impossible to predict the outcome of any future judicial proceeding. The opinions expressed herein are not a guarantee as to what any particular court would actually hold, but an opinion as to the decision a court would reach if the issues are properly presented to it and the court followed existing precedent as to legal and equitable principles applicable in such cases. As is evidenced by the District Court decisions in the *Berck, Snyder* and *Rucker* cases, while Delaware jurisprudence is developing, there is still no clear consensus on the issue of insurable interest at the time of procurement. The recipients of this Opinion should take these limitations into account in analyzing the risks associated with the transactions described herein.

Except as otherwise provided herein, our opinions expressed herein are as of the date of this letter, are solely for the benefit of the addressee hereof in connection with the consummation of the transactions contemplated by the Program, and may not be relied upon by the addressee for any other purpose or by any other person or entity for any purpose without our prior written consent; provided that this opinion letter may be furnished to, and relied upon by, your successors and permitted assigns in connection with the transactions described herein. Our review of the relevant reported judicial decisions and law is current as of October 15, 2010. We disclaim any obligation to update this letter for changes in fact or law or otherwise after such

H-AMT019749

California Public Employees' Retirement System
October 20, 2010
Page 18

___

date. We assume no, and hereby disaffirm any, obligation to update or to supplement our opinions expressed herein to reflect any facts or circumstances that may hereafter come to our attention or any changes in reported judicial decisions or laws that may occur after October 15, 2010. Our opinions are limited to the matters stated herein and no opinion is implied or may be inferred beyond the matters expressly stated herein.

Very truly yours,

*Cozen O'Connor*

COZEN O'CONNOR, P. C.

H-AMT019750

## SCHEDULE A

### List of Transaction Documents

A.   Life Expectancy reports;

B.   Policy application;

C.   Life insurance illustration;

D.   HIPAA forms;

E.   Medical release forms;

F.   Family Disclosure and Consent Agreement;

G.   Successor Beneficiary Agreement;

H.   Trust Agreement;

I.   Replacement Trust Agreement;

J.   Trustee Resignation (where applicable);

K.   Successor Trustee Agreement (where applicable);

L.   Trust Certification;

M.   Policy; and

N.   Insured identification information.

NYC_MIDTOWN\15850168 119740.000

H-AMT019751

## OCEAN GATE LIFE SETTLEMENT PROGRAM, LP

### OFFICER'S CERTIFICATE

October 20, 2010

In connection with the opinion dated October 20, 2010 (the "<u>Opinion</u>") to be delivered by Cozen O'Connor, a professional corporation in connection with a life settlement program ("<u>Program</u>") of Ocean Gate Life Settlement Program, LP (the "<u>undersigned</u>"), the undersigned hereby certifies that, to the best of its knowledge after due inquiry and review of the Opinion:

1. The undersigned understands that Cozen O'Connor, a professional corporation is relying on this Certificate in connection with the execution and delivery of the Opinion.

2. The facts contained in the Opinion insofar as they pertain to Ocean Gate Life Settlement Program LP or the Program, including without limitation the Program Facts, are true, correct and complete as of the date hereof.

3. The documents listed on Schedule A attached to the Opinion identifies all the documents relating to the Program.

4. The undersigned has no reason to believe that any other fact contained in the Opinion is untrue, inaccurate or incomplete.

5. Each of the undersigned and OGLS GP, LP has been duly authorized to execute this Certificate on behalf of Ocean Gate Life Settlement Program, LP.

<div style="margin-left: 40%;">

**OCEAN GATE LIFE SETTLEMENT
PROGRAM, LP**

By: OGLS GP, LP, as general partner

By: OGLS, LLC, as general partner

By: _____
Name:   Barry S. Turkanis
Title:   Manager

</div>

# Exhibit 10



**COZEN O'CONNOR**

A PROFESSIONAL CORPORATION

277 PARK AVENUE   NEW YORK, NY 10172   212.883.4900   888.864.3017   212.986.0604 FAX   www.cozen.com

October 20, 2010

**CONFIDENTIAL**

California Public Employees' Retirement System
Lincoln Plaza North
400 Q Street
Sacramento, California 95814
Attn: Dan Kiefer

Re:    Ocean Gate Life Settlement Program

Ladies & Gentlemen:

We have acted as special regulatory counsel to Ocean Gate Life Settlement Program, LP, a Delaware limited partnership (the "Purchaser"), in connection with a life settlement program (the "Program"), pursuant to which (i) an individual (the "Insured") has formed a New Jersey irrevocable trust (the "Trust"), (ii) the Trust has acquired a life insurance policy insuring the life of the Insured (the "Policy") and (iii) after the Policy was issued to the Trust, the beneficiary of the Trust has sold its beneficial interest in the Trust (the "Trust Interest") to the Purchaser. This opinion letter (the "Opinion") is being delivered pursuant to your request, and with the consent of the Purchaser.

<div align="center">FACTS AND ASSUMPTIONS</div>

In rendering this Opinion, our examination of documents has been limited to the examination of originals or copies of documents provided to us with respect to each Trust in which the Purchaser has purchased a Trust Interest, which documents are referenced on Schedule A attached hereto and made a part hereof (the "Transaction Documents").

For purposes of this Opinion, we have not reviewed any documents other than the Transaction Documents. We have assumed that there exists no provision in any document that we have not reviewed that is inconsistent with the opinions stated herein.

NYC_MIDTOWN\1587148\4 262977.000

H-AMT019754

California Public Employees' Retirement System
October 20, 2010
Page 2

In addition to the Transaction Documents, we have conducted interviews of the Purchaser as well as personnel at Dearborn Capital Partners, LLC (the "Aggregator"), with respect to the Program (together, the "Interviews").

We have relied solely upon the foregoing Transaction Documents, the factual statements and information set forth therein, the factual statements and information provided by the Purchaser and the Aggregator during the Interviews, as well as the additional matters recited or assumed herein, all of which we have assumed to be true, complete and accurate. We have also relied upon, and assumed the accuracy and completeness of, the representations and warranties contained in the Transaction Documents, oral and written statements and other information obtained from the Purchaser and Aggregator. Except as expressly set forth herein, we have not undertaken any independent investigation (including, without limitation, conducting any review, search, or investigation of any public files, records or dockets) to determine the accuracy or completeness of the facts that are material to our opinions stated herein, and no inference as to our knowledge concerning such facts should be drawn from our reliance on the representations of the Purchaser, the Aggregator or others in connection with the preparation and delivery of this Opinion.

Whenever a statement herein is qualified by the phrase "to our knowledge," "known to us" or words of similar import, such phrase shall mean that none of the attorneys in this firm who have had active involvement in analyzing the transactions contemplated by the Program is consciously aware at this time of facts or other information inconsistent with or contrary to such statement. We have not undertaken an independent investigation or review to determine the accuracy or completeness of any such statement, and any limited inquiry undertaken by us during the preparation of this Opinion should not be regarded as such an investigation or review. No inference as to our knowledge of any matters bearing on the accuracy or completeness of such statement should be drawn from the fact of our representation of the Purchaser.

We have assumed in this Opinion that the documents and instruments reviewed by us have not been amended by any oral or written amendment or conduct of the parties thereto, and that there are no extrinsic agreements or understandings among the parties that would modify or affect the interpretation of or the terms of the Transaction Documents or the respective rights and obligations of the parties thereunder.

We express no opinion concerning the laws of any jurisdiction other than the laws of the State of New Jersey and the federal laws of the United States of America.

We have assumed and relied upon the genuineness and due authorization of all signatures, the authenticity of all documents submitted to us as originals, the conformity to original documents of all documents submitted to us as copies, telecopies or pdfs and the authenticity of the originals of all documents submitted to us as copies, telecopies or pdfs.

The opinions expressed herein are based upon and subject to the compliance by each the Purchaser, the Insured, the Trustee (as defined herein), the Initial Beneficiary (as defined herein) and the Agent (as defined herein) at all relevant times, with all provisions of the Transaction Documents.

NYC_MIDTOWN\1587148\4 262977.000

H-AMT019755

California Public Employees' Retirement System
October 20, 2010
Page 3

In rendering our opinions set forth below, we have assumed the legal capacity for all purposes relevant hereto of all natural persons and, with respect to all parties to agreements or instruments relevant hereto, that such parties had the requisite power and authority (corporate or otherwise) to execute, deliver and perform such agreements or instruments, that such parties have all the necessary governmental licenses, permits or authorizations to act in the capacities in which they are to act thereunder, that such agreements or instruments have been duly authorized by all requisite action (corporate or otherwise), have been duly executed and delivered by such parties and that such agreements or instruments are the valid, binding and enforceable obligations of such parties.

**Program Facts:**

For the purposes of this Opinion, and based on the Transaction Documents and the Interviews referenced above, we have assumed that the facts and statements outlined in this Opinion are true, correct and complete. We have been advised of the following facts by the Purchaser and nothing in our Interview with the Aggregator was inconsistent therewith (referred to herein as "Program Facts"):

From time to time, the Purchaser was contacted by the Aggregator[1] to assess the Purchaser's interest in acquiring interests in entities owning the right to the proceeds of various life insurance policies on the lives of high net worth individuals. The Aggregator would provide the Purchaser with a life insurance illustration ("Illustration") based on a life proposed to be insured. The Aggregator sent each Illustration concurrently to the Purchaser as well as numerous other prospective purchasers. If the Purchaser was interested in the representations set forth in a particular Illustration, the Purchaser would reply to the Aggregator via email with a non-binding and hypothetical indication of interest in purchasing an interest in a trust owning a policy similar to the policy described in the Illustration. Such indications of interest did not include a hypothetical purchase price, and were not, nor were they intended to constitute, an offer to purchase any interest in any Policy. The Aggregator would, with respect to any given Illustration, expect to receive indications of interest from any number of prospective purchasers, including the Purchaser.

There was no communication, at the time of or prior to the Purchaser's indication of interest to the Aggregator, between the Purchaser or any of its affiliates, officers, directors, employees, agents or representatives and the Agent (as defined herein), Insured, Trustee or Initial Beneficiary or any of the affiliates, officers, directors, employees, agents or representatives thereof. No Transaction Documents were provided by the Aggregator or the Purchaser to the Agent, Insured, Trustee or Initial Beneficiary or any of the affiliates, officers, directors, employees, agents or representatives thereof at the time of Purchaser's indication of interest to the Aggregator, nor at any point prior to the issuance of the Policy. Furthermore, neither the Purchaser nor the Aggregator has informed us that the Purchaser's indication of interest to the Aggregator was communicated to the Insured, Trustee or Initial Beneficiary.

---

[1] Life Spring, LLC is a separate entity that also acted as an aggregator under the Program. We did not interview Life Spring, LLC. Life Spring, LLC and Dearborn Capital Partners, LLC are referred to hereinafter collectively as the "Aggregator".

California Public Employees' Retirement System
October 20, 2010
Page 4

The Insured created and established an irrevocable trust under the laws of the State of New Jersey (the "Trust") for the purpose of owning, maintaining, and administering a life insurance policy on the life of the Insured, a high net worth individual. The Insured named an individual with an address and its principal place of business in the State of New Jersey as Trustee.[2] The Insured designated as sole beneficiary of the Trust one or more individuals who are family members of the Insured, including without limitation the Insured's spouse, a child of the Insured, a grandchild of the Insured, an individual who is related by blood or law to the Insured, or such other individual whom the Insured considers to be a family member based upon a relationship of love and affection between the Insured and such individual (the "Initial Beneficiary").

After the Trust was established, the Trust procured, with the consent of the Insured,[3] the Policy, issued by a life insurance company licensed to do business in the State of New Jersey (the "Carrier"). At the time the Policy was issued, and at all relevant times thereafter, the Trust has been both the owner and beneficiary of the Policy. At the time of issuance of the Policy, the Insured: (i) had a minimum net worth of two million dollars ($2,000,000), (ii) was at least seventy (70) years of age and had a life expectancy greater than twenty-four (24) months, as determined by at least one independent third party medical underwriter, (iii) did not have any catastrophic, life-threatening or terminal illness or condition, and (iv) did not suffer from any chronic illness that rendered the Insured unable to perform two (2) or more activities of daily living or any cognitive impairment that caused the Insured to require substantial supervision in order to protect the Insured from threats to the Insured's health and safety. In addition, at the time of issuance of the Policy, the Insured had a valid need for the life insurance coverage, and the death benefit and premium under the Policy was not greater than the amount appropriate for the Insured, based upon the Insured's income, assets and other relevant factors. The Agent may, in some cases, have discussed with the Insured or the Initial Beneficiary a sale of the Policy or the Trust Interest as part of a discussion of all of the Insured's financial options, but no such transfer was guaranteed or arranged at that time.

Prior to procurement of the Policy, life expectancy reports may have been obtained by the Insured, or on his or her behalf. Furthermore, during the course of procurement but prior to issuance of the Policy, the Insured and/or the Initial Beneficiary may have solicited interest from, or offered to sell interests in the Policy or Trust to any variety of prospective purchasers. However, at no point prior to or during the procurement of the Policy did the Purchaser, the Aggregator, the Agent, or any of the Purchaser's, Aggregator's or Agent's affiliates, officers, directors, employees, agents or representatives: (i) enter into any agreement, or make any offer to enter into any agreement, whether oral, written or otherwise, to purchase the Policy or any interest in the Trust from any party, including but not limited to the Insured, Trustee, or Initial Beneficiary, or any representative or agent of the Insured, Trustee, or Initial Beneficiary or (ii)

---

[2] While this opinion is limited to New Jersey law, the Program also acquired Trust Interests in Policies that were previously owned by life insurance trusts in the following jurisdictions: California, Delaware, Florida, Illinois, Maryland, Massachusetts, New York, Pennsylvania, and Texas.

[3] The Insured's consent is evidenced by the terms of the Trust Agreement, as well as the Policy application, each document signed by the Insured.

California Public Employees' Retirement System
October 20, 2010
Page 5

purchase or offer to purchase the Policy or any interest in the Trust from any party, including but not limited to the Insured, Trustee, or Initial Beneficiary, or any representative or agent of the Insured, Trustee, or Initial Beneficiary. At no point prior to or during the procurement of the Policy did the Purchaser, the Aggregator or any of the Purchaser's or Aggregator's affiliates, officers, directors, employees, agents or representatives have any contact with the Insured, Trustee or Initial Beneficiary, or any affiliates, officers, directors, employees, agents or representatives thereof. Neither the Purchaser nor any of its affiliates, officers, directors, employees, agents or representatives provided the Aggregator with compensation for its services in connection with the Program; such compensation was provided solely by the Insured, its Agent, or the Initial Beneficiary.

Following the procurement and issuance of the Policy, the Aggregator contacted the Purchaser to determine the Purchaser's interest in purchasing the Initial Beneficiary's Trust Interest. Such contact occurred only following Policy issuance, in certain instances on the same day the Policy was issued, and in other instances several months following Policy issuance. The Aggregator included an illustration based on the issued Policy, as well as a life expectancy report on the Insured. The Purchaser responded, if interested, by submitting an offer to purchase the Trust Interest to the Aggregator that was subsequently communicated to the Trustee/Insured's licensed life insurance agent (the "Agent"). If the Purchaser's bid was accepted, the Purchaser, for the first time, provided form Transaction Documents, which if accepted by the Trustee and Initial Beneficiary, were subsequently executed. The form Transaction Documents provided by the Purchaser, and subsequently executed by the relevant parties, included a Successor Beneficiary Agreement, whereby the Initial Beneficiary agreed to transfer its Trust Interest to the Purchaser as successor beneficiary in return for the Purchaser's payment of consideration, and the Purchaser became responsible for the immediate payment of the entire first year's target premium under the Policy, or any remaining portion thereof, and for payment of subsequent premiums due under the Policy. Execution of the Transaction Documents was determined in part by the timing of the Aggregator's contact with the Purchaser, and occurred in certain instances on the same day the Policy was issued, and in other instances several months following Policy issuance.

The initial life insurance premium or deposit payment on the Policies was most often paid by a party other than the Purchaser, such as the Insured or the Initial Beneficiary. The amounts of such initial life insurance premium payments varied in each instance.

With respect to each Policy, following the transfer of the Initial Beneficiary's Trust Interest to the Purchaser as Successor Beneficiary, the Purchaser caused the amendment and restatement of the Trust Agreement, as well as the appointment of a successor trustee. Ultimately, Christiana Bank was named as Successor Trustee of the Trust. The Carriers have been notified, with respect to certain Policies, that Christiana Bank had been appointed as Successor Trustee.

We have assumed that no provision or characteristic of the Program is inconsistent with or contrary to the Program Facts. We have, with your permission, relied solely upon the Program Facts, all of which we assume to be true, complete, and accurate in all respects for the purposes of this Opinion.

H-AMT019758

California Public Employees' Retirement System
October 20, 2010
Page 6

## DISCUSSION AND ANALYSIS

*1.*    *New Jersey Statutory Law Regarding Insurable Interest*

### A.    Insurable Interest Statutes

With respect to the procurement of life insurance on one's own life, the universal rule is that "everyone not under some type of legal disability ... may validly contract for insurance on his own life ..."[4] The substantial interest that each individual has in the continuation of his or her own life gives that individual an insurable interest therein. Further, it is a general principle of insurance law that a person who procures a policy of life insurance for his own benefit on the life of another person must have an insurable interest in the continuance of the life of the insured.

Thus, assuming that an individual is competent to contract, an individual may legally procure insurance on his or her own life and health and may designate whomever he or she chooses to receive the policy proceeds, whether or not the designated beneficiary is someone who has an insurable interest in that person. In situations where a person other than the individual insured takes out a policy of insurance on the life of the insured, the designated beneficiary must have an insurable interest in the life of the individual insured.

In New Jersey, these principles are codified in N.J. STAT. ANN. § 17B:24-1.1 of the New Jersey Insurance Code.[5] Section 17B:24-1.1(a) provides that for the purpose of life insurance:

> (1) An individual has an insurable interest in his own life, health and bodily safety.

> (2) An individual has an insurable interest in the life, health and bodily safety of another individual if he has an expectation of pecuniary advantage through the continued life, health and bodily safety of that individual and consequent loss by reason of his death or disability.

> (3) An individual has an insurable interest in the life, health and bodily safety of another individual to whom he is closely related by blood or by law and in whom he has a substantial interest engendered by love and affection. An individual liable for the support of a child or former wife or husband may procure a policy of insurance on that child or former wife or husband.

In addition, N.J. STAT. ANN. § 17B:24-1.1(b) provides:

---

[4] R.E. Keeton, Insurance Law 119 -120 (West 1971).
[5] All further statutory references are to the New Jersey Insurance Code, unless provided otherwise.

NYC_MIDTOWN\1587148\4 262977.000

H-AMT019759

California Public Employees' Retirement System
October 20, 2010
Page 7

> No person shall procure or cause to be procured any insurance
> contract upon the life, health or bodily safety of another individual
> unless the benefits under that contract are payable to the individual
> insured or his personal representative, or to a person having, at the
> time when that contract was made, an insurable interest in the
> individual insured.

As a result, the New Jersey statutes recognize that an "insurable interest" may exist in the following two contexts: (i) one's insurable interest in his or her own life pursuant to N.J. STAT. ANN. § 17B:24-1.1(a)(1) and (ii) an individual's insurable interest in the life of another, where such individual has an insurable interest in the life of the insured because the individual is closely related by blood or by law and has a substantial interest in the insured engendered by love and affection pursuant to N.J. STAT. ANN. § 17B:24-1.1(b).

Where the individual insured procures insurance on his or her own life, the New Jersey statutes impose no restriction on whom the insured may designate as beneficiary. Where a person other than the insured, however, procures an insurance contract upon the life of the insured, the New Jersey statutes provide that the benefits under such contract may only be payable to the individual insured, his or her personal representative, or persons having, at the inception of such contract, an insurable interest in the life of the individual insured.

2.   *Under the New Jersey Statutes, the Beneficiary's Insurable Interest in the Life of the Insured Must Exist Only at the Time the Policy is Made*

It is widely recognized that, as a life insurance contract is not regarded as a contract of indemnity, it is sufficient that an insurable interest exist at the inception of the contract.[6] As noted by Columbia Professor Edwin W. Patterson in *Essentials of Insurance Law* (1935), "Insurable interest in life must exist at the inception of the policy but need not exist at the time when death occurs. An incipient interest is both necessary and sufficient." If the insurable interest requirement is satisfied by the Trust at the time the Policy is issued, such Policy should be valid, regardless of subsequent transactions with respect to the Policy.

As explained above, New Jersey statutes provide that no person shall procure insurance on the life of another person unless the policy benefits under that contract are payable "to a person having, at the time when that contract was made, an insurable interest in the individual insured."[7] New Jersey statutes, however, do not impose a requirement that the insurable interest must exist at any time after the contract is made. As a result, it appears that an insurable interest

---

[6] Couch on Insurance 3d, § 41 :23 (1997) "Time When Interest Must Exist." *See also*, U. Rich, L. Rev. 71 (Does Lack of an Insurable Interest Preclude an Insurance Agent from Taking an Absolute Assignment of his Client's Life Policy?) ("In the context of life insurance it is universally agreed that the [insurable] interest need exist only at the time of the inception of the policy. Consequently, the insurable interest rules are primarily concerned with the initial issuance of a life policy and less with subsequent events.")

[7] N.J. STAT. ANN. § 17B:24-1.1(b).

H-AMT019760

California Public Employees' Retirement System
October 20, 2010
Page 8

in the life of the person insured must exist at the time the policy is made, but need not exist thereafter.

3.    *Insurable Interest Under New Jersey Case Law*

A.    **Public Policy Against Wagers**

The New Jersey Supreme Court recognized as early as 1890 in the case of *Vivar v. Supreme Lodge of Knights of Pythias*, 52 N.J.L. 455 (Sup. Ct. 1890) ("Vivar"), that life insurance policies entered into without an insurable interest are generally condemned as being contrary to public policy. *Vivar* did provide, however, that where a person effects insurance on his or her own life, and designates another person as beneficiary, the beneficiary need not have an insurable interest. The New Jersey Court of Errors and Appeals followed the *Vivar* decision, and explained that:

> a policy taken out by one upon his own life and payable to his representatives or assigns was not a wagering contract...[8]

This anti-wagering concern underlies the New Jersey public policy that imposes insurable interest requirements for life insurance policies. Accordingly, the New Jersey District Court provided in the 2009 case of *Lincoln Nat'l Life Ins. Co. v. Calhoun*, 596 F. Supp. 2d 882,889 (D.N.J. 2009) ("Calhoun") that "[l]ife insurance policies must be secured by an insurable interest to be valid."

The Court in *Calhoun*, discussing the origins of the New Jersey insurable interest requirement, explained that:

> The Supreme Court first elucidated the insurable interest requirement nearly a century ago in the 1911 case, *Grigsby v. Russell*, 222 U.S. 149, 32 S. Ct. 58, 56 L. Ed. 133. The Court explained that, "[a] contract of insurance upon a life in which the [policy owner] has no interest is a pure wager that gives the [policy owner] a sinister counter interest in having the life come to an end." Id. at 154-55. The requirement that a policy be issued to only those who have an insurable interest, therefore, operates to prevent the prohibited "wagering" contracts.

The United States Supreme Court, in *Grigsby v Russell*, 222 U.S. 149, 32 S. Ct. 58 (1911), ("Grigsby"), indicated that the public policy underlying the insurable interest rule is satisfied in circumstances where the insured is "not afraid to trust" the person or entity entitled to the insurance proceeds.

Consequently, where the individual insured procures a policy of insurance on his or her own life, the insured may designate whomever he or she pleases as beneficiary. Where a person other than the individual insured takes out a policy of insurance on the individual insured's life,

---

[8] *Meyers v. Schumann*, 54 N.J. Eq. 414,417 (E. & A. 1896) ("Meyers").

H-AMT019761

California Public Employees' Retirement System
October 20, 2010
Page 9

the beneficiary of the policy must have an insurable interest in the individual insured at the time the policy is made.

## B.   The Trust's Insurable Interest

New Jersey statutes do not expressly address whether an insured-established trust may insure the life of the insured.  New Jersey Insurance Law § 17B:24-101(a), however, authorizes a trust to own life insurance on a company's or charitable entity's employees and recognizes the insurable interest of the trust under certain circumstances.  N.J. STAT. ANN. § 17B:24-101(a)(4) sets forth instances in which a corporation has an insurable interest in the lives of its directors, officers, employees, obligors and others, and provides in part that:

> The trustee of a trust established and fully funded by a corporation providing solely life, health, disability, retirement, or similar benefits to employees of the corporation or its affiliates and acting in a fiduciary capacity with respect to those employees, retired employees, or their dependents or beneficiaries, has an insurable interest in the lives of employees for whom such benefits are to be provided.

N.J. STAT. ANN. § 17B:24-101(a)(5) sets forth instances in which a nonprofit or charitable entity has an insurable interest in the lives of its directors, officers, employees, supporters or their designees or others, and provides in part that:

> The trustee of a trust established and fully funded by a nonprofit or charitable entity qualified pursuant to section 501 (c) (3) of the Internal Revenue Code of 1986 (26 U.S.C. 501(c)(3)), or a government entity providing solely life, health, disability, retirement, or similar benefits to employees of the entity or its affiliates and acting in a fiduciary capacity with respect to those employees, retired employees, or their dependents or beneficiaries, has an insurable interest in the lives of employees for whom such benefits are to be provided.

Furthermore, a review of relevant New Jersey case law reveals no legal authority that challenges the validity of the insurable interest that an irrevocable trust, established by its grantor, has in the life of its grantor where the insured/grantor directs the trust to procure insurance and consents, in writing, thereto.  In fact, New Jersey courts have recognized that a trust established by the insured may procure and receive benefits of a policy on the life of the grantor-insured.

The Court in *Calhoun* analyzed an action brought by an insurance carrier seeking rescission of a policy issued to the insured's family trust.  The insured had established a family insurance trust, and together with trustee of the trust applied for a policy on the life of the insured naming the trust as owner and beneficiary thereof.  After the policy was issued, the carrier came

H-AMT019762

California Public Employees' Retirement System
October 20, 2010
Page 10

to believe that the policy was intended to be sold to stranger investors, and initiated an action for rescission.

In analyzing the carrier's allegation that the policy should be rescinded due to a lack of insurable interest, the Court acknowledged that individuals have an insurable interest in their own lives, and that an individual that obtains coverage on his or her own life may transfer ownership of the policy to whomever he or she chooses. The Court, however, explained that where an insured intends *at the time of issuance* to transfer such policy to a stranger investor with no insurable interest, "insureds begin to run afoul of the insurable interest requirement."[9]

The Court recognized that as of the date of the action, the policy had not been transferred to an individual lacking an insurable interest, and that it remained the property of the trust. The Court framed the issue before it as whether a policy can be voided due to a lack of insurable interest based on the intent of the insured to sell the policy to a stranger. Significantly, the Court took no issue with the fact that the policy was applied for, procured by, held by, and was payable to the trust. It simply addressed the issue of whether there was intent to transfer the policy from the trust to a person that would lack an insurable interest.

The *Calhoun* decision did not expressly state that the family trust had an insurable interest in the life of its grantor. By recognizing that the trust owned the policy, however, and stating its concern that ownership of the policy may have been intended to be transferred to a person without an insurable interest, the Court implied that the policy was at inception, and at the time of the decision, held by a person – the trust – that could have an insurable interest in the life of the insured.

    3.    *Examination of the Interests of the Initial Beneficiary of the Trust at the time of Policy Inception*

**A.    Initial Beneficiary's Insurable Interest**

As set forth above, the New Jersey statutes require that the beneficiary of a policy have an insurable interest in the life of the insured at the time of policy inception. Nevertheless, during the course of a court's review of the Program, a party seeking to challenge the Trust's insurable interest may petition the court to "look through" the Trust to determine whether the beneficiary(ies) of the Trust had the requisite insurable interest in the life of the Insured.[10]

---

[9] *Calhoun* at 889.

[10] While there is no controlling authority under New Jersey Law that authorizes such analysis, parties have asserted challenges to a trust's insurable interest on the basis of STOLI allegations. See, *Calhoun*, *West Coast Life Ins. Co. v. Harry Esses 2007-1 Ins. Trust* and *Schwarz*, discussed *supra*. Allegations commonly associated with STOLI-related challenges include assertions that a trust-owned policy was caused to be procured not by the trust, but rather at the behest of investors with no insurable interest therein, with the purpose of gambling upon the life of the insured. As a result, proponents of these allegations frequently argue that such policies lack an insurable interest at inception and should therefore be deemed to be void *ab initio*.

H-AMT019763

California Public Employees' Retirement System
October 20, 2010
Page 11

The Insured has designated the Initial Beneficiary as sole beneficiary of the Trust. As stated under the Program Facts, the Initial Beneficiary is one or more individuals who are family members of the Insured. The New Jersey statutes require only that an insurable interest exists at the time the contract is made. Because the Initial Beneficiary is the sole beneficiary of the Trust at the time the Policy is issued and because the Initial Beneficiary has an insurable interest at the time of Policy inception pursuant to N.J. STAT. ANN. § 17B:24-1.1(a)(3), the fact that the Initial Beneficiary of the Trust has an insurable interest in the life of the Insured at the time of Policy inception might provide a basis for finding that the Policy satisfies the New Jersey insurable interest requirements, unless there is an intention at inception to sell the policy to a person without an insurable interest, as discussed in more detail below.

4.   *Whether the Sale of the Trust Interest Subsequent to the Issuance of the Policy Affects the Analysis*

As discussed *supra*, N.J. STAT. ANN. § 17B:24-1.1(b) provides that the insurable interest in the life of an insured must exist at the time the contract is made, but it need not exist thereafter. Furthermore, and as discussed above, the District Court in *Calhoun* recognized that:

> an individual who obtains life insurance on his own life is
> permitted to transfer ownership of the procured policy to a person
> or entity that lacks an insurable interest. [11]

Despite the fact that the Trust's insurable interest can be established at the date the Policy is made and although insurable interest need not exist after the inception date, a Carrier or the heirs of the Insured may nevertheless seek to challenge the transfer of the Trust Interests if they can establish that an insurable interest did not exist at the time of issuance because the Policy was procured by the Insured with the intention at the time of issuance to transfer to a person with no insurable interest. Certain recent opinions interpreting New Jersey law regarding trusts' insurable interests and/or allegations of stranger-owned life insurance ("STOLI") practices are discussed below.

A.   **Lincoln Nat'l Life Ins. Co. v. Calhoun**

As discussed above, the District Court in *Calhoun* analyzed an action brought by an insurance carrier where an insured had established a family insurance trust, and together with trustee of the trust applied for a policy on the life of the insured that named the trust as owner and beneficiary thereof. The carrier, following the issuance of the policy, sought to rescind the policy because, it alleged, the insured intended at the time the policy was procured to sell it to stranger investors. The carrier further alleged that the insured made material misrepresentations

---

[11] *Calhoun* at 889, citing *Travelers' Ins. Co. v. Morris*, 115 N.J. Eq. 142, 169 A. 835 (1934) (recognizing legality of assigning insurance policies to parties without an insurable interest). See, also, *Meyer*, which provided that not only is a policy taken out by one upon his own life and payable to his representatives or assigns not a wagering contract, but such policy "could not become so by an assignment to one having no insurable interest in the life, although the latter assumed the payment of future assessments." *Meyer* at 417.

H-AMT019764

California Public Employees' Retirement System
October 20, 2010
Page 12

in the policy application concerning discussions prior to policy application regarding a possible sale of the policy in the secondary market.

In *Calhoun*, the District Court explained the characteristics of a "typical STOLI transaction", and then addressed the carrier's allegations of material misrepresentation and the lack of insurable interest. With respect to the claim of material misrepresentation, the carrier alleged that the insured and/or trustee had either contacted or arranged to sell the policy to a stranger investor at the time of the application for the policy. The carrier also suggested that the trust was created in order to avoid arousing suspicion that the policy was part of a STOLI transaction. [12] The Court denied the defendants' motion to dismiss the material representation claim.

Regarding the insurable interest claim, the Court noted that it is a case of first impression for the Third Circuit and the New Jersey Supreme Court whether a policy can be voided due to lack of an insurable interest based on the unilateral intent of the insured to sell the policy to a stranger, or whether the remedy of rescission requires mutual intent on the part of both the insured and the stranger to assign the policy. The Court found that because issues of intent are crucial to the determination of this issue, dismissal at this juncture would be premature.

The Court proceeded to discuss *Sun Life Assurance Co. of Canada v. Paulson*, No. 07-3877, 2008 U.S. Dist. LEXIS 99633 (D. Minn. Dec. 3, 2008) ("Paulson"), the decision from the U.S. District Court for the District of Minnesota decision which found that mutual intent on the part of both the insured and the stranger to assign the policy is required for rescission to be proper. [13] While the *Calhoun* Court did not expressly determine which approach – either unilateral or mutual intent – controlled in New Jersey, the Court found that issues of intent are crucial in this case, and specifically allowed the carrier to proceed to "attempt to discover whether, and with whom, Calhoun had arranged to sell the Policy at the time the Application was submitted." [14]

While a party seeking to challenge the Policy under the Program may seek to use the *Calhoun* decision as precedent for arguing that a Trust lacks an insurable interest, such challenging party would need to establish whether the Insured or the Trust had arranged a sale of the Policy prior to issuance, and with whom such arrangement was made. While the Program Facts do not appear to indicate such intention, the analysis of intent is a very fact specific determination.

    **B.**    **West Coast Life Ins. Co. v. Harry Esses 2007-1 Ins. Trust**

---

[12] *Id.* at 888.

[13] As the Court explained in *Calhoun*, the *Paulson* Court held that the defendant-insured's intent to transfer his policy was "irrelevant" unless the plaintiff had also identified a prospective third party buyer who lacked an insurable interest in the policy, and had plead that there was mutual intent on the part of the defendant-insured and the third party to purchase the defendant's policy at the expiration of the contestability period. See, *Calhoun* at 889-890.

[14] *Id.* at 890.

H-AMT019765

California Public Employees' Retirement System
October 20, 2010
Page 13

In *West Coast Life Ins. Co. v. Harry Esses 2007-1 Ins. Trust*, 2010 U.S. Dist. LEXIS 40060 (D.N.J. Apr. 22, 2010), the U.S. District Court for the District of New Jersey considered an action brought by a carrier for rescission of a life insurance policy based on STOLI allegations. The Court in *West Coast* acknowledged that there was a separate action before the Texas state court in which the defendants in *West Coast* are proceeding as Plaintiffs, alleging that the carrier engaged in a scheme to solicit business from Texas policy owners and then wrongfully purport to rescind policies later deemed by them to be unprofitable.

Because the Court in *West Coast* determined that both *West Coast* and the Texas action focus on whether the trust has an insurable interest in the life of the insured at the time the policy was issued, and whether the policy application contained certain misrepresentations, the Court abstained from hearing this matter and any attendant motions until the conclusion of the parallel Texas state court proceeding.

### C. Lincoln Nat'l Life Ins. Co. v. Schwarz, 2010 U.S. Dist. LEXIS 85044 (D.N.J. Aug. 18, 2010) ( "Schwarz")

In *Schwarz*, the U.S. District Court for the District of New Jersey considered STOLI allegations made by a plaintiff insurer against the defendant trustees of an irrevocable trust established in the name of an insured under policies written by the plaintiff. The complaint alleged that the insured intended at the time of application to sell the policies to stranger investors, and that as a result the policies it issued lacked the requisite insurable interest. The insurer also alleged other fraud-related claims on the basis of misrepresentations made in the policy applications. The defendants moved to dismiss the complaint on a number of bases, including (i) that each of the policies contained an incontestability clause that acts as an absolute bar to any attempt to rescind the policies, (ii) the trust did hold an insurable interest, (iii) the insurer failed to properly plead its fraud-related claims, and (iv) the insurer failed to properly plead that jurisdiction rests with the *Schwarz* Court. [15]

In determining whether to apply New York or New Jersey law, the Court decided that further fact development was necessary, and that for the purposes of the motion to dismiss, the laws of both jurisdictions are materially the same. The Court proceeded to analyze the insurer's claims under the laws of New York as well as New Jersey.

The defendants in *Schwarz* argued that life insurance policies that are purchased with the intention to be sold still have an insurable interest under the laws of New Jersey, citing N.J. STAT. ANN. § 17B:24-1.1(b), and that the policies were taken out to benefit the trust. The Court disagreed, stating that New Jersey law requires insurable interest to exist at policy issuance, and while pursuant to *Calhoun* an individual may transfer the policy to persons without

---

[15] The policies in *Schwarz* were issued pursuant to the following fact pattern, which the Court described as a "typical STOLI transaction." The agent sold to the insured a policy in exchange for up-front cash. In exchange for being issued a policy at no cost to the insured, which would be financed by non-recourse premium financing, the insured would promise to sell the policy in the future to a lender if certain conditions are not met. The insured would establish a trust to apply for one or more policies, with the understanding that such policies will be sold to investors.

H-AMT019766

California Public Employees' Retirement System
October 20, 2010
Page 14

an insurable interest, such transfer is allowed only if the policy was not a wager in its inception. Moreover, again citing to *Calhoun*, the Court stated that:

> Under the laws of both states,"[i]nsureds begin to run afoul of the insurable interest requirement, however, when they intend at the time of the policy's issuance, to profit by transferring the policy to a stranger with no insurable interest at the expiration of the contestability period.[16]

The Court stated that *Calhoun* involved similar facts, and the Court found in *Calhoun* that because issues of intent are crucial, dismissal at this juncture would be premature. The Court in *Schwarz* opined that the New Jersey Supreme Court would likely hold that STOLI arrangement, as alleged by the insurer in Schwarz,[17] would be akin to a prohibited wagering contract, and the policies would as a result be held void *ab initio*. The Court denied the motion to dismiss and determined that that discovery was essential to determining if the insured had arranged to sell the policy to individuals with no insurable interest in the insured's life at the time the policy application was submitted.

The Court, relying upon the decision in *Ledley*, also decided that discovery and further briefing are needed to make a legal determination on the issue of incontestability after the two-year period. The Court noted that despite the fact that the statements in the *Ledley* decision regarding a fraud exception to the New Jersey incontestability rule were made solely as *dicta*, and that the case underlying the Ledley incontestability discussion related to the separate statute relating to disability, rather than life insurance policies, the *"dicta"* from *Ledley* was still *dicta* from the highest court in the state. The Court stated that while defendant's arguments regarding *Ledley's* inapposite application of the fraud exception to life, rather than just disability insurance had some merit, the Court nonetheless found the defendant's argument to be unavailing, and determined that the insurer in *Schwarz* had adequately made a claim that the expiration of the incontestability period does not bar the insurer's fraud claim.

Following the decisions in *Calhoun* and *Schwarz*, a party seeking to challenge the Policy under the Program could use those decisions as precedent for arguing that the Trust lacks an insurable interest. Such challenging party would need to establish whether the Insured or the Trust had intended to sell the Policy to a stranger at the time of issuance and whether a stranger intended to purchase the Policy. While the Program Facts do not appear to indicate such intention, the analysis of intent is a very fact-specific determination.

5.  *Transfer of Trust Interest Should Not Be a "Viatical Settlement" Under the New Jersey Viatical Settlements Statutes*

---

[16] *Schwarz* at 19.

[17] The allegations included that the policies were (i) procured by individuals with no insurable interest in the insured's life, and (ii) were sought by, and intended for, persons who were complete strangers to the insured and had no legally cognizable interest in the insured's life.

H-AMT019767

California Public Employees' Retirement System
October 20, 2010
Page 15

The New Jersey Viatical Settlements Act (the "Act") is codified at N.J.S.A. §§ 17B:30B-1 et seq. The Act applies to both traditional viatical settlements as well as life settlements, while referring to both transactions as "viatical settlements." The Act applies to "viatical settlement contracts", which the Act defines as a written agreement establishing the terms under which compensation or anything of value will be paid in return for the policy owner's "assignment, transfer, sale, devise or bequest of the death benefit or ownership of any portion of the policy." [18] The scope of the Act is thus limited to the actual assignment, transfer or sale of the Policy itself or the death benefits under the Policy, and does not appear to include the assignment, transfer or sale of beneficial interests in trusts that are the beneficiaries under such Policies.

Based on this technical reading of the Act, there is no assignment, transfer or sale of the Policy itself or the death benefits under the Policy under the Program Facts (the Policy remains owned by the Trust, and the Trust remains the beneficiary of the Policy) and the sale of Trust Interests should not fall within the scope of the Act.

6.   *Passage of the Incontestability Period Bars a Carrier from Thereafter Asserting Claims Unless an Exception Applies.*

   **A.   Application to Carrier**

The New Jersey statutes provide under § 17B:25-4 that:

> There shall be a provision that the policy (exclusive of provisions of the policy or any contract supplemental thereto relating to disability benefits or to additional benefits in event of death by accident or accidental means or in event of dismemberment or loss of sight) shall be incontestable, except for nonpayment of premiums, after it has been in force during the lifetime of the insured for a period of 2 years from its date of issue.

The Supreme Court of New Jersey has explained that incontestability clauses were introduced in the 19th century to dispel the public's fear that insurers would refuse to honor claims if the insured made a technical mistake on their application, and by the early-20th century, many state statutes mandated the inclusion of such clauses in insurance contracts. The Supreme Court explained that such clauses are for the benefit of the insured, and that the clauses serve "to give the insured a sense of security after the stated period elapses."[19]

The New Jersey Supreme Court in *Foster v. Wash. Nat'l Ins. Co.*, 118 NJL 228, 192 A.59 (1937) ("Foster") addressed whether a contractual incontestable provision which exceeded the statutorily prescribed exceptions to incontestability was enforceable. In *Foster*, the Court analyzed the statutory incontestable provision in effect at that time which provided that a policy shall be incontestable after it has been in force during the lifetime of the insured for a period of

---

[18] See, N.J.S.A. § 17B:30B-2.
[19] *Paul Revere Life Ins. Co. v. Haas*, 137 NJ 190,196 (1994) ("Paul Revere").

H-AMT019768

California Public Employees' Retirement System
October 20, 2010
Page 16

two (2) years from its date of issue "except for non-payment of premiums and for violation of its express conditions, if any, relating to travel, residence or occupation..." [20]

The statute provided no exception for fraud or misstatements from the application of the incontestable bar. The policy in *Foster*, however, contained a condition that was broader than that prescribed by the statute, and provided that the policy was incontestable "except for non-payment of premium, fraud or misstatement of age."[21] The *Foster* Court found that "[p]ublic policy will not permit the setting at naught of a statutory provision of this character." The Court found the contractual expansion of the incontestable clause to be an attempt to waive a statutory condition, and estopped the carrier from asserting the clause.

Following the *Foster* decision, the Morris County Court of Common Pleas of New Jersey explained that the *Foster* decision provided that:

> the Company had no legal justification for diluting the
> incontestability clause by adding such conditions as fraud and
> misstatement of age, neither of which were authorized by the
> statute. With these two unwarranted conditions eliminated, the
> incontestability clause obviously had matured for two years during
> the lifetime of the insured; and thus the policy had become
> incontestable...[22]

Since the *Foster* decision, the New Jersey statutory incontestable clause has been revised and recodified, ultimately as N.J. STAT. ANN. § 17B:25-4, set forth above. Section 17B:25-4, was in effect in 1995 at the time that the New Jersey Supreme Court decided *Ledley v. William Penn Life Ins. Co*, 138 NJ 627 (1995) ("Ledley").

In *Ledley*, the Court found that with respect to a life insurance policy, "Even after the expiration of the contestability period, an insurer may deny a claim if the insured committed fraud in the policy application." (citing to *Paul Revere*.) This decision by the New Jersey Supreme Court to allow conditions such as fraud to become exceptions to the statutorily prescribed incontestable clause, where fraud is not authorized by the statute, conflicts with the interpretation of the incontestable clause as set forth in *Foster* and thus by implication overrules that portion of the Foster decision.

Most recently, the *Schwarz* decision, discussed above, determined that, on the basis of *Ledley*, an insurer's fraud claims may be made even following the expiration of the New Jersey incontestable period. While the *Schwarz* decision acknowledged that the defendants' argument that *Paul Revere* may have been misread when the *Ledley* Court applied it in the context of life insurance (rather than disability insurance) is not without merit, the Court refused to dismiss the

---

[20] *Foster* at 230.

[21] *Id* at 230.

[22] *Lance v. Prudential Ins. Co.*, 19 N.J. Misc. 551, 554 (Cty. Ct. 1941)

H-AMT019769

California Public Employees' Retirement System
October 20, 2010
Page 17

insurer's complaint on the basis that the two-year incontestability provision barred the claim of fraud in the policy application.[23]

As of the date of this Opinion, each Policy in the Program was issued and has been in effect for at least two (2) years from the date that the respective Policy was issued. Assuming that no changes were made to any Policy such as an increase in death benefits or any other such change that would extend the effective date for incontestability purposes, all of the New Jersey Policies as of the date of this Opinion are outside the contestable period. However, based on the *Schwarz* and *Ledley* decisions, the Carrier would be able to challenge the Policies for fraud. The Program Facts do not address the contents of any Policy application.

**B.      Standing Is Conferred by Statute to Insured or His/Her Estate if Policy Proceeds are Paid in Violation of New Jersey Insurable Interest Laws**

N.J. STAT. ANN. § 17B:24-1.1(c) provides that an insured under a life insurance policy, or his/her executor or administrator, as applicable, may sue the beneficiary under the policy, another assignee or payee thereunder, if policy proceeds are paid in contravention of the insurable interest laws set forth under N.J. STAT. ANN. § 17B:24-1.1. Section 17B:24-1.1(c) expressly provides:

> If the beneficiary, assignee, or other payee under any contract
> made in violation of this section receives from the insurer any
> benefits thereunder accruing upon the death, disablement, or injury
> of the individual insured, the individual insured, or his executor or
> administrator, as the case may be, may maintain an action to
> recover those benefits from the person so receiving them.[24]

The right of action under N.J. STAT. ANN. § 17B:24-1.1(c) is not limited to the incontestable period. As a result, the Insured or his/her estate is not precluded from bringing an action at any time against the Trust and the Purchaser to recover proceeds paid under the Policy, and is free to allege that the Policy lacked an insurable interest.

OPINION

Based on the foregoing facts, representations, statements, and assumptions being correct at all relevant times, and based on the discussion and analysis above and subject to the qualifications set forth below, it is our opinion that, under present reported New Jersey decisional authority and statutes applicable to the interpretation and enforcement of the insurance laws, and in a properly presented case, a New Jersey court, acting reasonably and correctly applying the law to the facts as set forth in the Program Facts after full consideration of all relevant factors, should hold that the Trust has the requisite insurable interest in the life of the Insured under the

---

[23] The policy at issue in the *Schwarz* case did not contain any express fraud exception to the incontestability provision. Five New Jersey Policies contain an exception for fraud in the incontestability provisions.

[24] N.J. STAT. ANN. § 17B:24-1.1(c).

California Public Employees' Retirement System
October 20, 2010
Page 18

New Jersey Insurance Code, to enforce the Policy on the Insured's life as owner and beneficiary of such Policy. However, cases interpreting New Jersey law require an examination of the intent of the Insured and Trust to transfer the Policy and the intent of a transferee to acquire the Policy. Such analysis of intent is a very fact specific determination. Furthermore, challenges by a Carrier with respect to insurable interest, regardless of merit, may be barred by operation of the two-year incontestability provisions of the New Jersey Insurance Law, subject to an exception for fraud, although the Insured and his or her estate would not be so barred.

## QUALIFICATIONS

The foregoing opinions assume that the facts, representations, statements, and assumptions set forth in this Opinion will be those that exist at the time a state court considers the issues.

While we believe that our opinion respecting the insurable interest of the Trust is supported by sound analysis of existing New Jersey law, we have found no statute or reported judicial authority that directly determines whether policies such as those procured pursuant to the Program Facts have the requisite insurable interest. Moreover, we have found no reported judicial authority which has considered a transaction containing all the material facts and circumstances that are present with respect to the Program and opines directly on these issues. In rendering our opinion, we have thus relied on authorities discussing certain of the facts and circumstances that are present in the Program, and cases and statutes discussing more generally factors indicating whether a trust established by an insured, such as the Trust under the Program Facts, has an insurable interest. Accordingly, our opinion is not based on controlling precedent but rather on what we believe to be a sound reasoned analysis of existing authorities applied to the Program Facts.

Furthermore, you should recognize that it is impossible to predict the outcome of any future judicial proceeding. The opinions expressed herein are not a guarantee as to what any particular court would actually hold, but an opinion as to the decision a court would reach if the issues are properly presented to it and the court followed existing precedent as to legal and equitable principles applicable in such cases. As noted in the *Calhoun* and *Schwarz* decisions, there is substantial ground for difference of opinion on the issue of insurable interest and intent, a very fact specific determination, is a significant part of finding insurable interest. The recipients of this Opinion should take these limitations into account in analyzing the risks associated with the transactions described herein.

Except as otherwise provided herein, our opinions expressed herein are as of the date of this letter, are solely for the benefit of the addressee hereof in connection with the consummation of the transactions contemplated by the Program, and may not be relied upon by the addressee for any other purpose or by any other person or entity for any purpose without our prior written consent; provided that this opinion letter may be furnished to, and relied upon by, your successors and permitted assigns in connection with the transactions described herein. Our review of the relevant reported judicial decisions and law is current as of October 15, 2010. We disclaim any obligation to update this letter for changes in fact or law or otherwise after such date. We assume no, and hereby disaffirm any, obligation to update or to supplement our

California Public Employees' Retirement System
October 20, 2010
Page 19

opinions expressed herein to reflect any facts or circumstances that may hereafter come to our attention or any changes in reported judicial decisions or laws that may occur after October 15, 2010. Our opinions are limited to the matters stated herein and no opinion is implied or may be inferred beyond the matters expressly stated herein.

Very truly yours,

COZEN O'CONNOR, P.C.

H-AMT019772

California Public Employees' Retirement System
October 20, 2010
Page 20

---

### SCHEDULE A

List of Transaction Documents

A.   Life Expectancy reports;

B.   Policy application;

C.   Life insurance illustration;

D.   HIPAA forms;

E.   Medical release forms;

F.   Family Disclosure and Consent Agreement;

G.   Successor Beneficiary Agreement;

H.   Trust Agreement;

I.   Replacement Trust Agreement;

J.   Trustee Resignation (where applicable);

K.   Successor Trustee Agreement (where applicable);

L.   Trust Certification;

M.   Policy; and

N.   Insured identification information.

H-AMT019773

California Public Employees' Retirement System
October 20, 2010

---

## OCEAN GATE LIFE SETTLEMENT PROGRAM, LP

### OFFICER'S CERTIFICATE

October 20, 2010

In connection with the opinion dated October 20, 2010 (the "Opinion") to be delivered by Cozen O'Connor, a professional corporation in connection with a life settlement program ("Program") of Ocean Gate Life Settlement Program, LP (the "undersigned"), the undersigned hereby certifies that, to the best of its knowledge after due inquiry and review of the Opinion:

1. The undersigned understands that Cozen O'Connor, a professional corporation is relying on this Certificate in connection with the execution and delivery of the Opinion.

2. The facts contained in the Opinion insofar as they pertain to Ocean Gate Life Settlement Program LP or the Program, including without limitation the Program Facts, are true, correct and complete as of the date hereof.

3. The documents listed on Schedule A attached to the Opinion identifies all the documents relating to the Program.

4. The undersigned has no reason to believe that any other fact contained in the Opinion is untrue, inaccurate or incomplete.

5. Each of the undersigned and OGLS GP, LP has been duly authorized to execute this Certificate on behalf of Ocean Gate Life Settlement Program, LP.

OCEAN GATE LIFE SETTLEMENT
PROGRAM, LP

By: OGLS GP, LP, as general partner

By: OGLS, LLC, as general partner

By: _____
Name:  Barry S. Turkanis
Title:    Manager

NYC_MIDTOWN\158714814 262977.000

# Exhibit 11

| | |
|---|---|
| **From:** | Rubin, Aaron M. |
| **Sent:** | Friday, May 31, 2024 12:22 PM |
| **To:** | Burack, Brian D. |
| **Cc:** | Caponi, Steven L.; Goeller, Matthew B.; O'Connor, Megan E.; LeQuang, Khai; Krebs, Richard; Cheever, Kara E.; Jung, Joseph; Kelleher, Joseph; Mazzola, Victoria; Ekiner, Kaan; Turner, Jamaiah; Schwartzburg, Ilya |
| **Subject:** | RE: Ameritas Life Insurance Corp. v. Wilmington Savings Fund Society, FSB, No. 1:23-cv-00236 |

Brian,

We will respond to your email separately, but in the meantime will circulate a calendar invite for 2:30 p.m. ET on Monday, June 3, 2024.  Let us know if that time doesn't work.

Aaron

**Aaron M. Rubin**
Partner

Orrick
Orange County 
T +1-949-852-7732
amrubin@orrick.com





---

**From:** Burack, Brian D. <BBurack@cozen.com>
**Sent:** Friday, May 31, 2024 12:01 PM
**To:** Rubin, Aaron M. <amrubin@orrick.com>
**Cc:** Caponi, Steven L. <Steven.Caponi@klgates.com>; Goeller, Matthew B. <Matthew.Goeller@klgates.com>; O'Connor, Megan E. <Megan.OConnor@klgates.com>; LeQuang, Khai <klequang@orrick.com>; Krebs, Richard <rkrebs@orrick.com>; Cheever, Kara E. <KCheever@cozen.com>; Jung, Joseph <jjung@orrick.com>; Kelleher, Joseph <jkelleher@cozen.com>; Mazzola, Victoria <VMazzola@cozen.com>; Ekiner, Kaan <KEkiner@cozen.com>; Turner, Jamaiah <JTurner@cozen.com>; Schwartzburg, Ilya <ISchwartzburg@cozen.com>
**Subject:** RE: Ameritas Life Insurance Corp. v. Wilmington Savings Fund Society, FSB, No. 1:23-cv-00236

**[EXTERNAL]**

Aaron,

Your suggestion that Ameritas is to blame for WSFS's decision to drag its feet is absurd and counter-factual. The record is clear and speaks for itself: Ameritas has consistently tried to drive this case forward and WSFS has—*and still is*—trying to delay this case as long as possible.

As just a few examples: Ameritas promptly ran the searches it promised to run, and promptly produced documents. WSFS delayed running searches, refused to run searches, and then strategically dumped its documents over the holidays in December. And, of course, we still don't have all your documents and it seems we continue to find documents you promised we would receive but that have been speciously withheld—e.g., the investment committee memo that you withheld until 12 hours before BroadRiver's 30(b)(6) deposition earlier this month, and the spreadsheets Mr. Plevin admitted he reviewed, but you have still not turned over. Ameritas has pressed forward with depositions, having taken 5, and with every effort to meet the discovery deadline. The only reason BroadRiver's deposition was not months earlier is that you continually pushed it back to May. WSFS, by contrast, has not taken any depositions. We offered up five Ameritas depositions, and spent significant time and resources preparing for them for the dates to which we agreed—and then you unilaterally canceled them. If WSFS wants to blame someone it need only look in the mirror.

Most of your email is a self-serving regurgitation of your discovery motions—which as you know we think lack merit and should never have been brought. We have already responded to each one at length, and we are not going to spill more ink re-litigating them now. Perhaps if you spent more time moving this case forward rather than seeking discovery you don't need—and writing long emails—you would not be asking the Court to yet again modify the Scheduling Order. As we have already made clear, we oppose your taking depositions that are neither reasonable nor proportionate to the needs of the case, we oppose this punitive deposition schedule (to punish Ameritas for daring to ask that case deadlines be followed), and we oppose another delay.

Kaan and I are available to confer Monday afternoon.

Brian



**Brian D. Burack**
**Member | Cozen O'Connor**
One Liberty Place, 1650 Market Street Suite 2800 | Philadelphia, PA 19103
P: 215-665-2076 F: 215-372-2374
Email | Map | cozen.com

---

**From:** Rubin, Aaron M. <amrubin@orrick.com>
**Sent:** Thursday, May 30, 2024 7:43 PM
**To:** Cheever, Kara E. <KCheever@cozen.com>; Jung, Joseph <jjung@orrick.com>; Burack, Brian D. <BBurack@cozen.com>; Kelleher, Joseph <jkelleher@cozen.com>; Mazzola, Victoria <VMazzola@cozen.com>; Ekiner, Kaan <KEkiner@cozen.com>; Turner, Jamaiah <JTurner@cozen.com>; Schwartzburg, Ilya <ISchwartzburg@cozen.com>
**Cc:** Caponi, Steven L. <Steven.Caponi@klgates.com>; Goeller, Matthew B. <Matthew.Goeller@klgates.com>; O'Connor, Megan E. <Megan.OConnor@klgates.com>; LeQuang, Khai <klequang@orrick.com>; Krebs, Richard

<rkrebs@orrick.com>
**Subject:** RE: Ameritas Life Insurance Corp. v. Wilmington Savings Fund Society, FSB, No. 1:23-cv-00236

**\*\*EXTERNAL SENDER\*\***

Kara,

As noted, we intend to move to extend the case deadlines.  <u>Please let us know your availability on May 31, 2024 for a meet and confer pursuant to Delaware Local Rule 7.1.1 so that we can file the motion.</u>  Our motion will address the grounds for the extension.  If Ameritas wishes to make arguments in opposition, it can do so.

Your feigned shock that Securities Intermediary needs more time for discovery is disingenuous and belied by what has transpired in this case, as Ameritas has stymied Securities Intermediary's attempts to take discovery at every turn, ignoring Securities Intermediary's right to discovery related to its defenses and counterclaims.  As just a few examples:

- One of the outstanding discovery disputes concerns the fact that Ameritas did not identify document custodians in good faith.  As a result, it produced almost no documents in its initial production, then later identified the proper custodians in response to interrogatories and forced Securities Intermediary to file a motion to compel for Ameritas to search those custodians with search terms Ameritas used for its incorrect custodians.  That discovery dispute is still pending through no fault of Securities Intermediary.  Securities Intermediary cannot be held responsible for the delay caused by Ameritas's decision not to identify custodians in good faith in the first instance and subsequent failure to produce responsive documents as required under the discovery rules.

- Another discovery dispute concerns the facts related to Ameritas's investigation into the death claim, which forms the crux of this case but which Ameritas has improperly asserted privilege over.  Ameritas has therefore refused to produce the documents showing how it reached the decision not to pay this claim, which is highly relevant to Securities Intermediary's counterclaims.  This discovery dispute is still pending, again, through no fault of Securities Intermediary.

- Ameritas has refused to produce a small collection of requested deposition transcripts despite them being obviously relevant to this action and Ameritas requesting deposition transcripts from virtually every one of the nonparties it has subpoenaed.  Ameritas does not dispute their relevance, but claims it cannot easily locate them—a laughable assertion and far from a valid objection.  Again, Ameritas is forcing Securities Intermediary to file a motion for this valid discovery.

- Cozen O'Connor, as a nonparty, has refused to produce documents concerning the letters it issued opining that policies issued under the Ocean Gate program (such as the Flaks policy at issue) satisfied Delaware insurable interest law, even though Ameritas itself has sought these same documents from other parties.  Furthermore, Barry Turkanis testified just a few weeks ago that these opinion letters were intended to be given—and given—to third parties, including CalPERS, and cannot possibly be protected by the attorney-client privilege.  These documents are obviously relevant, and Cozen has no valid basis for refusing to produce them.  Notably, although Securities Intermediary raised this issue with the Court several months ago (in January), a Special Master has only now been appointed to address the matter.  The delay in resolving this dispute is again no fault of Securities Intermediary.

Finally, forty days is more than enough time to take nine depositions.  Cozen is a large firm with numerous attorneys at its disposal—more than Orrick has on its team—and will have no problem covering fewer than two depositions per week.  Cozen certainly has had no problem requiring individuals who have disclaimed any knowledge of the policy or Ocean Gate from showing up to depositions—an egregious waste of time and resources that Ameritas has put the parties and nonparty witnesses through several times now.  In any event, it is not a negotiation as to whether you will provide these witnesses.  Since you are the party holding the July 9, 2024 date, we have no choice but to notice dates before that time and you can either provide a witness on that date, provide an alternative date, or move for a protective order.  And if the extension is granted or our motion to compel is granted (which seeks documents from several of the individuals we intend to depose since, as noted above, Ameritas did not provide custodians in good faith the first time it searched), we will depose each witness again and seek our costs for having to do so.

Aaron

**Aaron M. Rubin**
Partner

Orrick
Orange County 
T +1-949-852-7732
amrubin@orrick.com





---

**From:** Cheever, Kara E. <KCheever@cozen.com>
**Sent:** Thursday, May 30, 2024 9:13 AM
**To:** Jung, Joseph <jjung@orrick.com>; Rubin, Aaron M. <amrubin@orrick.com>; Burack, Brian D. <BBurack@cozen.com>; Kelleher, Joseph <jkelleher@cozen.com>; Mazzola, Victoria <VMazzola@cozen.com>; Ekiner, Kaan <KEkiner@cozen.com>; Turner, Jamaiah <JTurner@cozen.com>; Schwartzburg, Ilya <ISchwartzburg@cozen.com>
**Cc:** Caponi, Steven L. <Steven.Caponi@klgates.com>; Goeller, Matthew B. <Matthew.Goeller@klgates.com>; O'Connor, Megan E. <Megan.OConnor@klgates.com>; LeQuang, Khai <klequang@orrick.com>; Krebs, Richard <rkrebs@orrick.com>
**Subject:** RE: Ameritas Life Insurance Corp. v. Wilmington Savings Fund Society, FSB, No. 1:23-cv-00236



Joseph,

We are confused by your email. Discovery has been open for over a year and already been extended twice. Orrick has dragged its feet at every juncture and Ameritas, which by contrast has diligently pursued discovery, can no longer consent to delay after delay. Your suggestion that Ameritas is not prejudiced by a third discovery extension—merely because the *trial* date remains the same—is hard to take seriously considering you are proposing to delay summary judgment yet again. Ameritas intends to seek a case-dispositive ruling on summary judgment where, as you must know, most STOLI cases are resolved. So Ameritas is very much prejudiced by delaying the best avenue for expeditiously bringing this case to a close.

Discovery should close on July 9 and proceed to dispositive motions on November 22, as the parties expressly agreed less than two months ago, and as the Court ordered. If you should move for a third discovery extension, please indicate to the Court that Ameritas objects on the grounds that: (i) discovery has been open for over a year; (ii) WSFS has had more than enough time to conduct discovery and has not diligently pursued discovery; and (iii) WSFS cannot continue to unilaterally delay summary judgment.

We will respond under separate cover regarding your last-minute attempt to cram nine (9) depositions into the final month of the agreed-upon discovery period.

Kara



**Kara Eileen Cheever**
**Associate | Cozen O'Connor**
One Liberty Place, 1650 Market Street Suite 2800 | Philadelphia, PA 19103
P: 215-665-7292 C: 917-445-1746
Email | Map | cozen.com

---

**From:** Jung, Joseph <jjung@orrick.com>
**Sent:** Wednesday, May 29, 2024 4:29 PM
**To:** Rubin, Aaron M. <amrubin@orrick.com>; Cheever, Kara E. <KCheever@cozen.com>; Burack, Brian D. <BBurack@cozen.com>; Kelleher, Joseph <jkelleher@cozen.com>; Mazzola, Victoria <VMazzola@cozen.com>; Ekiner, Kaan <KEkiner@cozen.com>; Turner, Jamaiah <JTurner@cozen.com>; Schwartzburg, Ilya <ISchwartzburg@cozen.com>
**Cc:** Caponi, Steven L. <Steven.Caponi@klgates.com>; Goeller, Matthew B. <Matthew.Goeller@klgates.com>; O'Connor, Megan E. <Megan.OConnor@klgates.com>; LeQuang, Khai <klequang@orrick.com>; Krebs, Richard <rkrebs@orrick.com>
**Subject:** RE: Ameritas Life Insurance Corp. v. Wilmington Savings Fund Society, FSB, No. 1:23-cv-00236

**\*\*EXTERNAL SENDER\*\***

Kara,

We have not yet received a response to our email below.  Please see attached an amended notice of deposition for Scott Foreman on June 10, 2024.

Regards,
Joseph

**From:** Rubin, Aaron M. <amrubin@orrick.com>
**Sent:** Friday, May 24, 2024 2:55 PM
**To:** Cheever, Kara E. <KCheever@cozen.com>; Burack, Brian D. <BBurack@cozen.com>; Kelleher, Joseph <jkelleher@cozen.com>; Mazzola, Victoria <VMazzola@cozen.com>; Ekiner, Kaan <KEkiner@cozen.com>; Turner, Jamaiah <JTurner@cozen.com>; Schwartzburg, Ilya <ISchwartzburg@cozen.com>
**Cc:** Caponi, Steven L. <Steven.Caponi@klgates.com>; Goeller, Matthew B. <Matthew.Goeller@klgates.com>; O'Connor, Megan E. <Megan.OConnor@klgates.com>; LeQuang, Khai <klequang@orrick.com>; Krebs, Richard <rkrebs@orrick.com>; Jung, Joseph <jjung@orrick.com>
**Subject:** RE: Ameritas Life Insurance Corp. v. Wilmington Savings Fund Society, FSB, No. 1:23-cv-00236

Kara,

Given that the proposed extension does not change the trial date, it is not clear what the basis for your opposition is other than try to prejudice WSFS from taking discovery to support its defenses and counterclaims.  Indeed, the outstanding discovery disputes that justified the last extension are, for the most part, still outstanding—except, conveniently, for Ameritas's first motion to compel.  In any event, we plan to move the court for the additional time next week.

In the meantime, we intend to take the following depositions on the following dates:

June 10, 2024 – Scott Foreman as fact witness
June 12, 2024 – Rhonda Loosle as Rule 30(b)(6) witness regarding claims, the Flaks claim, and related issues
June 14, 2024 – Dennis Peyton as nonparty fact witness represented by Cozen served with subpoena
June 24, 2024 – Scott Farmen as fact witness and as Rule 30(b)(6) witness regarding compliance, the agent, and related issues
June 26, 2024 – Dave Voelker as Rule 30(b)(6) witness regarding servicing, policy correspondence, and related issues
June 28, 2024 – Scott Corbett as Rule 30(b)(6) witness regarding underwriting
July 1, 2024 – William Shamleffer as fact witness
July 8, 2024 – Kelly Halverson as fact wittiness
July 9, 2024 – Andrea Snowden as fact witness

Please confirm as soon as possible that these dates work or propose alternative dates within the current fact discovery period.  In addition, in light of Ameritas's position, we reserve the right to reopen any of these depositions based on the rulings on our motions to compel and seek costs in having to reopen the depositions.  Please also note that we plan to take the depositions of Mr. Peyton, Ms. Snowden, Mr. Halverson, and Mr. Shamleffer on the noticed dates (or alternative dates agreed to by the parties), and we expect the witnesses to appear for deposition unless they or Ameritas files a timely motion for a protective order.

Best,

Aaron

**Aaron M. Rubin**
Partner

Orrick
Orange County

T +1-949-852-7732
amrubin@orrick.com



 

**From:** Cheever, Kara E. <KCheever@cozen.com>
**Sent:** Friday, May 24, 2024 11:53 AM
**To:** Rubin, Aaron M. <amrubin@orrick.com>; Burack, Brian D. <BBurack@cozen.com>; Kelleher, Joseph <jkelleher@cozen.com>; Mazzola, Victoria <VMazzola@cozen.com>; Ekiner, Kaan <KEkiner@cozen.com>; Turner, Jamaiah <JTurner@cozen.com>; Schwartzburg, Ilya <ISchwartzburg@cozen.com>
**Cc:** Caponi, Steven L. <Steven.Caponi@klgates.com>; Goeller, Matthew B. <Matthew.Goeller@klgates.com>; O'Connor, Megan E. <Megan.OConnor@klgates.com>; LeQuang, Khai <klequang@orrick.com>; Krebs, Richard <rkrebs@orrick.com>; Jung, Joseph <jjung@orrick.com>
**Subject:** RE: Ameritas Life Insurance Corp. v. Wilmington Savings Fund Society, FSB, No. 1:23-cv-00236

**[EXTERNAL]**

Aaron,

We are opposed to extending the pretrial deadlines. As you know, discovery has been ongoing in this matter since last May, and we have already received two extensions of the fact discovery deadline since that time. We have diligently pursued discovery in this case and are prepared for fact discovery to close on July 9th. While we understand that you have postponed deposing certain fact witnesses because it is your contention that those depositions are impacted by outstanding discovery disputes, you chose to do so at your own risk. We disagree that those postponements or any other outstanding issues warrant extensions of the schedule.

Have a good holiday weekend,
Kara



**Kara Eileen Cheever**
**Associate | Cozen O'Connor**
One Liberty Place, 1650 Market Street Suite 2800 | Philadelphia, PA 19103
P: 215-665-7292 C: 917-445-1746
Email | Map | cozen.com

**From:** Rubin, Aaron M. <amrubin@orrick.com>
**Sent:** Friday, May 24, 2024 2:45 PM
**To:** Burack, Brian D. <BBurack@cozen.com>; Cheever, Kara E. <KCheever@cozen.com>; Kelleher, Joseph <jkelleher@cozen.com>; Mazzola, Victoria <VMazzola@cozen.com>; Ekiner, Kaan <KEkiner@cozen.com>; Turner, Jamaiah <JTurner@cozen.com>; Schwartzburg, Ilya <ISchwartzburg@cozen.com>
**Cc:** Caponi, Steven L. <Steven.Caponi@klgates.com>; Goeller, Matthew B. <Matthew.Goeller@klgates.com>; O'Connor, Megan E. <Megan.OConnor@klgates.com>; LeQuang, Khai <klequang@orrick.com>; Krebs, Richard <rkrebs@orrick.com>; Jung, Joseph <jjung@orrick.com>
**Subject:** RE: Ameritas Life Insurance Corp. v. Wilmington Savings Fund Society, FSB, No. 1:23-cv-00236

**\*\*EXTERNAL SENDER\*\***

Counsel:

We are following up on the email below.  We have revised the draft joint stipulation we circulated on May 20, 2024 (attached, in clean and redline) to reflect that the Special Master was appointed earlier today.  However, for the reasons identified in our email, we still ask that Ameritas agree to extend the pretrial deadlines by approximately three months.

Please let us know if you have any comments or if we have your consent to file.  We are available to meet and confer about this as well.

Best,

Aaron

**Aaron M. Rubin**
Partner

Orrick
Orange County 
T +1-949-852-7732
amrubin@orrick.com





**From:** Rubin, Aaron M. <amrubin@orrick.com>
**Sent:** Monday, May 20, 2024 10:34 AM

**To:** Burack, Brian D. <BBurack@cozen.com>; Cheever, Kara E. <KCheever@cozen.com>; Kelleher, Joseph <jkelleher@cozen.com>; Mazzola, Victoria <VMazzola@cozen.com>; Ekiner, Kaan <KEkiner@cozen.com>; Turner, Jamaiah <JTurner@cozen.com>; Schwartzburg, Ilya <ISchwartzburg@cozen.com>
**Cc:** Caponi, Steven L. <Steven.Caponi@klgates.com>; Goeller, Matthew B. <Matthew.Goeller@klgates.com>; O'Connor, Megan E. <Megan.OConnor@klgates.com>; LeQuang, Khai <klequang@orrick.com>; Krebs, Richard <rkrebs@orrick.com>; Jung, Joseph <jjung@orrick.com>
**Subject:** Ameritas Life Insurance Corp. v. Wilmington Savings Fund Society, FSB, No. 1:23-cv-00236

Counsel:

We are writing to ask if Ameritas would agree to extend the pretrial deadlines by approximately three months.

As you know, fact discovery is scheduled to close on July 9, 2024, but there are still several discovery disputes outstanding, including disputes with third parties and disputes that have been referred to an as-yet unappointed Special Master for ruling.  Many of these discovery disputes should be resolved before certain depositions are taken in order to ensure the deposition proceeds after all documents have been produced.  In addition, and as you know, the court clerk has not yet appointed a Special Master to decide the outstanding discovery disputes.  We want to make sure there is adequate time in the schedule for the Special Master to be appointed, for the Special Master to decide all the outstanding disputes, for any additional documents to be produced, and for the remaining depositions to take place.  We do not think the current schedule—which was agreed to before the discovery disputes were referred to a Special Master—is sufficient for all of these to be completed.

Note that we do not propose extending the current dates for the pretrial conference and start of trial, which we think can stay the same notwithstanding a three-month extension of the other dates.

We have drafted the attached stipulation to this effect, which generally tracks the parties' previous stipulations in this matter.  The new schedule we propose is also copied below.  Please let us know if you have any comments or if we have your consent to file.  We are available to meet and confer about this as well.

| Event | Current Deadline | Proposed Deadline |
|---|---|---|
| Close of fact discovery | July 9, 2024 | October 4, 2024 |
| Affirmative expert reports | August 9, 2024 | November 15, 2024 |
| Rebuttal expert reports | September 6, 2024 | December 13, 2024 |
| Reply expert reports | September 25, 2024 | January 10, 2025 |
| Expert discovery cutoff | October 23, 2024 | January 31, 2025 |
| Dispositive motions due | November 22, 2024 | February 28, 2025 |
| Oppositions to dispositive motions due | December 20, 2024 | March 31, 2025 |
| Replies in further support of dispositive motions due | January 24, 2025 | April 21, 2025 |
| Deadline motions *in limine* and *Daubert* motions due | March 7, 2025 | June 6, 2025 |
| Pretrial conference | November 12, 2025 | November 12, 2025 |
| Jury Trial begins | November 17, 2025 | November 17, 2025 |

Best,

Aaron

**Aaron M. Rubin**
Partner

Orrick
Orange County 
T +1-949-852-7732
amrubin@orrick.com





---

NOTICE TO RECIPIENT | This e-mail is meant for only the intended recipient of the transmission, and may be a communication privileged by law. If you received this e-mail in error, any review, use, dissemination, distribution, or copying of this e-mail is strictly prohibited. Please notify us immediately of the error by return e-mail and please delete this message from your system. Thank you in advance for your cooperation.

For more information about Orrick, please visit *http://www.orrick.com*.

In the course of our business relationship, we may collect, store and transfer information about you. Please see our privacy policy at https://www.orrick.com/Privacy-Policy to learn about how we use this information.

---

NOTICE TO RECIPIENT | This e-mail is meant for only the intended recipient of the transmission, and may be a communication privileged by law. If you received this e-mail in error, any review, use, dissemination, distribution, or copying of this e-mail is strictly prohibited. Please notify us immediately of the error by return e-mail and please delete this message from your system. Thank you in advance for your cooperation.

For more information about Orrick, please visit *http://www.orrick.com*.

In the course of our business relationship, we may collect, store and transfer information about you. Please see our privacy policy at https://www.orrick.com/Privacy-Policy to learn about how we use this information.

---

NOTICE TO RECIPIENT | This e-mail is meant for only the intended recipient of the transmission, and may be a communication privileged by law. If you received this e-mail in error, any review, use, dissemination, distribution, or copying of this e-mail is strictly prohibited. Please notify us immediately of the error by return e-mail and please delete this message from your system. Thank you in advance for your cooperation.

# Exhibit 12

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

AMERITAS LIFE INSURANCE CORP.,

         Plaintiff,

    v.

WILMINGTON SAVINGS FUND SOCIETY,
FSB, SOLELY AS SECURITIES
INTERMEDIARY,

         Defendant,

---

WILMINGTON SAVINGS FUND SOCIETY,
FSB, SOLELY AS SECURITIES
INTERMEDIARY,

         Counter-Claimant,

    v.

AMERITAS LIFE INSURANCE CORP.,

         Counter-Defendant.

C.A. No. 23-236-GBW

## PLAINTIFF/COUNTERCLAIM DEFENDANT'S
## SECOND AMENDED RULE 26(a)(1) INITIAL DISCLOSURES

Pursuant to Federal Rule of Civil Procedure Rule 26(a)(1), Plaintiff/Counterclaim Defendant Ameritas Life Insurance Corp. ("Ameritas" or "Plaintiff"), by and through its undersigned attorneys, make the following Second Amended Initial Disclosures:

## I.   <u>Rule 26(a)(1)(A)(i) Individuals</u>

The following individuals are likely to have discoverable information that Ameritas may use to support its claims or defenses concerning Policy No. U000038534 (the "Policy") taken out on the life of Marvin Flaks (the "Insured") at issue in this litigation:

> **1.   Wilmington Savings Fund Society ("WSFS")**
> c/o Counsel to Defendant WSFS
> 500 Delaware Avenue
> Wilmington, DE 19801

Subject Matter: The business of WSFS; the relationship between WSFS and the securities entitlement holder for the Policy; the transfer of ownership for the Policy; the identity of the true beneficiary of the Policy; the application for the Policy; the solicitation, procurement, and delivery of the Policy; the sources of funding for the premiums paid on the Policy, the claim for the death benefits under the Policy; WSFS's knowledge of the Policy's insurable interest problems; the Policy's prior beneficial owners' knowledge of the Policy's insurable interest problems; whether the Policy had insurable interest at inception; and,  the nature of any dealings with, among others, the individuals and entities identified in these Initial Disclosures, and any other individuals or entities identified in the pleadings or its Initial Disclosures.

> **2.   Brian A. Sullivan, Esq.**
> 300 Delaware Avenue
> Wilmington Delaware, DE 19899

Subject Matter: The creation of the Trust involved in this litigation; the intended purpose of the Trust; the intended beneficiary of the Trust; the source of funds used by the Trust to pay premiums on the Policy; the application for the Policy; the intended purpose of the Policy; any transfer or transfers of the beneficial interest in the Trust and/or the Policy; and/or the nature of the trustee's and/or the Trust's dealings with, among others, WSFS, the individuals and entities

identified in these Initial Disclosures, and any other individuals or entities identified in the pleadings or in WSFS's Initial Disclosures.

3.    **Werb and Sullivan**
      1225 North King Street, Suite 600,
      Wilmington, DE 19801

Subject Matter: The creation of the Trust involved in this litigation; the intended purpose of the Trust; the intended beneficiary of the Trust; the source of funds used by the Trust to pay premiums on the Policy; the application for the Policy; the intended purpose of the Policy; any transfer or transfers of the beneficial interest in the Trust and/or the Policy; and/or the nature of the trustee's and/or the Trust's dealings with, among others, WSFS, the individuals and entities identified in these Initial Disclosures, and any other individuals or entities identified in the pleadings or in WSFS's Initial Disclosures.

4.    **ITM TwentyFirst, LLC ("ITM")**
      333 South 7th Street
      Minneapolis, MN 55402

Subject Matter: The source of funding for the premiums paid on the Policy; the application for the Policy; the method and circumstances of any transfers of ownership for the Policy; the claim for the death benefits under the Policy; the nature of the involvement and role in the application for, procurement of, financing of, and transfer of, any interest in the Policy or in any trusts in the name of the Marvin Flaks; information regarding the relationship between itself, the insurance producer for the Policy, purported premium finance lenders, and/or others; ITM's interactions with and relationship to any defendants (and their counsel) or any member of the Flaks family; communications with those on whose behalf or in concert with which ITM worked; contacts of ITM, and those on whose behalf or in concert with which ITM worked, in this forum; citizenship of ITM; ITM's (and their counsel's) knowledge of the existence of Ameritas' claims; any life expectancy reports conducted regarding the Insured under the Policy; any mortality

profiles regarding the Insured; and/or any communications or business with the individuals or entities identified in these Initial Disclosures.

     **5.**     **Accenture Credit Services ("Accenture")**
          161 N Clark St.
          Chicago, IL 60601

Subject Matter: The source of funding for the premiums paid on the Policy; the application for the Policy; the method and circumstances of any transfers of ownership for the Policy; the claim for the death benefits under the Policy; the nature of the involvement and role in the application for, procurement of, financing of, and transfer of, any interest in the Policy or in any trusts in the name of the Marvin Flaks; information regarding the relationship between itself, the insurance producer for the Policy, purported premium finance lenders, and/or others; ITM's interactions with and relationship to any defendants (and their counsel) or any member of the Flaks family; communications with those on whose behalf or in concert with which Accenture worked; contacts of Accenture, and those on whose behalf or in concert with which Accenture worked, in this forum; citizenship of Accenture; Accenture's (and their counsel's) knowledge of the existence of Ameritas' claims; any life expectancy reports conducted regarding the Insured under the Policy; any mortality profiles regarding the Insured; and/or any communications or business with the individuals or entities identified in these Initial Disclosures.

     **6.**     **Anthony Socci**
          6515 Main Street
          Trumbull, CT 06611

Subject Matter: The creation of the Policy; the source of funds used to pay premiums on the Policy; the application for the Policy; the intended purpose of the Policy; any transfer or transfers of the ownership or the beneficial interest in the Trust and/or the Policy; any purported sale of the Policy on the life settlement market and subsequent transfer of ownership; and the nature of any third party's role in establishing the Trust and/or in connection with the application

for procurement of, financing of, and transfer of, the Policy; and/or Mr. Socci's interactions with and relationship to, among others, the individuals and entities identified in these Initial Disclosures, the pleadings or in WSFS's Initial Disclosures.

    7.    **Omega Financial Group, LLC**
          6515 Main Street
          Trumbull, CT 06611

Subject Matter: The creation of the Policy; the source of funds used to pay premiums on the Policy; the application for the Policy; the intended purpose of the Policy; any transfer or transfers of the ownership or the beneficial interest in the Trust and/or the Policy; any purported sale of the Policy on the life settlement market and subsequent transfer of ownership; and the nature of any third party's role in establishing the Trust and/or in connection with the application for procurement of, financing of, and transfer of, the Policy; and/or Omega Financial Group, LLC's interactions with and relationship to, among others, the individuals and entities identified in these Initial Disclosures, the pleadings or in WSFS's Initial Disclosures.

    8.    **Davida Trick**

Subject Matter: The financial status of Marvin Flaks; Marvin Flaks' estate planning needs; trusts benefiting the family or next of kin of Marvin Flaks; communications or business with the individuals or entities identified in these Initial Disclosures; the solicitation, procurement, and delivery of the Policy; and the source of funding for premiums paid on the Policy.

    9.    **Barry Turkanis**
          16834 River Birch Circle
          Delray Beach, FL 33445

Subject Matter: The origination of the Policy, including the Policy's purpose, the source of funding to pay premium, the structure of the trust used to hold the Policy, and any beneficial interest transactions relating thereto. The Ocean Gate program's general practices and procedures

for acquiring policies.

### 10.   **BroadRiver Asset Management, L.P.**
c/o Orrick, Herrington & Sutcliffe LLP

Subject Matter: The business of BroadRiver; the ownership interests in BroadRiver; the application for the Policy; the solicitation, procurement, and delivery of the Policy; the source of funding for the premiums paid on the Policy; BroadRiver's interest in the Policy; BroadRiver's decision to purchase the Policy; BroadRiver's investigation into whether the Policy had insurable interest at inception; the extent to which BroadRiver knew, suspected, believed, or was told that the Policy might have lacked insurable interest at inception; whether BroadRiver was excusably ignorant of the Policy's invalidity; whether BroadRiver was less at fault than Ameritas; whether the failure to award restitution to BroadRiver would result in a disproportionate forfeiture; whether BroadRiver engaged in misconduct by purchasing a STOLI policy; whether BroadRiver engaged in misconduct by requesting the death benefit on a STOLI policy; whether BroadRiver conducted an investigation into whether the Policy had insurable interest at inception, what that investigation consisted of, what that investigation found, and how that investigation was used in deciding to buy the Policy; whether BroadRiver saw insurable interest "red flags" surrounding the Policy or the Ocean Gate program more generally, whether BroadRiver ignored these red flags, how BroadRiver evaluated these red flags, and how BroadRiver decided to buy the Policy and the portfolio of policies (which included the Policy) known as Project MJ (the "Portfolio") notwithstanding the presence of red flags;  BroadRiver's decision to purchase the Portfolio; BroadRiver's assessment of insurable interest risk to the Portfolio or to the Ocean Gate program more generally; BroadRiver's knowledge of Delaware's insurable interest case law; BroadRiver's knowledge of the insurable interest risk associated with "Beneficial Interest" or "BI" programs; BroadRiver's decision to change its philosophy from never buying STOLI policies, to knowingly (or recklessly)

buying them; BroadRiver's purported reliance on routine policy correspondence from Ameritas in assessing whether the Policy had insurable interest as a matter of law; BroadRiver's purported reliance on opinion letters regarding the Ocean Gate program; any business or communications with, among others, Mr. Flaks, the individuals and entities identified in these Initial Disclosures, and any other individuals or entities identified in the pleadings or in WSFS's Initial Disclosures.

   **11.** **Andrew Plevin**
     c/o Orrick, Herrington & Sutcliffe LLP

Subject Matter: The business of BroadRiver; the ownership interests in BroadRiver; the application for the Policy; the solicitation, procurement, and delivery of the Policy; the source of funding for the premiums paid on the Policy; BroadRiver's interest in the Policy; BroadRiver's decision to purchase the Policy; BroadRiver's investigation into whether the Policy had insurable interest at inception; the extent to which BroadRiver knew, suspected, believed, or was told that the Policy might have lacked insurable interest at inception; whether BroadRiver was excusably ignorant of the Policy's invalidity; whether BroadRiver was less at fault than Ameritas; whether the failure to award restitution to BroadRiver would result in a disproportionate forfeiture; whether BroadRiver engaged in misconduct by purchasing a STOLI policy; whether BroadRiver engaged in misconduct by requesting the death benefit on a STOLI policy; whether BroadRiver conducted an investigation into whether the Policy had insurable interest at inception, what that investigation consisted of, what that investigation found, and how that investigation was used in deciding to buy the Policy; whether BroadRiver saw insurable interest "red flags" surrounding the Policy or the Ocean Gate program more generally, whether BroadRiver ignored these red flags, how BroadRiver evaluated these red flags, and how BroadRiver decided to buy the Policy and the portfolio of policies (which included the Policy) known as Project MJ (the "Portfolio") notwithstanding the presence of red flags; BroadRiver's decision to purchase the Portfolio; BroadRiver's assessment

of insurable interest risk to the Portfolio or to the Ocean Gate program more generally; BroadRiver's knowledge of Delaware's insurable interest case law; BroadRiver's knowledge of the insurable interest risk associated with "Beneficial Interest" or "BI" programs; BroadRiver's decision to change its philosophy from never buying STOLI policies, to knowingly (or recklessly) buying them; BroadRiver's purported reliance on routine policy correspondence from Ameritas in assessing whether the Policy had insurable interest as a matter of law; BroadRiver's purported reliance on opinion letters regarding the Ocean Gate program; any business or communications with, among others, Mr. Flaks, the individuals and entities identified in these Initial Disclosures, and any other individuals or entities identified in the pleadings or in WSFS's Initial Disclosures.

      **12.**    **Phil Siller**
             c/o Orrick, Herrington & Sutcliffe LLP

Subject Matter: The business of BroadRiver; the ownership interests in BroadRiver; the application for the Policy; the solicitation, procurement, and delivery of the Policy; the source of funding for the premiums paid on the Policy; BroadRiver's interest in the Policy; BroadRiver's decision to purchase the Policy; BroadRiver's investigation into whether the Policy had insurable interest at inception; the extent to which BroadRiver knew, suspected, believed, or was told that the Policy might have lacked insurable interest at inception; whether BroadRiver was excusably ignorant of the Policy's invalidity; whether BroadRiver was less at fault than Ameritas; whether the failure to award restitution to BroadRiver would result in a disproportionate forfeiture; whether BroadRiver engaged in misconduct by purchasing a STOLI policy; whether BroadRiver engaged in misconduct by requesting the death benefit on a STOLI policy; whether BroadRiver conducted an investigation into whether the Policy had insurable interest at inception, what that investigation consisted of, what that investigation found, and how that investigation was used in deciding to buy the Policy; whether BroadRiver saw insurable interest "red flags" surrounding the Policy or the

Ocean Gate program more generally, whether BroadRiver ignored these red flags, how BroadRiver evaluated these red flags, and how BroadRiver decided to buy the Policy and the portfolio of policies (which included the Policy) known as Project MJ (the "Portfolio") notwithstanding the presence of red flags;  BroadRiver's decision to purchase the Portfolio; BroadRiver's assessment of insurable interest risk to the Portfolio or to the Ocean Gate program more generally; BroadRiver's knowledge of Delaware's insurable interest case law; BroadRiver's knowledge of the insurable interest risk associated with "Beneficial Interest" or "BI" programs; BroadRiver's decision to change its philosophy from never buying STOLI policies, to knowingly (or recklessly) buying them; BroadRiver's purported reliance on routine policy correspondence from Ameritas in assessing whether the Policy had insurable interest as a matter of law; BroadRiver's purported reliance on opinion letters regarding the Ocean Gate program; any business or communications with, among others, Mr. Flaks, the individuals and entities identified in these Initial Disclosures, and any other individuals or entities identified in the pleadings or in WSFS's Initial Disclosures.

### 13.    Justine Lin

Subject Matter: The business of BroadRiver; the ownership interests in BroadRiver; the application for the Policy; the solicitation, procurement, and delivery of the Policy; the source of funding for the premiums paid on the Policy; BroadRiver's interest in the Policy; BroadRiver's decision to purchase the Policy; BroadRiver's investigation into whether the Policy had insurable interest at inception; the extent to which BroadRiver knew, suspected, believed, or was told that the Policy might have lacked insurable interest at inception; whether BroadRiver was excusably ignorant of the Policy's invalidity; whether BroadRiver was less at fault than Ameritas; whether the failure to award restitution to BroadRiver would result in a disproportionate forfeiture; whether BroadRiver engaged in misconduct by purchasing a STOLI policy; whether BroadRiver engaged in misconduct by requesting the death benefit on a STOLI policy; whether BroadRiver conducted

9

an investigation into whether the Policy had insurable interest at inception, what that investigation consisted of, what that investigation found, and how that investigation was used in deciding to buy the Policy; whether BroadRiver saw insurable interest "red flags" surrounding the Policy or the Ocean Gate program more generally, whether BroadRiver ignored these red flags, how BroadRiver evaluated these red flags, and how BroadRiver decided to buy the Policy and the portfolio of policies (which included the Policy) known as Project MJ (the "Portfolio") notwithstanding the presence of red flags;  BroadRiver's decision to purchase the Portfolio; BroadRiver's assessment of insurable interest risk to the Portfolio or to the Ocean Gate program more generally; BroadRiver's knowledge of Delaware's insurable interest case law; BroadRiver's knowledge of the insurable interest risk associated with "Beneficial Interest" or "BI" programs; BroadRiver's decision to change its philosophy from never buying STOLI policies, to knowingly (or recklessly) buying them; BroadRiver's purported reliance on routine policy correspondence from Ameritas in assessing whether the Policy had insurable interest as a matter of law; BroadRiver's purported reliance on opinion letters regarding the Ocean Gate program; any business or communications with, among others, Mr. Flaks, the individuals and entities identified in these Initial Disclosures, and any other individuals or entities identified in the pleadings or in WSFS's Initial Disclosures.

   **14.** **Phil Hall**
     511 S. Mangum Street, Apt. 1121
     Durham, NC 27701
     Or c/o Orrick, Herrington & Sutcliffe LLP

   Subject Matter: The business of Highland Capital Management; the application for the Policy; the solicitation, procurement, and delivery of the Policy; any insurable interest analysis or diligence conducted by Highland Capital Management on the Policy or the Portfolio containing the Policy; any insurable interest analysis or diligence conducted by Highland Capital Management on the Policy or the Portfolio containing the Policy; Highland Capital Management's

10

knowledge of the Ocean Gate program; Highland Capital Management's knowledge of the Policy's insurable interest problems; whether Highland Capital Management was excusably ignorant of the Policy's invalidity; whether Highland Capital Management was less at fault than Ameritas; whether a failure to award restitution would cause a disproportionate forfeiture; whether Highland Capital Management engaged in misconduct; the source of funding for the premiums paid on the Policy; and any business or communications with, among others, Mr. Flaks, the individuals and entities identified in these Initial Disclosures, and any other individuals or entities identified in the pleadings or in WSFS's Initial Disclosures.

15. **Jolene Fullerton**
4152 Iron Works Pike
Lexington, KY 40511

Subject Matter: The business of BroadRiver; the ownership interests in BroadRiver; the application for the Policy; the solicitation, procurement, and delivery of the Policy; the source of funding for the premiums paid on the Policy; BroadRiver's interest in the Policy; BroadRiver's decision to purchase the Policy; BroadRiver's investigation into whether the Policy had insurable interest at inception; the extent to which BroadRiver knew, suspected, believed, or was told that the Policy might have lacked insurable interest at inception; whether BroadRiver was excusably ignorant of the Policy's invalidity; whether BroadRiver was less at fault than Ameritas; whether the failure to award restitution to BroadRiver would result in a disproportionate forfeiture; whether BroadRiver engaged in misconduct by purchasing a STOLI policy; whether BroadRiver engaged in misconduct by requesting the death benefit on a STOLI policy; whether BroadRiver conducted an investigation into whether the Policy had insurable interest at inception, what that investigation consisted of, what that investigation found, and how that investigation was used in deciding to buy the Policy; whether BroadRiver saw insurable interest "red flags" surrounding the Policy or the

Ocean Gate program more generally, whether BroadRiver ignored these red flags, how BroadRiver evaluated these red flags, and how BroadRiver decided to buy the Policy and the portfolio of policies (which included the Policy) known as Project MJ (the "Portfolio") notwithstanding the presence of red flags;  BroadRiver's decision to purchase the Portfolio; BroadRiver's assessment of insurable interest risk to the Portfolio or to the Ocean Gate program more generally; BroadRiver's knowledge of Delaware's insurable interest case law; BroadRiver's knowledge of the insurable interest risk associated with "Beneficial Interest" or "BI" programs; BroadRiver's decision to change its philosophy from never buying STOLI policies, to knowingly (or recklessly) buying them; BroadRiver's purported reliance on routine policy correspondence from Ameritas in assessing whether the Policy had insurable interest as a matter of law; BroadRiver's purported reliance on opinion letters regarding the Ocean Gate program; any business or communications with, among others, Mr. Flaks, the individuals and entities identified in these Initial Disclosures, and any other individuals or entities identified in the pleadings or in WSFS's Initial Disclosures.

### 16.  Scott Corbett, Vice President and Chief Underwriter at Ameritas
c/o Cozen O'Connor

Scott Corbett is a Senior Vice President, Chief Actuary and Underwriting, Individual at Ameritas. Subject Matter: Ameritas's corporate policy against issuing policies intended to benefit stranger-investors; Ameritas's corporate policy against issuing policies that are funded by non-recourse premium financing; and Ameritas's policies and procedures regarding underwriting.

### 17.  Rhonda Loosle, Manager, Claims Services - Life
c/o Cozen O'Connor

Rhonda Loosle is Manager of Claims Services – Life at Ameritas. Subject Matter: Ameritas' corporate policy against life insurance policies intended to benefit stranger-investors; and Ameritas' receipt, review, and investigation of the claim for death benefits under the Policy.

**18. Scott Farmen (Vice President – Compliance, Ameritas)**
c/o Cozen O'Connor

Scott Farmen is the Chief Compliance Officer at Ameritas. Subject Matter: Ameritas' corporate policy against life insurance policies intended to benefit stranger-investors; Ameritas' corporate policy against life insurance policies that are funded by non-recourse premium financing; and Ameritas' administration of life insurance policies.

**19. David Voelker, Senior Vice President, Individual Operations**
c/o Cozen O'Connor

David Voelker is Senior Vice President, Individual Operations at Ameritas. Subject Matter: Ameritas's servicing of the Policy and Ameritas's policies and procedures regarding servicing of policies.

**20. Scott Foreman, Senior Life Claims Examiner**
c/o Cozen O'Connor

Scott Foreman is Senior Life Claims Examiner at Ameritas. Subject Matter: Ameritas's receipt, handling, and investigation of the claim on the Policy.

**21. Kelly Halverson (Senior Vice President – Individual Chief Actuary and Underwriting, Ameritas)**
c/o Cozen O'Connor

Kelly Halverson is a Senior Vice President – Individual Chief Actuary and Underwriting at Ameritas. Subject Matter: Ameritas' underwriting of life insurance policies; Ameritas' corporate policy against life insurance policies intended to benefit stranger-investors; and Ameritas' corporate policy against life insurance policies that are funded by non-recourse premium financing.

**II. Rule 26(a)(1)(A)(ii) Documents**

Ameritas may use the following categories of documents to support its claims or defenses:

1. The Policy;

2. Documents relating to the Trust;

3.      Documents relating to the payment of premiums on the Policy;

4.      The Policy's delivery receipt(s);

5.      Documents relating to the death benefit claim submitted for the Policy;

6.      Ameritas' Policy file;

7.      Documents concerning Ameritas' position with regard to issuing life insurance policies lacking insurable interest, life insurance policies procured for the benefit of investors, and life insurance policies funded by non-recourse premium financing;

8.      Documents relating to what BroadRiver (as well as the Policy's prior owners) knew or should have known about the Policy's origination, funding, and insurable interest problems.

9.      Documents relating to the Ocean Gate program, both generally and specifically with regard to the Policy.

10.     Documents relating to BroadRiver's knowledge (or the knowledge of its advisors, managers, or attorneys) regarding the Ocean Gate program in general, and the Policy in particular.

11.     Documents identified by WSFS in its Initial Disclosures or otherwise produced by WSFS in this litigation;

12.     Documents in the possession of other persons or entities, including, but not limited to, communications and transactional documents relating to the solicitation, purpose, application, delivery, placement, ownership, financing, and transfer(s) of the Policy;

14

13.   Documents in the possession, custody, or control of non-parties or Defendant's securities entitlement holder in connection with the Policy relating to the Policy or any trusts in the name of the Insured, including, among other things, their acquisition and ownership of the Policy; any risk disclosures provided in connection with their acquisition of the Policy, either individually or as part of a portfolio that contained the Policy; any payment of premium for the Policy by one or more of them; any request made, directly or indirectly, for a copy of the Insured's death certificate; the submission of a claim for the Policy death benefit(s) by Defendant or its securities entitlement holder(s)/undisclosed principal(s), either directly or indirectly; and

14.   Additional relevant documents to be identified during the course of discovery, including as may be relevant to any counterclaims or defenses that may ultimately be asserted by Defendant in this action.

**III.    <u>Rule 26(a)(1)(A)(iii) Damages</u>**

Ameritas is seeking a declaration regarding the validity of the Policy, a form of relief which is not capable of "computation" under Rule (a)(1)(iii), as well as attorneys' fees and costs associated with bringing this lawsuit, as determined by the Court.  Ameritas will amend these disclosures should Ameritas amend its complaint to include a claim for damages.

**IV.    <u>Rule 26(a)(1)(A)(iv) Insurance Agreements</u>**

Not applicable.

Dated: August 26, 2024

**COZEN O'CONNOR P.C.**

*/s/ Kaan Ekiner*
Kaan Ekiner (No. 5607)
1201 North Market St., Ste. 1001
Wilmington, DE 19801
302-295-2046
kekiner@cozen.com

Joseph M. Kelleher (admitted *pro hac vice*)
Kara E. Cheever (admitted *pro hac vice*)
Victoria G. Mazzola (admitted *pro hac vice*)
Ilya Schwartzburg (admitted *pro hac vice*)
1650 Market St., Ste. 2800
Philadelphia, PA 19103

*Attorneys for Plaintiff/Counterclaim Defendant*
*Ameritas Life Insurance Corp.*